NICOLA T. HANNA
United States Attorney
CHRISTOPHER D. GRIGG
Assistant United States Attorney
Chief, National Security Division
REEMA M. EL-AMAMY (Cal. Bar No. 237743)
DAVID T. RYAN (Cal Bar No. 295785)
Assistant United States Attorneys
Terrorism and Export Crimes Section
      1500 United States Courthouse
      312 North Spring Street
      Los Angeles, California 90012
      Telephone:  (213) 894-0552/4491
      Facsimile:  (213) 894-2979
      E-mail:     reema.el-amamy@usdoj.gov
                  david.ryan@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 19-313-SVW |
| Plaintiff, | |
| v. | GOVERNMENT'S MOTION *IN LIMINE* TO PRECLUDE AN ENTRAPMENT DEFENSE |
| MARK STEVEN DOMINGO, | |
| Defendant. | |

    Plaintiff United States of America, by and through its counsel
of record, the United States Attorney for the Central District of
California and Assistant United States Attorneys Reema M. El-Amamy
and David T. Ryan, hereby files its Motion in limine to Preclude An
Entrampment Defense (the "Motion").

//

//

//

1    This Motion is based on the attached memorandum of points and

2  authorities, the files and records in this case, and any further

3  evidence or argument the Court may allow.

4  Dated: June 1, 2020                Respectfully submitted,

5                                     NICOLA T. HANNA
                                      United States Attorney
6
7                                     CHRISTOPHER D. GRIGG
                                      Assistant United States Attorney
                                      Chief, National Security Division
8

9                                          /s/
                                      _____
10                                    REEMA M. EL-AMAMY
                                      DAVID T. RYAN
11                                    Assistant United States Attorney

12                                    Attorneys for Plaintiff
                                      UNITED STATES OF AMERICA

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.......................................................i

MEMORANDUM OF POINTS AND AUTHORITIES...............................1

I.    INTRODUCTION.......................................................1

II.   STATEMENT OF FACTS.................................................2

    A.    February 2017-March 2019: Defendant Expresses Support
        for ISIS and Desire to Commit Attacks in the United
        States.........................................................2

    B.    March-April 2019: Defendant Writes to Associates and
        the OCE About His Desire to Engage in Violent Jihad.......4

    C.    March-April 2019: Defendant Meets With the CHS to Plan
        Terrorist Attacks and Attempts to Recruit an Associate....7

    D.    April 22-26, 2019: Defendant Works with the UCE and
        CHS to Build IEDs to Use in Terrorist Attack.............11

III.  DEFENDANT MUST PROFFER FACTS ESTABLISHING A PRIMA FACIE
    SHOWING OF ENTRAPMENT IN ORDER TO PRESENT AN ENTRAPMENT
    DEFENSE AT TRIAL.................................................13

IV.   DEFENDANT CANNOT ESTABLISH A PRIMA FACIE CASE THAT HE WAS
    INDUCED TO COMMIT THE CHARGED CRIMES.........................15

V.    DEFENDANT CANNOT ESTABLISH A PRIMA FACIE CASE THAT HE WAS
    NOT PREDISPOSED TO COMMIT THE CHARGED CRIMES.................18

VI.   IF DEFENDANT IS PERMITTED TO PRESENT AN ENTRAPMENT DEFENSE,
    THE GOVERNMENT SHOULD BE PERMITTED TO REBUT THE DEFENSE
    WITH EVIDENCE OF DEFENDANT'S PREDISPOSITION...................20

