NICOLA T. HANNA
United States Attorney
CHRISTOPHER D. GRIGG
Assistant United States Attorney
Chief, National Security Division
REEMA M. EL-AMAMY (Cal. Bar No. 237743)
DAVID T. RYAN (Cal Bar No. 295785)
Assistant United States Attorneys
Terrorism and Export Crimes Section
        1500 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone:  (213) 894-0552/4491
        Facsimile:  (213) 894-2979
        E-mail:     reema.el-amamy@usdoj.gov
                    david.ryan@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 19-313-SVW |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO ADMIT POST-ARREST STATEMENTS PER FED. R. EVID. 106, 804(B)(3), AND 807 |
| v. | |
| MARK STEVEN DOMINGO, | |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Reema M. El-Amamy and David T. Ryan, hereby files its Opposition to Defendant's Motion to Admit Post-Arrest Statements Per Fed. R. Evid. 106, 804(B)(3), and 807 (the "Opposition").

//

//

This Opposition is based on the attached memorandum of points and authorities, the attached exhibits, the files and records in this case, and any further evidence or argument the Court may allow.

Dated: June 15, 2020                    Respectfully submitted,

                                        NICOLA T. HANNA
                                        United States Attorney

                                        CHRISTOPHER D. GRIGG
                                        Assistant United States Attorney
                                        Chief, National Security Division


                                        _____/s/_____
                                        REEMA M. EL-AMAMY
                                        DAVID T. RYAN
                                        Assistant United States Attorney

                                        Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES................................1

I.    INTRODUCTION..................................................1

II.   FACTUAL BACKGROUND...........................................3

      A.    Defendants Statements About His Desire to Commit a
            Terrorist Attack to Weaken America and Retaliate for
            Attacks Against Muslims................................3

      B.    Defendant's Post-Arrest Statements.....................4

            1.    Excerpt One: Defendant Admitted His Intent to
                  Attack the Rally.................................5

            2.    Excerpt Two: Defendant Discussed His Ideology.......5

            3.    Excerpt Three: Defendant Again Admitted His
                  Intent to Attack the Rally..........................6

            4.    Excerpt Four: Defendant Said He Wanted to Provoke
                  Civil Unrest........................................7

            5.    Excerpt Five: Defendant Again Admitted His Intent
                  to Attack the Rally.................................8

            6.    Excerpt Six: Defendant Discussed Getting Back at
                  the World...........................................9

            7.    Excerpt Seven: Defendant Discussed Standing Up
                  for Sunni Islam....................................10

            8.    Excerpt Eight: Defendant Discussed Hating All
                  People.............................................10

            9.    Excerpt Nine: Defendant Described Himself as an
                  Extremist Who Wanted to Kill Americans.............12

III.  LEGAL STANDARDS.............................................12

IV.   ARGUMENT....................................................15

      A.    Defendant Cannot Invoke the Rule of Completeness to
            Introduce Self-Serving Inadmissible Hearsay............15

      B.    Defendant's Proposed Additions Are Not Statements
            Against His Interest...................................16

      C.    The Residual Hearsay Exception Does Not Apply..........18

V.    CONCLUSION..................................................18

## TABLE OF AUTHORITIES

**Cases**

United States v. Bachsian,
   4 F.3d 796 (9th Cir. 1993)......................................15

United States v. Bonds,
   608 F.3d 495 (9th Cir. 2010)...............................15, 18

United States v. Collicott,
   92 F.3d 973 (9th Cir. 1996).........................13, 14, 15, 16

United States v. Fernandez,
   839 F.2d 639 (9th Cir. 1988)...................................13

United States v. Liera-Morales,
   759 F.3d 1105 (9th Cir. 2014)..................................14

United States v. Nakai,
   413 F.3d 1019 (9th Cir. 2005)..................................13

United States v. Ortega,
   203 F.3d 675 (9th Cir. 2000)...............................12, 14

United States v. Vallejos,
   742 F.3d 902 (9th Cir. 2014)...............................13, 14