VII.  CONCLUSION.......................................................21

# TABLE OF AUTHORITIES

**CASES**

United States v. Al Kassar,

  660 F.3d 108 (2d Cir. 2011) ...................................... 21

United States v. Arellano-Rivera,

  244 F.3d 1119 (9th Cir. 2001) ................................... 13

United States v. Bailey,

  444 U.S. 394 (1980) ............................................ 14

United States v. Busby,

  780 F.2d 804 (9th Cir. 1986) ................................... 18

United States v. Cutler,

  806 F.2d 933 (9th Cir. 1986) ................................... 21

United States v. Davis,

  36 F.3d 1424 (9th Cir. 1994) ................................... 18

United States v. Dorrell,

  758 F.2d 427 (9th Cir. 1985) ................................... 14

United States v. Gurolla,

  333 F.3d 944 (9th Cir. 2003) ................................... 13

United States v. Moreno,

  102 F.3d 994 (9th Cir. 1996) ................................... 14

United States v. Poehlman,

  217 F.3d 692 (9th Cir. 2000) ................................... 15

United States v. Reynoso-Ulloa,

  548 F.2d 1329 (9th Cir. 1977) ............................... 15, 18

United States v. Simas,

  937 F.2d 459 (9th Cir. 1991) ............................... 15, 18

United States v. Smith,

  924 F.2d 889 (9th Cir. 1991) ................................... 18

i

<u>United States v. Sotelo-Murillo</u>,

  887 F.2d 176 (9th Cir. 1989)......................................14

<u>United States v. Thickstun</u>,

  110 F.3d 1394, (9th Cir. 1997)...................................21

<u>United States v. Wolf</u>,

  691 Fed. Appx. 438 (9th Cir. May 24, 2017)......................21

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

**I.    INTRODUCTION**

3
4
5
6
7
8
9
10
11

In March and April 2019, after writing for more than a year about his support for the Islamic State of Iraq and al-Sham ("ISIS"), his hatred of the United States, and his desire to carry out mass-casualty attacks in the United States, defendant Mark Steven Domingo ("defendant") planned and took steps to manufacture and use a weapon of mass destruction to commit mass murder.  Defendant attempted to commit this terrorist attack with two people whom he believed were collaborators, but who were in fact a confidential human source ("CHS") and undercover officer ("UCE") working for the FBI.

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

Defendant has provided notice that he intends to present an entrapment defense at trial.  To present this affirmative defense to the jury, it is defendant's burden prior to trial to make an offer of proof that is sufficient as a matter of law to support the defense. He cannot do so here.  Defendant's extensive writings for nearly two years before this investigation began regarding his support for ISIS, his hatred of the United States, and his desire to commit mass-casualty attacks in the United States, demonstrate his predisposition to commit the charged crimes.  Furthermore, defendant's recorded communications with the CHS and UCE in this case demonstrate the lack of inducement.  Defendant led the planning for the attack from start to finish.  He selected the rally as the target.  He bought materials for the bombs.  He told the UCE to build the bombs.  He dictated each person's role in carrying out the attack.  And he led a final surveillance mission to decide where to place the bombs to kill the most people.  In light of this evidence of predisposition and lack of

28

inducement, defendant cannot make a sufficient offer of proof to warrant presentation of an entrapment defense at trial.

To the extent defendant is permitted to present an entrapment defense, the government should be permitted to rebut that defense by presenting evidence of defendant's predisposition to commit the charged crimes, including his statements regarding his support for ISIS, his support for violent Jihad, and his desire to commit mass-casualty attacks in the United States.

## II. STATEMENT OF FACTS

### A. May 2017-March 2019: Defendant Expresses Support for ISIS and Desire to Commit Attacks in the United States

As early as May 2017 – nearly two years before he ever met the CHS or UCE – defendant began posting ISIS propaganda online, expressing his desire to commit violent Jihad in the United States, and seeking collaborators to join him.

For example, between May 2017 and March 2019, defendant exchanged numerous private Facebook messages with an associate, J.B., regarding his support for ISIS, hatred of Jews, and desire to commit mass-casualty attacks.  On May 22, 2017, J.B. sent defendant a private message with the text, "It was the kikes[1] all along . . . Straight to the oven."  Defendant replied, "to be fair, they must be given the chance to convert to islam lol.  Now if they refuse ALLAH HU AKBAR!!!!!!"  On June 4, 2017, J.B. sent defendant an article about French forces destroying an ISIS fighter attempting to detonate a car bomb, and defendant replied, "sucks that man didn't reach his target . . . I watch isis videos . . . they do these interviews with those drivers  . . . like last words n shit."  Defendant then sent

---

[1] "Kikes" is a derogatory term for Jews.

J.B. two ISIS propaganda videos, and said that the "second one has beheadings . . . they cut em off fast as fuq." The next day, defendant followed up with J.B., "u watch anymore isis propaganda?" J.B. said no, shared a video of ISIS fighters in the Philippines, and wrote that ISIS was "having fun in the Philippines it looks like." Defendant replied, "having all the fun without me :/"

On June 16, 2017, defendant wrote to J.B., "why haven't you burned down a church yet?" J.B. replied, "Risk:Reward ratio . . . not worth it." Defendant replied, "pussy lol." J.B. replied, "Burning 1 church wouldn't do jack shit in theory . . . They will just go to the next church down the street. If you want to traumatize their beliefs you might have to burn down a few dozen local churches. Sounds like a lot of work and very little reward." Defendant replied, "sounds like a job for allahs mujahedeen."[2]

On March 21, 2019, defendant sent J.B. a picture of ISIS fighters charging forward on a battlefield, and the word, "baqqiyah," which is an Arabic term for "everlasting" or "it shall remain," and which is commonly used by ISIS supporters to project strength despite the group's territorial losses. Defendant wrote that he hoped St. Peter's basilica "will go thru the same thing." J.B. responded, "Most likely, but I don't really care for all that. Let's just get rid of all the kikes for now." Defendant replied, "agreed. We'll start off venture blvd."[3] J.B. replied, "Lawl more like Beverly. Jews everywhere there."

---

[2] "Allah" is Arabic for God, and "mujahedeen" is Arabic for those engaged in Jihad.

[3] "Venture blvd" appears to be a misspelled reference to Ventura Boulevard, a major thoroughfare in the San Fernando Valley where defendant lived, north of Los Angeles.