**Rules**

Fed. R. Evid. 106..................................................1

Fed. R. Evid. 801(c)..............................................12

Fed. R. Evid. 801(d)..............................................13

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.    INTRODUCTION**

3      In March and April 2019, after writing for more than a year

4  about his support for the Islamic State of Iraq and al-Sham ("ISIS"),

5  his hatred of the United States, and his desire to carry out mass-

6  casualty attacks in the United States, defendant Mark Steven Domingo

7  ("defendant") planned and took steps to carry out a terrorist attack

8  in the United States by using a weapon of mass destruction to commit

9  mass murder.  The night of his arrest, defendant gave a recorded,

10  <u>Mirandized</u> interview in which he admitted that he intended to commit

11  the attack, that he was angry about attacks on Muslims, hated all

12  people, and wanted to "give a big fuck you to the world" that had

13  treated him poorly.

14      The government has identified several portions of defendant's

15  40-minute interview that it intends to introduce at trial.  Defendant

16  now moves for the government to introduce additional, self-serving,

17  out-of-court statements defendant made during the interview under

18  several specious theories of admissibility.  But the Rules of

19  Evidence and the law of this Circuit are clear: a defendant cannot

20  use the government as a vehicle to introduce his own, exculpatory

21  statements at trial.  No exception to the hearsay rule allows a

22  defendant to introduce his own exculpatory, out-of-court statements.

23      First, defendant cannot rely upon the Rule of Completeness to

24  "backdoor" inadmissible hearsay into trial.  The government's

25  proposed excerpts are not misleading, they do not cut off defendant

26  or take his statements out of context.  In fact, contrary to

27  defendant's assertion in the motion, the government's excerpts

28  include statements defendant made regarding non-religious motivations

for his attack planning.  Defendant's proposed additions are calculated to garner the jury's sympathy and support his entrapment defense.

Second, contrary to defendant's assertion, his proposed additional excerpts are not admissible as statements against interest under Federal Rule of Evidence 804(3).  The excerpts defendant seeks to introduce minimize his culpability and shift blame to others for his criminal conduct.  They are not statements against interests; they are exculpatory statements, which defendant seeks to introduce to generate jury sympathy without having to subject himself to cross-examination.

Third, defendant's proposed excerpts are not admissible under the residual hearsay exception because they do not bear any indicia of reliability.  Defendant's statements minimizing his desire to engage in violent Jihad are contradicted by his numerous recorded statements, including statements recorded just hours before his arrest, in which defendant explained his desire to commit a mass casualty attack to weaken America, provoke civil unrest, and retaliate for perceived attacks against Muslims.  After his arrest, defendant tried to present a more sympathetic story to the arresting agents regarding his motivation.  The residual hearsay exception does not apply.

Defendant can present his story to the jury by testifying and subjecting himself to cross-examination.  He cannot do it by requiring the government to introduce his own self-serving hearsay.

## II.   FACTUAL BACKGROUND

### A.   Defendants Statements About His Desire to Commit a Terrorist Attack to Weaken America and Retaliate for Attacks Against Muslims

Throughout March and April 2019, defendant wrote and spoke to numerous people about his desire to carry out a terrorist attack to provoke civil unrest in the United States in retaliation for attacks against Muslims around the world.

For example, on March 3, he wrote about conducting a mass attack similar to a 2017 shooting in Las Vegas, Nevada which killed 59 people, stating, "America needs another vegas event [. . .] something to kick off civil unrest [. . .] and its not about winning the civil war its about weakening America giving them a taste of the terror they gladly spread all over the world."  On March 14, after a shooting at two Mosques in Christchurch New Zealand, defendant wrote, "there were mosque shootings in new Zealand . . . there must[]be retribution."  On March 15, he wrote that he was "enraged" about the shootings in Christchurch and "these fuckers do need to bleed [. . .] one way or another."  On March 21, he wrote to a Jihadi fighter in the Philippines who bragged about killing "kuffar"[1] that the fighter was "an inspiration . . . I have to follow ur example."  On March 22, he shared an ISIS propaganda video and said he was "impatient for the slaughter."  On April 11, he wrote that he was "impatient now for war" and the United States was "on the verge of mass riots."  On April 12, he wrote, "I want to slaughter kaffirs."  On April 21, he wrote to justify the killing of civilians, stating "kaffir blood is

---

[1] "Kuffar" is an Arabic term for "infidels," or those who do not believe in Islam.