3

Beginning in at least January 2019, defendant also participated in several invite-only online chatrooms along with other supporters of violent Jihadi groups and expressed his support for ISIS and his desire to commit violent attacks.  For example, on January 3, 2019, defendant wrote in one chatroom about recent violence in the city of Idlib, Syria and ISIS's loss of territory, and stated, "I just want dawla[4] back . . . I want to see that map black again.  I still remember when the caliphate was stron[g]."  On March 3, 2019, defendant wrote about conducting a mass attack similar to the October 1, 2017 shooting in Las Vegas, Nevada which killed 59 people, stating, "America needs another vegas event [. . .] something to kick off civil unrest [. . .] and its not about winning the civil war its about weakening America giving them a taste of the terror they gladly spread all over the world."  On March 7, 2019, defendant wrote in an online chatroom that he was looking forward to the collapse of the United States, which would provide "a chance for a conquest . . . to spread the deen."[5]  On March 14, 2019, after a shooting at two Mosques in Christchurch New Zealand, defendant wrote, "there were mosque shootings in new Zealand . . . there must[]be retribution."

**B.   March-April 2019: Defendant Writes to Associates and the OCE About His Desire to Engage in Violent Jihad**

On March 15, 2019, the OCE saw and captured defendant's posts in the invite-only chatroom about the shootings in New Zealand, and initiated a direct conversation with defendant on the same online

---

[4] "Dawla Islamiyyah" is Arabic for "Islamic State" and the word "Dawla" standing alone is often used as shorthand to refer to the Islamic State, or ISIS.

[5] The "deen" is an Arabic word referring to one's faith or religion.

platform.  Defendant wrote to the OCE that he was "enraged" and "these fuckers do need to bleed [. . .] one way or another."  The OCE cautioned that police would be ready the next day, and a response would require planning.  In discussing with the OCE how many people defendant would like to kill, defendant wrote, "Was thinking more like a group theres a bunch of jews around this one street not a lot of parking so theyre forced to find parking and walk to the synagogue."  Defendant wrote that the synagogue had surveillance cameras, but he did not care about "getting caught" because "some things are worth more."

Over the next month, as defendant planned his terrorist attack, the OCE captured more messages that defendant sent to the OCE and posted in online chatrooms in which defendant shared ISIS propaganda videos and photographs, and wrote about his desire to kill Americans, to take over America and impose Islamic law, and to die a martyr.  For example, on March 20, 2019, defendant told the OCE that Muslims were taking over the United Kingdom "block by block" and "if our bros had weapons the [United Kingdom] [would] be done."  The OCE asked, "do you think we can do that here?"  Defendant replied, "yep.  US mil[itary] is overrated . . . we'll have to start out in an urban setting . . . turn this place like damascus."  On March 21, 2019, defendant exchanged messages with a Jihadi fighter in the Philippines regarding the fighting in that country.  Defendant suggested assassinating a government official in the Philippines, writing, "catch him in transit on the road . . . take out the lead and rear columns then move in for the slaughter."  Defendant wrote, "do you take part in the raids urself?  Sounds fun."  The fighter shared

pictures of his guns and bragged about killing "kuffar."[6]  Defendant
replied, "your an inspiration . . . I have to follow ur example."

On March 22, 2019, defendant sent the OCE an ISIS propaganda
video and wrote, "Im jus[t] impatient for the slaughter I guess."
The next day, defendant wrote to the OCE that instead of conducting a
large-scale attack, he might first murder one person, explaining that
"murders around here go unsolved all the time . . . a brutal murder
will be enough if its [d]one harshly enough . . . we'll see."

On April 11, 2019, a member of the invite-only online chatroom
wrote that ISIS had "launched a massive global military campaign" and
is "set to win long term if its enemies continue to proceed with no
coherent strategy."  Defendant wrote that he wanted to "just be a
martyr already," and that he was "impatient now for war."  Defendant
wrote that there was "tension in the air in usa . . . the country is
on the verge of mass riots."

The next day, defendant wrote to the OCE, "I want to slaughter
kaffirs."  Defendant said that in an ISIS propaganda video he had
recently sent the OCE, he liked "how much training they did before
trying to kill," but "I kinda wanna jus quit and kill."  The OCE
wrote, "what about ur grandma? And ur cat?"  Defendant replied, "both
are in my lords hands."

On April 21, 2019, defendant posted a celebratory message in an
invite-only chatroom regarding ISIS capturing territory in Syria.  A
participant asked, "how on earth can you support the killing of
civilians???"  Defendant replied, "kaffir blood is kaffir blood."
When others wrote that killing children was improper, defendant

---

[6] "Kuffar," also spelled below as "Kaffir," is an Arabic term
for "infidels," or those who do not believe in Islam.

6

1  wrote, "those male children will grow to be enemies."  A participant

2  asked, "how are you achieving anything by killing civilians," and

3  defendant replied, "settling the debt of Christchurch."