3

kaffir blood," "male children will grow to be enemies," and killing civilians was "settling the debt of Christchurch."

Similarly, in his meetings with the CHS, defendant explained his motivation for carrying out terrorist attacks.  On April 3, defendant said he needed the CHS to help him provoke civil unrest, saying "I need you bro, just the one IED[2] that's going to stir up the hornet's nest bro," and saying he wanted to conduct a string of attacks to "put the stress" on America and lead to martial law.  On April 26, shortly before his arrest, defendant explained at length his motivation for attacking the upcoming rally:

> We look for the right position because it's designed to cause fear and terror through the capital yeah.  But this is also because, I mean you feel it, the tension in the air, left and right . . . there's a civil war brewing bro.  A divided America. . . .  It's not just for the movement but just for the world in general, bro. All around the world America goes on sticking its fucking cock in everyone's fucking business. Now, divided America!  All those, I'm banking on a lot of the US fleets, the Navy, that are constantly patrolling to have a strike for us anywhere in the world, they will be forced to duck back here, and, you know, martial law, to bring back order.  Because it's common sense right?  Why patrol the world when your own house is on fire?  And it gives our brothers around the world, the Mujahideen, a little stress off their back. . . .  If we can cause enough civil tension here and bring back the US troops, they all come back here and give our brothers a little more time to fight."

**B.   Defendant's Post-Arrest Statements**

A few hours after finalizing the attack plan and explaining his motive to the CHS, the FBI arrested defendant.  The FBI advised defendant of his <u>Miranda</u> rights and defendant waived those rights and

---

[2] "IED" is an abbreviation for Improvised Explosive Device.

4

agreed to participate in an interview with the FBI.  The interview

excerpts the government and defendant seek to admit are discussed

below.[3]

    1.   Excerpt One: Defendant Admitted His Intent to Attack the Rally

At the outset of the interview, an FBI agent asked, "I just need

to know, is there anyone besides your group that's looking to attack

the rally in Long Beach."  Defendant replied, "I mean besides those

neo-Nazi white nationalists that will show up armed, like the New

Zealand Mosque shooter.  I mean I'm sure they're going to make it

California legal.  But I'm sure anti-gun Antifa won't come armed, so,

besides them, I don't know."  The agent then asked, "Ok, why did you

choose to attack that specific rally in Long Beach on Sunday?"

Defendant answered, "I guess it was just convenient."  (Ex. 1 at

11:20-12:04).

Defendant seeks to extend this clip to include defendant's

statement, "I wanted to wait til after Ramadan.  But I'm sure, I'm

sure someone tipped you guys off.  I'm sure someone who I'm thinking

of is a master of psychology and so they persuaded me to at least

plan for the rally."  (Ex. 1 at 12:20-12:42).

    2.   Excerpt Two: Defendant Discussed His Ideology

Later in the interview, an FBI agent asked defendant, "What do

you think should happen to nonbelievers?"  Defendant replied, "You

know if they stop attacking Muslim countries, then nothing.  If they

stop supporting governments that use white phosphorous in defeating

---

[3] Defendant's motion does not specify the additional clips he seeks to admit, however defense counsel previously provided the government a list of the additional clips defendant seeks to introduce.

1    [a] militant group that's simply fighting for their worldview, which

2    can't be denied, then sure, you know." The agent asked, "But what if

3    that doesn't stop?" Defendant answered, "And it probably won't. So

4    the world goes on until some shit happens and World War Three fucking

5    starts. Or maybe not even World War Three. We'll just go into a

6    steady fucking economic fucking plateau or decline of presidents who

7    make promises but don't keep them. Typical, status quo happens.