4      **C.    March-April 2019: Defendant Meets With the CHS to Plan**

                **Terrorist Attacks and Attempts to Recruit an Associate**

5

6      On March 16, 2019, after defendant posted in the online chatroom

7  about his desire to seek retribution for the shootings in

8  Christchurch, New Zealand, the CHS, who also had an account in the

9  chatroom, sent defendant a message to ask how he was feeling.

10  Defendant responded that he was "still mad [. . .] even more so [. .

11  .] since I watched the vid," referring to the video of the New

12  Zealand shooting.  Over the next month, defendant met with the CHS

13  several times and made plans to conduct a string of terror attacks.

14      Before their first meeting, defendant wrote to another associate

15  online, R.Y., and said R.Y. should join the meeting, but R.Y. replied

16  that he was not in Los Angeles.  Defendant asked R.Y., regarding the

17  invite-only chatroom, "do u suspect anyone here in the server to be

18  fed?  Or r u confident we're all true in our belief[?]"  R.Y. assured

19  defendant that "everyone in it is invited by the trusted [people]

20  also we purge inactives from time to time."

21      On March 18, 2019, defendant met the CHS and discussed the

22  tactics used by ISIS and al-Qa'ida to conduct attacks.  The CHS said

23  al-Qa'ida was "not doing anything," and defendant replied, "Well,

24  they'll, they'll plant IEDs."[7]  Defendant said he preferred ISIS to

25  al-Qa'ida because ISIS's leader Abu Bakr al-Baghdadi "took the direct

26  stance [. . .] victory or martyrdom."  Defendant pointed out possible

27

28       [7] "IEDs" is a commonly used abbreviation for "Improved Explosive Devices."

7

targets for attacks, including police cars, churches, a National Guard Armory, and a street where defendant said Jews congregated on Saturdays. The CHS said if defendant acted without planning, he would get caught, and defendant replied "Martyrdom, bro." The CHS said, "It's better not to get caught." Defendant replied, "Better not to be taken alive. But [. . .] I have many magazines." Defendant said he had nine "AK magazines," five of which were loaded, and described his guns. Later, the CHS said he knew someone who "used to make IEDs," and defendant replied, "That's even better."

On March 19, 2019, defendant wrote to R.Y. online, "I kinda want to get some other muslims here to get together w[ith] me [and] [the CHS] but I kinda fel iffy cuz snitches."

On March 22, 2019, defendant met again with the CHS to discuss plans for an attack. Defendant told the CHS how he had modified one of his AK-47 assault style rifles to be fired more easily from inside a car during a drive-by shooting. The CHS said that defendant had just converted to Islam and was "so pure," and said, "you don't need to, like you don't have to do this. You know that, right?" Defendant responded by pointing to a police car and saying that police cars have bulletproof windows but sometimes roll them down.

On April 3, 2019, defendant met again with the CHS. Defendant said that placing an IED on a freeway "would do damage. [. . .] An IED, like the ones in Iraq [. . .] blows up on the freeway, hundreds and maybe thousands of US citizens injured." The CHS asked, "And then what?" Defendant replied, "Then the fun starts." Defendant said, "a dead police that will get, like, that will get like the police riled up. But I need you bro, just the one IED that's going to stir up the hornet's nest, bro." Defendant said his plan was to

1  "go in fast" and "kill enemies here and there, then we flee."

2  Defendant said if they caused "small casualties here and there," that

3  would "put the stress" on America and lead to martial law.  Defendant

4  said that although the hit-and-run strategy was more like al-Qa'ida

5  and less like ISIS, they lacked the manpower to succeed in an ISIS-

6  style sustained battle.  Defendant expressed his support for ISIS and

7  said if ISIS "came here," he would swear allegiance to ISIS.

8      Later in that meeting, the CHS said police in Europe had caught

9  a Turkish man who killed three people in the Netherlands.  Defendant

10  said the Netherlands is small and crowded, and "he probably didn't

11  plan it right."  The CHS said, "you have to be patient."  Defendant

12  replied, "Oh I know but you know, I want to do it."  The CHS replied

13  "Show me how you want to do, show me."  Defendant drew a diagram and

14  explained how he could attack police officers.  Defendant then said

15  they were talking about committing serious crimes, and "you can't

16  expect to do these kind of things and remain anonymous forever [. .

17  .]  At some point, they're gonna know and you gotta be a man and you

18  gotta stand your ground."  The CHS said they could get caught, and

19  defendant replied, "then we're gonna die shahid."[8]

20      On April 5, 2019, defendant wrote to R.Y. and proposed that R.Y.

21  could "try to meet me in usa?  Or perhaps near the border . . . it

22  cud be possible to bring [the CHS] and maybe even [the OCE] with me

23  since were all in Southern California."  R.Y. raised suspicions that

24  the OCE was an informant, and defendant wrote that he would "try to

25  meet up with [the OCE] one day just for clarification."  Defendant

26  then wrote to R.Y. that he was "still mad" about the Christchurch

27

28

      [8] "Shahid" is an Arabic term for "martyr."

shooting, but that the CHS "advises to be patient for now."
Defendant continued, "I agree to a point, we really shud wait til we
have more brothers here.  I hate being patient [to be honest]."