8    Status quo." The agent responded, "Yea I know when something like

9    New Zealand happens and, it's a freaking tragedy man. Fifty people

10   anywhere getting killed is a tragedy. But then . . . the news kind

11   of moved on . . . So you kind of have to live it all over again.

12   Because you get angry the first time that the thing happens and then

13   people forget about it. What do you think about that?" Defendant

14   answered, "I suppose that's the normie attitude of, 'shit happens,'

15   and then, we'll just get used to getting shit on. No change . . .

16   don't even try to change anything. Just go on being a worker bee for

17   the good of society. Don't even try. Just stay in your fucking

18   lane, because God forbid if you do something or you try to do

19   something to change something, 'well that guy's a fucking wierdo.'"

20   The agent asked, "Did you think you could change something by

21   attacking the rally?" Defendant answered, "Not entirely. Maybe vent

22   my anger of just my life crashing around me. But other than that,

23   no, not realistic." (Ex. 1 at 13:25-15:58).

24       Defendant has not proposed any additions to this clip.

25       3.   Excerpt Three: Defendant Again Admitted His Intent to
             Attack the Rally
26

27       The FBI agent asked, "the question I have for you is, you chose

28   the rally to attack in Long Beach on Sunday, you must have done it

                                      6

for a reason.  What was that message that you were trying to send?"
Defendant responded, "I mean, besides the whole, bring terror and
fear to the infidel, yada yada, yada, besides the whole drumbeat, it
was just convenient."  (Ex. 1 at 22:33-23:03.)

Defendant seeks to add a clip shortly thereafter, in which he
says, "I would've preferred to wait til after Ramadan just so I could
say I went through Ramadan, right, just so I could fuckin say I went
through Ramadan, but, you know."  The agent asked, "And what would
you have done after Ramadan?"  Defendant answered, "Fuck if I know,
probably something similar.  I just wanted a break because my life's
been kinda crashing around me."  (Ex. 1 at 23:29-24:05).

4.   Excerpt Four: Defendant Said He Wanted to Provoke
     Civil Unrest

The FBI agent said, "You got the chance here to really tell us
what the message is that you were trying to send.  Because obviously
the attack's not going to happen, so that message can't be sent
through a bomb."  Defendant answered, "Perhaps not our attack, but
you got a bunch of white nationalists who are armed, who will show up
armed . . .  Some swastikas, maybe not swastikas, but, who will show
up.  So, maybe not an attack from an Islamic standpoint but, I mean,
I mean, surely you must know you get a bunch of Antifa motherfuckers
next to a bunch of far-right motherfuckers, you already know what's
gonna happen."  The agent asked, "So how does those two being there
play into your attack?"  Defendant answered, "More bodies."  The
agent asked, "What do you mean?"  Defendant answered, "Just more
bodies.  Instead of one political party showing up it's two, both
opposing parties."  The agent asked, "And by more bodies you mean
more people killed?"  Defendant answered, "Not necessarily, I mean,

it was a wide open area . . . Wide open area, bodies of people have the luxury of moving around, people will move around.  So not necessarily more casualties, but I guess more confusion, so yea." The agent asked, "what did you imagine would happen after that goes off, after the bomb goes off?"  Defendant answered, "Oh you know the media gets into hysteria, plays the blame game.  Oh, 'this side did it,' no 'this side did it.'  Then the fucking normies eat it up as they will, as they do.  They do.  They eat that shit like fucking candy."  (Ex. 1 at 25:19-27:27).

Defendant has not proposed any additions to this clip.