On April 12, 2019, defendant wrote to R.Y. that he had been
fighting with his aunt because she did not like Islam, and "its
getting to the point I want her blood."  R.Y. wrote, "if u decide to
rush towards the afterlife let me join u."  Defendant replied, "lol u
n [the CHS].  Yea but he advised [restraint].  Im the one ready u
know."

On April 19, 2019, defendant met the CHS again.  Defendant
arrived wearing camouflage pants and holding a backpack containing an
AK-47 style rifle partially covered by what appeared to be a shirt.
When the CHS expressed surprise that he had brought the rifle,
defendant replied "if we're going to commence fighting, jihad, yeah,
. . . you gotta remain."  Defendant later said he brought the gun
because "I just wanted to show you that I'm serious."

During their meeting, the CHS asked if defendant wanted the CHS
to reach out to an associate who could make IEDs.  Defendant said
yes, and directed the CHS to have the associate write down
instructions so defendant could buy the ingredients "little by
little" from different home improvement stores "so it's not
suspicious."  Defendant then brought up an upcoming rally on April
28, 2019 in Long Beach organized by a "white nationalist" group.
Defendant said if they could get an IED in time, "we can detonate it
in a crowd.  Which would be perfect. . . .  Even a small IED would do
damage in a crowd. . . .  The human body is very easy to break . . . a
big IED just in a backpack, in a crowd?  You're looking at least 20
people dead, maybe, maybe 30 people injured."  The CHS asked, "are

1  you sure you want to do this, I am serious are you serious?"

2  Defendant replied, "I am serious, I want to do the IED route."

3      **D.   April 22-26, 2019: Defendant Works with the UCE and CHS to Build IEDs to Use in Terrorist Attack**

4

5      On April 22, 2019, the CHS wrote to defendant that the associate

6  was willing to help them build an IED the next day if they bought the

7  materials that night.  Defendant agreed to buy Christmas lights and

8  nails to use as shrapnel inside the IED.  Defendant then went to home

9  improvement stores and bought several hundred three-and-a-half inch

10  and longer nails.

11      On April 23, 2019, defendant met with the CHS and showed the CHS

12  the nails he had purchased for the IED.  Defendant said he chose the

13  specific nails because they were long enough to penetrate the human

14  body and puncture internal organs.  The CHS told defendant that they

15  "don't have to do this."  Defendant said that the event in Long Beach

16  may be cancelled, and proposed attacking a different "White

17  Nationalist" rally in Huntington Beach, California, on Saturday,

18  April 27, 2019.  Defendant said the Huntington Beach rally would be

19  on the beach, which may make it more difficult to kill as many people

20  because it was a wide open space.  Defendant said the Santa Monica

21  Pier would provide a better space for an attack, particularly during

22  the summer when it was crowded, because it was a more enclosed space

23  and people would not be able to escape from a blast.  Defendant said

24  that detonating an IED with a timer on the Santa Monica Pier would

25  cause a lot of casualties.

26      Shortly thereafter, the UCE arrived, and defendant showed the

27  UCE the nails he had bought for the bombs and told the UCE he would

28  buy more parts if the UCE needed them.  Defendant said they should

consider delaying the attack because he wanted to finish reading the Quran and experience Ramadan, which would be starting on May 5, 2019. The UCE said they should all agree they would not pressure each other.  Defendant told the UCE and CHS that he would let them know in a few days whether they would proceed with the attack in Long Beach, and the UCE should wait to complete the bombs until receiving confirmation from defendant.  Defendant said that when he was ready to proceed, he would send the UCE a message with a photograph which would be the "go ahead" for the attack.

On April 24, 2019, defendant spoke to the CHS online and said he was concerned about rushing the UCE to complete the bombs in time for the Long Beach rally.  The CHS said the CHS was ready to go forward with the attack, and defendant said he knew it was "gonna be big," and "Let's just sleep on it.  If we're still as motivated, we'll give the go-ahead.  I'll give the go-ahead."

On April 25, 2019, defendant sent the UCE the "go ahead" message, and the UCE replied, "Okay I hear and obey."  The UCE said he would have the IEDs ready by the next morning.  The next evening, April 26, 2019, defendant met with the UCE and CHS, inspected what he believed were completed IEDs, practiced operating the remote detonators, and drove to the location for the upcoming rally to identify how they would enter the rally, where they would detonate the IEDs in order to kill the most people, and how they would escape. Defendant said if they survived the attack, they could conduct further attacks against multiple locations.  Defendant then explained the purpose of the attacks, saying "it's designed to cause fear and terror through the capital yeah.  But this is also because, I mean you feel it, the tension in the air, left and right . . . there's a

12

civil war brewing bro.  A divided America. . . .  It's not just for the movement but just for the world in general, bro."  Defendant continued, "All around the world America goes on sticking its fucking cock in everyone's fucking business.  Now, divided America! . . . I'm banking on a lot of the US fleets, the Navy, that are constantly patrolling to have a strike for us anywhere in the world, they will be forced to duck back here, and, you know, martial law, to bring back order.  Because it's common sense right?  Why patrol the world when your own house is on fire?"  Defendant explained that provoking civil war in the United States and causing the US military to impose martial law would "give[] our brothers around the world, the Mujahideen, a little stress off their back. . . .  If we can cause enough civil tension here and bring back the US troops, they all come back here and give our brothers a little more time to fight."