    5.   <u>Excerpt Five: Defendant Again Admitted His Intent to Attack the Rally</u>

The FBI agent asked, "You seem to have thought out kind of the steps to this and you did have a reason for that rally, so how, how was that attack, what other message beyond, kind of, retaliation for New Zealand, did you want to send.  You mentioned Sunni Islam as a whole.  Was that a part of it?"  Defendant answered, "I mean a little bit.  I love how you bring up the whole Sunni Islam thing.  Yea, I mean I'm part of it.  What's happening in Gaza, Palestine."  The agent said, "those are other things that don't get a lot of headlines."  Defendant said, "No.  Afghanistan.  Maybe not anymore. Africa.  Shit happens in Africa.  Yea."  The agent said, "Yea that's kind of what I'm talking about when I say about, you know tell me what your message is."  Defendant answered, "A big fuck you to this world that's been taking a big giant shit on me for the last few fucking months to the point where I just can't fucking take it anymore."  (Ex. 1 at 28:07-29:27).

Defendant has not proposed any additions to this clip.

6.   Excerpt Six: Defendant Discussed Getting Back at the World

The FBI agent asked defendant where he converted to Islam, and defendant identified his Mosque, and then said, "Those people are good people, they're not like me.  I'm not trying to hide any affiliation, they're good people they're not associated with me." The agent asked, "What do you mean, 'like you'?"  Defendant answered, "They don't stand up for, they don't believe in my ideals."  The agent asked, "What ideals are those?"  Defendant answered, "Getting back at the world.  Getting back at the world."  (Ex. 1 at 30:48-31:35).

Defendant seeks to add an excerpt prior to this clip, in which he states, "religion aside, religion aside, I just got laid the fuck off yesterday.  Two of my girlfriends fucking leave me, right.  One was going through a housing situation so I can't fuck with her anymore.  And another one is like, far the fuck away in Victorville. So I'm like, why am I going to drive to Victorville every day just to fuck you."  The agent said, "Yea, but see the thing is, I think you already know that we know that this whole, your anger and your planning for the attack started around New Zealand.  And, you know, maybe you felt like you were defending your faith and standing up for others?"  Defendant answered, "I mean coupled with the events of, like I just said, the last few months of my life.  Like, it's literally just all gone downhill.  Like, my family doesn't take too kindly to me being a Muslim now.  So there's that.  I mean they didn't take too kindly to me bringing women over.  So that was already a ruined relationship from the get-go."  (Ex. 1 at 29:10-31:52).

9

7. <u>Excerpt Seven: Defendant Discussed Standing Up for Sunni Islam</u>

The FBI agent asked, "You also mentioned standing up for people. Who are those people?" Defendant answered, "Besides the deen that is Sunni Islam? I mean that's who I meant, standing up for Sunni Islam. It's been getting shit on recently in recent conflicts throughout the Middle East. I don't expect the average American to keep up with the whole . . . conflict. But its in a very weakened state, if not as a religious ideology then as a political entity, it is. So, yea." (Ex. 1 at 31:52-32:39).

Defendant seeks to add an excerpt in which the agent asked, "But how did you expect people to know that you were standing up for Sunni Islam?" Defendant answered, "I kinda just didn't. I just kinda wanted to do it. Like I'm doing it, yea, for Sunni Islam, but at the same time, yea, like there's recent events in my life that just pushed me to this decision." The agent then asked defendant again why he intended to commit the attack, and if there was a "bigger" reason for the attack, and defendant said, "life's just been shitting on me for the last few months, man. And I get it, everyone gets shit on. You're not the top its just the way of life, I get that. Lost my family. Trying to find God. Lost three of my four girlfriends." (Ex. 1 at 33:25-35:16).

8. <u>Excerpt Eight: Defendant Discussed Hating All People</u>

The FBI agent asked about the impact of the New Zealand shootings on defendant and defendant said, "To be fair, I was already an angry piece of shit before New Zealand happened. Then it happened, and I was just mad. I mean all Muslims around the world are still mad. But most will choose not to do anything about it,

10

which, to me, I mean whatever, you do you and I'll do me, you know, that's it."  The agent asked, "you mentioned being angry before New Zealand, what were you angry about?"  Defendant answered, "I don't get any, like, just people in general, you know.  I'm very misanthropic . . . I just fucking hate people . . . Really I'm not racist I just hate everyone fucking equally.  This is coming from like my heavy metal phase, which still is kind of persistent."  The agent asked, "When was that heavy metal phase?"  Defendant answered, "Middle school til about my conversion. So for a long time, I'm just an angry piece of shit."  (Ex. 1 at 35:16-36:50).