After surveilling the location for the attack, defendant returned with the UCE and CHS to their meeting location.  Defendant then carried one of the IEDs out of the location to put into the UC's vehicle, at which point he was arrested by the FBI.  Later that night, in a recorded, <u>Mirandized</u> interview, defendant told FBI agents that he chose to commit the attack to "bring terror and fear to the infidel" and "stand up" for the global Sunni Muslim community.

## III. DEFENDANT MUST PROFFER FACTS ESTABLISHING A <u>PRIMA FACIE</u> SHOWING OF ENTRAPMENT IN ORDER TO PRESENT AN ENTRAPMENT DEFENSE AT TRIAL

"A district court may require a defendant to submit a pretrial offer of proof on an entrapment defense; if the defendant fails to make a <u>prima facie</u> showing, the district court may preclude him from presenting the defense at trial."  <u>United States v. Gurolla</u>, 333 F.3d 944, 951 n.8 (9th Cir. 2003); <u>see also</u> <u>United States v. Arellano-</u>

1   <u>Rivera</u>, 244 F.3d 1119, 1125 (9th Cir. 2001) ("[I]f the defendant's

2   offer of proof is insufficient as a matter of law to support the

3   proffered defense, then the trial court should exclude the defense

4   and the evidence offered in support."); <u>United States v. Dorrell</u>, 758

5   F.2d 427, 429 (9th Cir. 1985) (explaining that where "the evidence,

6   as described in the defendant's offer of proof, is insufficient as a

7   matter of law to support the proffered defense," the "trial court

8   should exclude the defense and the evidence offered in support").

9       This is because, absent an adequate offer of proof, evidence in

10  support of an affirmative defense is not relevant.  <u>See</u> <u>United States</u>

11  <u>v. Moreno</u>, 102 F.3d 994, 997 (9th Cir. 1996) ("Evidence of duress is

12  not relevant if the defendant fails to present evidence of a prima

13  facie case of the affirmative defense.").  Thus, "[t]he requirement

14  of a threshold showing on the part of those who assert an affirmative

15  defense to a crime is by no means a derogation of the importance of

16  the jury as a judge of credibility.  Nor is it based on any distrust

17  of the jury's ability to separate fact from fiction.  On the

18  contrary, it is a testament to the importance of trial by jury and

19  the need to husband the resources necessary for that process by

20  limiting evidence in a trial to that directed by the elements of the

21  crime or at affirmative defenses." <u>United States v. Bailey</u>, 444 U.S.

22  394, 416 (1980)

23      The affirmative defense of entrapment has two elements: (1) a

24  government agent induced the defendant to commit an illegal act that

25  (2) the defendant was not predisposed to commit.  <u>United States v.</u>

26  <u>Sotelo-Murillo</u>, 887 F.2d 176, 179 (9th Cir. 1989).  Accordingly, to

27  be permitted to present evidence or argument in support of an

28  entrapment defense at trial, defendant must proffer facts prior to

1    trial that establish a prima facie case as to both elements.  As set
2    forth below, defendant cannot do so here.

3    **IV.   DEFENDANT CANNOT ESTABLISH A <u>PRIMA FACIE</u> CASE THAT HE WAS
         INDUCED TO COMMIT THE CHARGED CRIMES**
4

5        Neither the CHS nor the UCE induced defendant to attempt to
6    carry out his planned terrorist attack.  Inducement occurs when
7    government agents engage in "repeated and persistent solicitation or
8    persuasion which overcomes the defendant's reluctance" to commit a
9    crime.  <u>United States v. Simas</u>, 937 F.2d 459, 462 (9th Cir. 1991)
10   (quotation marks omitted).  Inducement does not occur when government
11   agents merely "provide an opportunity" or "make themselves available
12   to participate in a criminal transaction."  <u>United States v.</u>
13   <u>Poehlman</u>, 217 F.3d 692, 701 (9th Cir. 2000).  Thus, "the defense of
14   entrapment, while protecting the innocent from the government
15   creation of a crime, is unavailable to a defendant who, motivated by
16   greed and unconcerned about breaking the law, readily accepts a
17   propitious opportunity to commit an offense."  <u>United States v.</u>
18   <u>Reynoso-Ulloa</u>, 548 F.2d 1329, 1338 (9th Cir. 1977).