Defendant seeks to add an additional excerpt in which he states, "I mean I didn't really have a cause to be angry just puberty and then with my family.  The way Filipino-Americans tend to bring up their fucked up children.  Maybe not physically abused fucked up children, but the head games."  The agent asked, "Did you have anyone to talk to about converting to Islam or religion in general?"  Defendant answered, "No I used to hate Islam actually.  I used to be vehemently anti-Islam actually.  I mean, to be honest, I joined the fucking US Army, 11 Bravo, US Infantry rifleman, to slaughter Muslims.  If you want to know how much I hated Islam.  But to be fair, this idea of 'Oh I'm serving red white and blue, you know, and we're defending people's rights,' that wasn't why I enlisted.  I played a lot of fucking shooting video games like many kids in my generation.  They're like, 'hey why don't you do it for real.'  Then I got to the US Army and realized it's just a bunch of sitting around, getting fucked with by bored NCOs or, you know, doing stupid chores.  Getting shot at, not being allowed to shoot back, by Afghan Taliban.  Being in a high-stress land . . . near the Afghan border.

11

Taliban around you but you can't lay a fucking finger on them."  (Ex. 1 at 36:50-38:32).

### 9.   Excerpt Nine: Defendant Described Himself as an Extremist Who Wanted to Kill Americans

At the end of the interview, the FBI agent asked, "Before we go is there anything else we can get you for the time being?  I know you've got apple juice.  Anything other than chips?"  Defendant answered, "No I'm good.  Other than a bullet to the head, save the taxpayers some money.  I mean surely you two pay taxes."  The agent said, "Doesn't everyone?"  Defendant answered, "Yea.  I mean surely, this shithead, wanted to kill Americans, why let him live?  It'd be doing you guys a great, be doing everyone a great favor.  You can even spin it off as a media story.  Heroic FBI raid kills extremist! Go men and women in blue!  There, you secure funding and the love and adoration of all the fucking normies, who will continue to do drugs and gamble and all the other shit you guys don't want them doing." (Ex. 1 at 39:51-41:03).

Defendant has not proposed any additions to this clip.

## III. LEGAL STANDARDS

The Federal Rules of Evidence prohibit the introduction of hearsay.  The Rules define hearsay as an out-of-court statement offered into evidence to prove the truth of the matter asserted in the statement.  See Fed. R. Evid. 801(c).  But the Rules allow a party to introduce the out-of-court statements of an opposing party because such statements, when offered by the opposing party, are considered "party admissions" and not hearsay.  See Fed. R. Evid. 801(c), (d)(2)(A); United States v. Ortega, 203 F.3d 675, 682 (9th Cir. 2000) ("[S]elf-inculpatory statements, when offered by the

government, are admissions by a party-opponent and are therefore not hearsay, see Fed. R. Evid. 801(d)(2), but the non-self-inculpatory statements are inadmissible hearsay."). Accordingly, under Rule 801, the government may introduce a defendant's out-of-court statements; a defendant, however, is barred from introducing his own out-of-court statements. Fed. R. Evid. 801(d)(2)(A); United States v. Fernandez, 839 F.2d 639, 640 (9th Cir. 1988) (affirming decision to preclude defendant from introducing his own post-arrest statements under Rule 801(c)).

Even where the government introduces a portion of a defendant's out-of-court statement, the defendant may not admit additional statements he made because those statements, when offered by defendant, are inadmissible hearsay. See United States v. Nakai, 413 F.3d 1019, 1022 (9th Cir. 2005) (holding that a defendant cannot introduce out-of-court statements he made to a witness, even if exculpatory, because such statements constitute inadmissible hearsay when offered by defendant).