19       In this case, the recorded communications between defendant and
20   the CHS and UCE, as well as defendant's statements to other
21   associates, demonstrate that the CHS and UCE did not subject
22   defendant to "repeated and persistent solicitation or persuasion
23   which over[came his] reluctance" to commit the planned attack.
24   <u>Simas</u>, 937 F.2d at 462 (quotation marks omitted).

25       First, far from being reluctant to commit the planned attack,
26   defendant repeatedly spoke about how badly he wanted to do it, and
27   how hard it was for him to wait.  Before he ever met the CHS or UCE,
28   defendant wrote for nearly two years about how inspired he was by

ISIS, how he wanted to burn down churches, kill Jews, and commit a mass shooting in America to "kick off civil unrest."  Indeed, the CHS contacted defendant only after defendant stated his desire to commit a mass-casualty attack in retaliation for the killing of Muslims in Christchurch, New Zealand.  After defendant began meeting with the CHS, he continued to write to others online about how he was "impatient for the slaughter" and wanted to "slaughter kaffirs."  He even attempted to recruit others to join the attack, inviting R.Y. to join him and explaining that he wanted "to get some other Muslims here to get together" with him and the CHS but was nervous about "snitches."  Defendant also continued to justify killing civilians, explaining in an online chatroom five days before his arrest that "kaffir blood is kaffir blood," young boys "will grow to be enemies," and killing civilians was "settling the debt of Christchurch."  Defendant was not reluctant in any way to carry out the attempted attack; he was impatient to get on with the "slaughter."

Second, after defendant met the CHS, defendant led the planning for the attack from start to finish.  From their first meeting, defendant was the one proposing targets and strategies for mass-casualty attacks.  Indeed, defendant sought to persuade the CHS to join him, explaining that detonating an IED to kill police "will get like the police riled up.  But I need you bro, just the one IED that's going to stir up the hornet's nest."  The CHS agreed to follow along.  Defendant then selected the rally as the ultimate target.  The CHS followed along.  Defendant instructed the CHS to recruit the UCE to build the bombs.  The CHS followed along.  Defendant bought the deadly shrapnel for the bombs and instructed the UCE to start building the bombs.  The UCE followed along.  Defendant told the CHS

he would make the final decision whether to proceed with the attack, after defendant considered delaying the attack because it may not kill enough people and he did not want to die before Ramadan.  The CHS followed along.  Defendant then sent the final "go-ahead" message to the UCE.  The UCE replied, "Okay.  I hear and obey."  And defendant led the final surveillance mission at the attack site, dictating each person's role in carrying out the attack.  The CHS and UCE followed along.  The CHS and UCE did not induce defendant to commit the charged crimes; they merely followed his lead.

Third, not only did the CHS and UCE refrain from persuading defendant to carry out an attack, they told him multiple times that he did not need to do it.  On March 22, 2019, the CHS explained to defendant that defendant had just converted to Islam and was "so pure," and said, "you don't need to, like you don't have to do this. You know that, right?"  Defendant responded by pointing to a police car and saying that police cars have bulletproof windows but sometimes roll them down.  On April 3, 2019, the CHS told defendant to be "patient," and defendant replied "Oh I know but you know, I want to do it."  Defendant even acknowledged to R.Y. that the CHS was not pushing him to act.  On April 5, 2019, defendant wrote to R.Y. that the CHS "advises to be patient for now," and that defendant "hate[d] being patient."  On April 12, 2019, defendant wrote to R.Y. that the CHS "advised [restraint].  Im the one ready u know."  On April 23, 2019, the CHS again told defendant they "don't have to do this."  Defendant replied by suggesting that if the Long Beach rally was cancelled, they could target a rally in Huntington Beach the same weekend, or the Santa Monica pier in the summer, when it was crowded with people who would have no escape.

The recorded evidence in this case shows that the CHS and UCE did not subject defendant to "repeated and persistent solicitation or persuasion which over[came his] reluctance" to commit the planned attack.  Simas, 937 F.2d at 462 (quotation marks omitted).  Accordingly, defendant cannot establish a prima facie case that he was induced to commit the charged crimes and he should be precluded from presenting an entrapment defense at trial.

**V.   DEFENDANT CANNOT ESTABLISH A PRIMA FACIE CASE THAT HE WAS NOT PREDISPOSED TO COMMIT THE CHARGED CRIMES**

Defendant's written statements for nearly two years before the planned attack show that he was predisposed to commit the charged crimes.  In fact, he was not merely predisposed to do it, he was "impatient for the slaughter."  "If a defendant is predisposed to commit a crime, an entrapment defense is unavailable, regardless of the inducement."  United States v. Smith, 924 F.2d 889, 898 (9th Cir. 1991).  See Reynoso-Ulloa, 548 F.2d at 1334 ("[T]he focal point of the [entrapment] defense is the predisposition of the defendant, rather than the nature of Government conduct.")  Courts evaluating a defendant's predisposition to commit a crime review five factors: "(1) the character and reputation of the defendant; (2) whether the government made the initial suggestion of criminal activity; (3) whether the defendant engaged in the activity for profit; (4) whether the defendant showed any reluctance; and (5) the nature of the government's inducement."  United States v. Davis, 36 F.3d 1424, 1430 (9th Cir. 1994) (internal citation omitted).  "Although none of these factors is controlling, the defendant's reluctance to engage in criminal activity is the most important."  United States v. Busby, 780 F.2d 804, 807 (9th Cir. 1986).