The Rule of Completeness, codified in Federal Rule of Evidence 106, is applicable only where one party seeks to introduce a "misleadingly-tailored snippet" of a statement that distorts its original meaning. United States v. Collicott, 92 F.3d 973, 983 (9th Cir. 1996) (holding the Rule of Completeness did not support admission of additional out-of-court statement because "the complete statement did not serve to correct a misleading impression of a prior statement created by taking [the statement] out of context"); United States v. Vallejos, 742 F.3d 902, 905 (9th Cir. 2014) (rejecting defendant's attempt to introduce additional excerpts of post-arrest interview under the Rule of Completeness, and explaining "it is often

perfectly proper to admit segments of prior testimony without including everything, and adverse parties are not entitled to offer additional segments just because they are there and the proponent has not offered them"); United States v. Liera-Morales, 759 F.3d 1105 (9th Cir. 2014) (rejecting defendant's attempt to introduce additional excerpts of post-arrest interview under the Rule of Completeness).

A party may not rely on the Rule of Completeness to skirt the hearsay prohibitions by introducing self-serving statements to cast the party in a more positive light. See Vallejos, 742 F.3d at 905 (holding that district court "properly rejected [the defendant's] argument that the redacted portions should be admitted to show the jury the 'flavor of the interview,' to 'humanize' [the defendant], to prove his 'character,' and to convey to the jury the voluntariness of the statement").

Moreover, even when the Rule of Completeness applies, a statement must still fall within a recognized exception to the prohibition against hearsay to be admissible. See Ortega, 203 F.3d at 682 ("Even if the rule of completeness did apply, exclusion of [the defendant's] exculpatory statements was proper because these statements would still have constituted inadmissible hearsay."); Collicott, 92 F.3d at 983.

The Residual Hearsay Exception contained in Rule 807 does not apply to self-serving hearsay that is contradicted by other evidence in the record. Under Rule 807, a proponent of evidence must establish: (1) the facts demonstrate circumstantial guarantees of trustworthiness; (2) the statement is probative of a material fact; (3) it is more probative on that issue than other evidence the

proponent can procure through reasonable efforts; (4) the proponent has provided the other party sufficient notice; and (5) admission of the statement serves the general purposes of the Rules and lies in the interest of justice.  <u>United States v. Bachsian</u>, 4 F.3d 796, 798 (9th Cir. 1993) (discussing predecessor to Rule 807).  This exception is "designed for 'exceptional circumstances,'" such as where a witness previously gave testimony under oath and was subsequently rendered unavailable.  <u>United States v. Bonds</u>, 608 F.3d 495, 501 (9th Cir. 2010) (rejecting request to "take an unprecedented step in using 807 to admit the statements of a declarant who has chosen not to testify and whose statements lack significant indicators of trustworthiness").

## IV. ARGUMENT

### A. Defendant Cannot Invoke the Rule of Completeness to Introduce Self-Serving Inadmissible Hearsay

The government's selected interview portions will not mislead the jury nor do the selections distort the content of the defendant's interview with the FBI.  All the proposed excerpts contain the complete exchange between defendant and the FBI agent.  They do not, for example, cut off defendant in the middle of a thought, thereby creating a distorted or "misleading impression" of what he actually said.  <u>See</u> <u>Collicott</u>, 92 F.3d at 983.  Indeed, the government's proposed portions even include references to defendant's non-religious motivations for planning the attack.  For example, the government's second proposed excerpt includes defendant's statement that he wanted to "vent my anger of just my life crashing around me." (Ex. 1 at 13:25-15:58).  The government's fifth proposed excerpt includes defendant's statement that his attack was intended as "a big

15

fuck you to this world that's been taking a big giant shit on me for the last few fucking months to the point where I just can't fucking take it anymore." (Ex. 1 at 28:07-29:27). The government's eighth proposed excerpt includes defendant's statement that he was angry before the New Zealand shooting, that he was "very misanthropic," that he hated people, and that his hatred came from his "heavy metal phase which had listed from "Middle school til about my conversion. So for a long time, I'm just an angry piece of shit." (Ex. 1 at 35:16-36:50).