All five of these factors demonstrate defendant's predisposition to carry out the attack.  First, defendant's character and reputation are demonstrated in his nearly two years of writings online, in which he expressed his support for ISIS and violent Jihad, justified killing civilians and children, and wrote about wanting to kill Jews, burn churches, and commit mass-casualty attacks to weaken America.

Second, defendant made the initial suggestion of criminal activity.  Defendant spoke of his desire to carry out mass-casualty attacks before he ever met the CHS.  Indeed defendant's statements about carrying out such attacks are what prompted the investigation in the first place.  Then, after meeting the CHS, defendant led the discussion regarding planning an attack, suggested potential targets and different strategies, settled on the ultimate attack location, and directed the CHS to have the UCE build bombs to use in the attack.

Third, although defendant did not engage in the activity for financial profit, he repeatedly explained his deep personal motivation for carrying out the planned attacks.  Before ever meeting the CHS or UCE, defendant spoke of the need for a mass shooting in the United States to "kick off civil unrest" and weaken America.  Five days before defendant's arrest, an associate asked how he was "achieving anything by killing civilians" and defendant answered it was "settling the debt of Christchurch."  And during his surveillance mission with the CHS and UCE to finalize the attack plans, defendant explained at length his goal that the attack would "cause fear and terror through the capital" and provoke civil unrest that would cause the U.S. military to retreat from Muslim lands to impose martial law, giving the "Mujahideen" "a little more time to fight."

Fourth, as discussed above, defendant showed no reluctance to carry out the planned attack.  On the contrary, defendant repeatedly proclaimed he was "impatient for the slaughter" and he led the planning from start to finish.

Fifth, defendant's interactions with the CHS and UCE, which were recorded, show no inducement.  As discussed above, defendant was the one who proposed the attack, tried to recruit participants, settled on the target, directed the CHS to have the UCE make the bombs, gave the final go-ahead for the attack, dictated each person's role in the attack, and led the surveillance mission to finalize the attack plan.

All five factors demonstrate defendant's predisposition to commit the charged crimes.  Accordingly, he cannot establish a _prima facie_ case that he was not predisposed to commit the charged crimes and he should be precluded from presenting an entrapment defense.

**VI.  IF DEFENDANT IS PERMITTED TO PRESENT AN ENTRAPMENT DEFENSE, THE GOVERNMENT SHOULD BE PERMITTED TO REBUT THE DEFENSE WITH EVIDENCE OF DEFENDANT'S PREDISPOSITION**

If defendant is permitted to raise an entrapment defense, the government has the burden of proving beyond a reasonable doubt that either: (1) he was predisposed to commit the crime before being contacted by government agents; or (2) he was not induced by the government agents to commit the crime.  See Ninth Circuit Model Jury Instruction No. 6.2 (entrapment).

Some of the strongest evidence of predisposition and lack of inducement are (1) defendant's statements before the investigation began demonstrating his support for ISIS and his desire to wage violent Jihad against the United States, and (2) his statements during the investigation about his support for ISIS, his motive for the planned attack, and his "impatience" to carry it out.  If

defendant is permitted to raise an entrapment defense, the government should be permitted to admit these statements to rebut the defense. See United States v. Cutler, 806 F.2d 933, 936 (9th Cir. 1986) (affirming admission of evidence of Cutler's affiliation with the Aryan Nations and background on the Aryan Nations because the "testimony was relevant to rebut [the defendant]'s entrapment defense"); United States v. Al Kassar, 660 F.3d 108, 119-20 (2d Cir. 2011) (affirming admission of evidence in a terrorism case regarding the defendants' "positive reaction to the idea that the arms would be used to kill Americans and harm U.S. interests" because such evidence "suggests a predisposition to support and participate in that goal"); United States v. Thickstun, 110 F.3d 1394, (9th Cir. 1997) (affirming admission of evidence of Thickstun's "eagerness" to engage in the criminal conduct during conversations with a government agent and explaining that such "evidence of predisposition may arise both before the government's initial contact and during the course of dealings"); United States v. Wolf, 691 Fed. Appx. 438 (9th Cir. May 24, 2017) (affirming admission of evidence of Wolf's "statements about his plan to engage in an upcoming war with the government and his desire to obtain powerful weapons to fight in that conflict" to establish "predisposition" and "lack of reluctance to commit the offense" of illegal possession of a machine gun).

**VII. CONCLUSION**

For the foregoing reasons, the Court should preclude defendant from presenting an entrapment defense at trial. If the Court permits to present an entrapment defense, the Court should allow the government to rebut the defense with evidence of defendant's predisposition to commit the charged crimes.