The Rule of Completeness is not a vehicle for defendant to introduce self-serving, inadmissible hearsay. Defendant seeks to introduce additional portions of his interview in which he discusses family and relationship problems, presents himself sympathetically, and minimizes his desire to engage in violent Jihad. In other words, defendant seeks to introduce his out-of-court statements to promote his own, self-serving narrative of the case.

That is not what the Rule of Completeness allows. The rule aims to prevent one party from distorting another party's statements. Collicott, 92 F.3d at 983. Because the government's proposed excerpts are not misleading or distorted, defendant's motion to admit additional excerpts under the Rule of Completeness should be denied.

**B.   Defendant's Proposed Additions Are Not Statements Against His Interest**

All of the statements defendant now moves to admit are calculated to minimize defendant's culpability and engender sympathy. Thus, defendant's spurious reliance on Rule 804(b)(3)'s hearsay exception for statements against a party's interest is unavailing.

1     Defendant's proposed addition to the government's first excerpt
2   minimizes defendant's conduct by suggesting that a "master of
3   psychology" "persuaded" him to plan to attack the rally
4   (notwithstanding that he spoke for years about his desire to commit
5   an attack, selected the rally as the target, and led the attack
6   planning from start to finish).  (Ex. 1 at 12:20-12:42).  In his
7   proposed addition to the government's sixth excerpt, defendant
8   attempts to minimize his predisposition to commit the attack, by
9   including statements defendant made that he was upset because he was
10  recently fired and broke up with his girlfriend, though in reality he
11  started planning for the attack more than a month before his arrest.
12  (Ex. 1 at 29:10-31:52).  Similarly, defendant's proposed additions to
13  the government's seventh and eighth excerpts, statements that
14  defendant was having family and relationship problems, are self-
15  serving efforts to minimize the years defendant spent researching and
16  planning a mass causality attack. (Ex. 1 at 33:25-35:16; 36:50-
17  38:32.)

18     Moreover, the statements defendant seeks to introduce are not
19  corroborated, but rather are directly contradicted, by the recorded
20  evidence in this case.  As set forth above, defendant voraciously
21  consumed and promoted violent ISIS propaganda, and repeatedly spoke
22  of his desire to carry out attacks to weaken America, provoke civil
23  unrest, and retaliate for attacks against Muslims.  While it is true
24  that defendant had conflicts in his personal life, his statements to
25  law enforcement that those conflicts rather than his violent Jihadi
26  ideology drove him to carry out the attack are flatly contradicted by
27  the record.  For this additional reason, defendant's proposed

28

1  additional statements do not qualify for the hearsay exception for

2  statements against interest and should be excluded.

3      **C.   The Residual Hearsay Exception Does Not Apply**

4      The Residual Hearsay Exception does not apply because the

5  statements defendant seeks to introduce are not supported by

6  sufficient guarantees of trustworthiness as required under Rule

7  807(a)(1).  On the contrary, as discussed above, the statements he

8  seeks to introduce, in which he emphasizes conflicts in his personal

9  life rather than his violent Jihadi ideology and shifts blame to

10  others for his actions are directly contradicted by his previous

11  recorded statements.  The Residual Hearsay Exception has been applied

12  sparingly, for statements such as testimony under oath, for witnesses

13  who are no longer available due to extraordinary circumstances such

14  as deportation.  See Bonds, 608 F.3d at 501.  The Rule does not apply

15  to a defendant who seeks to admit his own self-serving statements

16  that are contrary to his prior recorded admissions simply to present

17  his preferred narrative to the jury without facing cross-examination.

18  **V.  CONCLUSION**

19      For the foregoing reasons, the Court should deny defendant's

20  motion to admit additional portions of his post-arrest statements.

21

22

23

24

25

26

27

28

18

# U.S. v. Domingo

# PLACER HOLDER PAGE

Ex 1 – Post-Arrest Interview (MP4 File)