1  AMY M. KARLIN (Bar No. 150016)
   Interim Federal Public Defender
2  DAVID I. WASSERMAN (Bar, No. 275987)
   (E-Mail: David_Wasserman@fd.org)
3  Deputy Federal Public Defender
   ANGELA C. C. VIRAMONTES (Bar No. 228228)
4  (E-Mail: Angela_Viramontes@fd.org)
   Deputy Federal Public Defender
5  321 East 2nd Street
   Los Angeles, CA 90012
6  Telephone: (213) 894-2854
   Facsimile: (213) 894-0081
7
   Attorneys for Defendant
8  MARK DOMINGO

9

10                  **UNITED STATES DISTRICT COURT**

11                  **CENTRAL DISTRICT OF CALIFORNIA**

12                       **WESTERN DIVISION**

13

14

15  UNITED STATES OF AMERICA,          Case No. 19-313-SVW

16              Plaintiff,
                                       **OPPOSITION TO THE**
17       v.                            **GOVERNMENT'S MOTION TO**
                                       **PRECLUDE MR. DOMINGO'S**
18  MARK DOMINGO,                      **ENTRAPMENT DEFENSE;**
                                       **MEMORANDUM OF POINTS AND**
19              Defendant.             **AUTHORITIES**

20                                     **[Proposed] Hrng. Date: July 13, 2020**
                                       **[Proposed] Hrng. Time: 11:00 a.m.**
21

22       Defendant Mark Domingo, by and through his attorneys of record, David I.

23  Wasserman and Angela C. C. Viramontes, hereby opposes the government's motion *in*

24  *limine* to preclude Mr. Domingo from presenting an entrapment defense at trial.

25

26

27

28

1    This opposition is based upon the attached memorandum of points and
2  authorities, argument and evidence in the record, and all other arguments, authorities,
3  and exhibits that may be provided in support of this opposition and at any other hearing
4  on this opposition.

5

6    Respectfully submitted,

7    AMY M. KARLIN
     Interim Federal Public Defender
8

9  DATED:  June 15, 2020    By  */s/ DAVID I. WASSERMAN*
10    DAVID I. WASSERMAN
     ANGELA C. C. VIRAMONTES
11    Deputy Federal Public Defender
     Attorney for MARK DOMINGO

# **TABLE OF CONTENTS**

Page

I. INTRODUCTION ................................................................................ 1

II. RELEVANT FACTS ......................................................................... 1

III. LAW ............................................................................................... 8

IV. ARGUMENT ................................................................................... 9

    A.    Predisposition and Inducement .................................................. 10

          1.    Government agents initially suggested that Mr. Domingo use a weapon of mass destruction .................. 11

          2.    Mr. Domingo demonstrated reluctance to use a weapon of mass destruction in two distinct ways .......................... 11

          3.    Mr. Domingo's general disdain for non-Muslims has little bearing on whether he was entrapped into using a weapon of mass destruction ............................ 13

          4.    Mr. Domingo committed the instant offense, not for profit, but because government agents induced him by exploiting his depression and feelings of being an outsider, making him feel like he was part of a larger community and family, and promising him rewards in the afterlife if he committed violent jihad using a weapon of mass destruction ........................ 14

    B.    Prevailing Supreme Court and Ninth Circuit authority approve an entrapment instruction on the facts at bar ........................ 15

          1.    *United States v. Kessee*, 992 F.2d 1001 (9th Cir. 1993) ................. 16

          2.    *United States v. Mohamud*, 843 F.3d 420 (9th Cir. 2016) ............. 17

    C.    The cases cited by the government fail to support its position ................. 20

          1.    *United States v. Simas*, 937 F.2d 459 (9th Cir. 1991) .................... 20

          2.    *United States v. Poehlman*, 217 F.3d 692 (9th Cir. 2000) ............. 21

          3.    *United States v. Reynoso-Ulloa*, 548 F.2d 1329 (9th Cir. 1977) and *United States v. Davis*, 36 F.3d 1424 (9th Cir. 1994) ............. 22

    D.    Any rebuttal evidence proffered by the government must be limited to that which shows a predisposition and lack of inducement to attempt to use of a weapon of mass destruction, not simply a general propensity for criminal conduct ............................ 23

          1.    *United States v. Cutler*, 806 F.2d 933 (9th Cir. 1986) .................... 23

          2.    *United States v. Al Kassar*, 660 F.3d 108 (2d Cir. 2011) ............. 24

          3.    *United States v. Thickstun*, 110 F.3d 1394 (9th Cir. 1997) ............. 25

i

# TABLE OF CONTENTS

Page

    4.    *United States v. Wolf*, 691 Fed. Appx. 438 (9th Cir. May 24, 2017) ........................................................................................25

V. CONCLUSION ...........................................................................................25

# TABLE OF AUTHORITIES

Page(s)

1

**Cases**

*Masciale v. United States,*
   356 U.S. 386 (1958)...................................................................................... 16

*Mathews v. United States,*
   485 U.S. 58 (1988)......................................................................................... 8

*Osborn v. United States,*
   385 U.S. 323 (1966)...................................................................................... 15

*Sherman v. United States,*
   356 U.S. 369 (1958)............................................................................. 9, 13, 22

*Sorrells v. United States,*
   287 U.S. 435 (1932)................................................................................ 16, 22

*United States v. Al Kassar,*
   660 F.3d 108 (2d Cir. 2011) .................................................................... 24, 25

*United States v. Cutler,*
   806 F.2d 933 (9th Cir. 1986) ................................................................... 23, 24

*United States v. Davis,*
   36 F.3d 1424 (9th Cir.1994) .............................................................. 9, 15, 22

*United States v. Griffin,*
   434 F.2d 978 (9th Cir. 1970) ...................................................................... 16

*United States v. Gurolla,*
   333 F.3d 944 (9th Cir. 2003) ........................................................................ 8

*United States v. Hollingsworth,*
   27 F.3d 1196 (7th Cir. 1994) ...................................................................... 22

*United States v. Jacobson,*
   503 U.S. 540, 549 (1992) ...................................................................... 8, 22

*United States v. Kessee,*
   992 F.2d 1001 (9th Cir. 1993) .................................................................... 16

*United States v. Mohamud,*
   843 F.3d 420 (9th Cir. 2016) .............................................................*passim*

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# <u>TABLE OF AUTHORITIES</u>

Page(s)

*United States v. Poehlman*,
 217 F.3d 692 (9th Cir. 2000) ...........................................................*passim*

*United States v. Reynoso-Ulloa*,
 548 F.2d 1329 (9th Cir. 1977) ................................................. 15, 22, 23

*United States v. Sahakian*,
 No. CR 02-938 (A) VAP, 2008 WL 11383346 (C.D. Cal. 2008)............. 24

*United States v. Simas*,
 937 F.2d 459 (9th Cir. 1991) ...................................................... 15, 20

*United States v. Smith*,
 924 F.2d 889 (9th Cir. 1991) ................................................................ 20

*United States v. Sotelo-Murillo*,
 887 F.2d 176 (9th Cir. 1989) ...................................................... 1, 8, 10, 20

*United States v. Thickstun*,
 110 F.3d 1394 (9th Cir. 1997) ............................................................... 25

*United States v. Wolf*,
 691 Fed. Appx. 438 (9th Cir. May 24, 2017) (unpublished).................... 25

**Statutes**

18 U.S.C. § 2332a(a)(2)(A) ........................................................................... 17

**Other Authorities**

Federal Rule of Evidence 803................................................................... 14

iv

## I.  INTRODUCTION

The government's motion bombards the Court with irrelevant facts to obfuscate the simple truth it admitted at the March 9, 2020, status conference – it was the CHS, not Mr. Domingo, who first raised the idea of using a weapon of mass destruction to commit the instant offenses. The government then propounds excerpts, taken out-of-context, from conversations between Mr. Domingo and the CHS to distract the court from the central issue – is there "some" evidence from which a rational juror could conclude that Domingo was entrapped into committing the instant offense?  If so, then the entrapment instruction is warranted. *United States v. Sotelo-Murillo*, 887 F.2d 176, 179 (9th Cir. 1989). Because the answer is yes and the jury should decide, the government's motion must be denied.

## II.  RELEVANT FACTS

In its motion, the government conflates the question of whether Mr. Domingo was predisposed to commit *a crime* with whether Mr. Domingo was predisposed to commit *the crime charged in the Indictment* (i.e., the attempted use of a weapon of mass destruction).  The government's focus on Mr. Domingo's apparent disdain for non-Muslims is a red herring.  The focus of the Court's inquiry is rightfully placed on the question of whether Mr. Domingo was predisposed to the attempted use of a weapon of mass destruction and, if not, whether he was induced by government agents to do so.

The CHS was the first person to raise using a weapon of mass destruction at the Long Beach rally.  The government conceded this fact when the Court inquired on this precise issue at the status conference on March 9, 2020. This fact is inescapable, notwithstanding the government's selectively excerpted statements. Mr. Domingo's comments between May 2017 and March 2019, prior to meeting the CHS, are not relevant for the court's consideration of whether an entrapment instruction is appropriate.  In proffering facts related to Mr. Domingo's apparent generalized disdain for the West, the United States, and non-Muslims, the government confuses Mr.

1

Domingo's desire to commit *a crime or act of violence* with a desire to commit *the crime charged in the indictment*.  Prior to his interactions with the CHS, Mr. Domingo made no statements regarding his potential use of a weapon of mass destruction in the United States.  Put simply, statements that are not about using a weapon of mass destruction are irrelevant to the government's argument about predisposition.  A review of the relevant statements and their context is necessary.

| Date | Gov't Proffer | Facts Omitted by the Government |
|------|---------------|--------------------------------|
| 3/18/19 | Mr. Domingo met the CHS and discussed the tactics used by ISIS and al-Qa'ida to conduct attacks. The CHS said al-Qa'ida was "not doing anything," and Mr. Domingo replied, "Well, they'll, they'll plant IEDs." | The government misinterprets Mr. Domingo's statements as an endorsement of IEDs.  Not so.  Mr. Domingo is criticizing the use of IEDs by al-Qa'ida and Zawahiri. His statement is, "They'll plant IEDs *but they won't fight*." |
|  | The CHS said, "it's better not to get caught."  Mr. Domingo replied, "Better not to be taken alive. But [. . .] I have many magazines."  Mr. Domingo said he had nine "AK magazines," five of which were loaded, and described his guns.  Later, the CHS said he knew someone who "used to make IEDs," and Mr. | The colloquy proffered by the government comes *after* the CHS repeatedly urges Mr. Domingo not to go through with a plan that involves him simply shooting people in the street.  The CHS implores Mr. Domingo, "If you want to do it right, have a plan.  Don't just go and kill people on the street."

The CHS continues by explaining that a shooting in response to a shooting (i.e., Christchurch) is not the way to go.  The CHS states, "You have to hit harder than what they did if you really want to do it."  The CHS continues, "You have to have a plan – like, we hit.  We don't get caught.  You know? Like, that's [what] we used to [do it] overseas.  It's not a big deal.  Your plan is not going to work.  I'm telling you."

It is *after* the above-referenced quotes that Mr. Domingo tries to explain to the CHS that he does in |

2

| | | | |
|---|---|---|---|
| | | Domingo replied, "That's even better." | fact have a plan, one that involves an AK-47, multiple magazines, and a knife.  In response, the CHS says "That's not going to work; were going to get caught. . .  not the plan you have; the plan you have will we'll end up in jail."<br><br>Only after repeatedly explaining to Mr. Domingo that Mr. Domingo's plan will get them caught because their fingerprints would be on the firearms and ammunition and because the firearms were registered to Mr. Domingo, does the CHS say he has a brother who makes IEDs.  The CHS, not Mr. Domingo, then describes a plan to put the IED underneath cars using glue. |
| | 4/3/19 | Mr. Domingo said that placing an IED on a freeway "would do damage. [. . .] An IED, like the ones in Iraq [. . .] blows up on the freeway, hundreds and maybe thousands of US citizens injured." The CHS asked, "And then what?" Defendant replied, "Then the fun starts." | This conversation starts with the CHS, not Mr. Domingo, again raising the idea of an IED.  The quote proffered by the government is actually Mr. Domingo's reference to a conversation he had with someone online who indicated that s/he used IEDs during warfare outside of the United States.  The quote was not made in preparation for the use of an IED on a freeway in the United States.  Mr. Domingo is merely making an observation about what the IED could do, not making a statement about what plan he wants to go along with.<br><br>And after Mr. Domingo says "[t]hen the fun starts," he immediately starts talking about an attack with firearms.  Specifically, he states "But, imagine a Humvee… parked right there, and you know the guns on top?  He's turn around right where he's standing, there's an AK, one shot then he's [UI] like Iraq."<br><br>Mr. Domingo then talks about using a sniper rifle and conducting home to home raids.  As noted below, this is consistent with this statements on April 24, 2019, wherein Mr. Domingo reminds the CHS that "I'm the one who wanted to go raiding.  You are the one who said, no we should be more safe and we should just IED." |

| | | Mr. Domingo states "But I need you bro, just the one IED that's going to stir up the hornet's nest bro." | Immediately after saying this, Mr. Domingo goes back to discussing an attack comprised only of using firearms. He talks about the institution of Martial Law and *shooting* soldiers, not using bombs against them. And, as the government noted, later that evening Mr. Domingo drew a diagram and explained how he could attack police officers. Nothing in this diagram included the use of an IED. |
|---|---|---|---|
| 4/19/19 | | Mr. Domingo at the CHS's residence bearing an AK-47. | The government will undoubtedly argue at trial that had it not been for the CHS talking Mr. Domingo down, Mr. Domingo would have committed an attack that evening with his firearm – not with a bomb, but with a firearm. |
| | | The CHS asked, "are you sure you want to do this, I am serious are you serious?" Defendant replied, "I am serious, I want to do the IED route." | As the government correctly notes, and confirmed at the March 9, 2020, status conference, "the CHS asked if [Mr. Domingo] wanted the CHS to reach out to an associate who could make IEDs." And although Mr. Domingo asked the CHS to obtain instructions from the UCE on how to build an IED, he did so because he did not know how to do it himself. That is, without the assistance of the CHS and UCE, Mr. Domingo would not have been able to make an IED. This is an excerpt from their April 19 conversation:<br><br>CHS: "I mean… you know like I told you that; with the IEDs, I can talk to them, you know the…"<br><br>Mr. Domingo: "the IEDs would be more damage and would be better to transport [than the firearm initially suggested], but you're gonna have them… you know we'll, we'll both make it I just don't know—how, I mean, I'll be honest, I'm smart in history but I failed chemistry. . . Science is not my forte." |
| 4/22/19 | | CHS wrote to defendant that the associate was willing to help them build an IED the next day if they bought the materials that | In a phone call, Mr. Domingo confirms that he does not know how to build the IED himself and notes to the CHS that if he fails to obtain the Christmas lights by April 23, "it's not the end of the world." After looking for the lights at a few places, Mr. Domingo gives up and drives to see his girlfriend in Los Angeles. |

4

| | | | |
|---|---|---|---|
| | | night. Defendant agreed to buy Christmas lights and nails to use as shrapnel inside the IED. Defendant then went to home improvement stores and bought several hundred three-and-a-half inch and longer nails. | |
| | 4/23/19 | Mr. Domingo meets with the CHS and UCE at the CHS's residence.  Mr. Domingo brings the nails he purchased for the IED. | Mr. Domingo repeatedly tells the CHS and UCE that his faith is weak due to the drama in his life and that, if the IED is completed, they can just hold onto it for a later date.<br><br>After noting that he feels rejected by his Muslim brothers at work, Mr. Domingo explained that he feels "like no one fucking likes me.  No one fucking wants me."  As a result, he notes "That's why I'm starting to have doubts about the thing because you know, like I said, my drama, my [faith] isn't the strongest right now."<br><br>Mr. Domingo then explains that they should wait until after Ramadan to commence any attack and everyone agrees.  He states "we are not doing it this weekend," and that anything they would do would occur months down the line.<br><br>Mr. Domingo reiterates that the original idea was to use an AK-47 to shoot police.<br><br>The UCE says to Mr. Domingo, "I can tell you're a warrior; your mind and body are fit."<br><br>The CHS and UCE use this meeting to further instruct Mr. Domingo about Islam and affirm to him that "we are family now." |

| | | | |
|---|---|---|---|
| 4/24/19 | Mr. Domingo spoke to the CHS online and said he was concerned about rushing the UCE to complete the bombs in time for the Long Beach rally. The CHS said the CHS was ready to go forward with the attack, and defendant said he knew it was "gonna be big," and "Let's just sleep on it. If we're still as motivated, we'll give the go-ahead. I'll give the go-ahead." | In addition to the online communication noted by the government, Mr. Domingo and the CHS also spoke by phone on April 24, 2019.  In that call, Mr. Domingo reiterates to the CHS that the three of them already agreed to execute the plan *after Ramadan*.  In response, the CHS repeatedly urges Mr. Domingo to go through with the plan on April 28, 2019, and not after Ramadan.  The CHS notes, "we can't wait anymore."  Not only does Mr. Domingo indicate that he wants to wait, he reminds the CHS, "I'm the one who wanted to go raiding.  You are the one who said, no we should be more safe and we should just IED." | |
| 4/26/19 | The next evening, April 26, 2019, defendant met with the UCE and CHS, inspected what he believed were completed IEDs, practiced operating the remote detonators, and drove to the location for the upcoming rally to identify how they would enter the rally, where they would detonate the IEDs in order to kill the most people, and how | Once again, Mr. Domingo indicates to the UCE that it was the CHS' idea to use an IED and that Mr. Domingo initially wanted to use his firearms to ambush people; that he modified the pin on his 30-round magazines so they would actually carry 30 rounds; that he had a wire stock on his AK to carry it in a backpack; and that his original plan was to kill cops with firearms.  The CHS confirms this by telling the UCE about the April 19, 2019, visit where Mr. Domingo came to the residence with an AK-47.  This is consistent with Mr. Domingo's March 22, 2019, statements to the CHS about how he had modified one of his AK-47 assault style rifles to be fired more easily from inside a car during a drive-by shooting. The CHS said that defendant had just converted to Islam and was "so pure," and said, "you don't need to, like you don't have to do this. You know that, right?" Defendant responded by pointing to a police car and saying that | |

6

| | | |
|---|---|---|
| | they would escape. Defendant said if they survived the attack, they could conduct further attacks against multiple locations. | police cars have bulletproof windows but sometimes roll them down. |
| | After surveilling the location for the attack, defendant returned with the UCE and CHS to their meeting location  Defendant then carried one of the IEDs out of the location to put into the UC's vehicle, at which point he was arrested by the FBI.  Later that night, in a recorded, *Mirandized* interview, defendant told FBI agents that he chose to commit the attack to "bring terror and fear to the infidel" and "stand up" for the global Sunni Muslim community. | The defense does not contest that Mr. Domingo made the aforementioned statements.  However, not less than 26 seconds after telling agents he chose Long Beach because it was convenient, Mr. Domingo explained to agents that he did not want to use the IED at the Long Beach rally and, instead wanted to wait until after Ramadan to commit an attack.<br><br>And approximately two minutes before explaining that his desire to commit such an attack was rooted somewhat in his faith, he explains to agents that – religion aside – he wanted to commit the attack to get back at the world for perceived lifelong slights.<br><br>Further, two minutes before agents guide the conversation to the Christchurch shooting, Mr. Domingo reiterates that his actions were precipitated by the steady decline in his quality of life over the previous couple of months due to him losing his job, his girlfriends, and his family.  He describes himself as misanthropic, disdainful of people in general, and that his affinity toward violence came from playing violent video games.<br><br>Finally, he explains that he joined the United States Army to kill Muslims and to do in real life what he was only able to do previously in video games. |

Based on the aforementioned facts, if Mr. Domingo was not predisposed to provide material support for terrorists by attempting to use a weapon of mass destruction and the government induced him to commit such an offense, then the charges against him cannot stand and he will be found not guilty by a jury.  But the

7

1  question at this juncture is merely whether there is sufficient evidence to warrant an
2  entrapment instruction.  Undoubtedly there is and the government's motion should be
3  denied.

### III.  LAW

5       "[A] defendant is entitled to an instruction as to any recognized defense for
6  which there exists evidence sufficient for a reasonable jury to find in his favor."
7  *Mathews v. United States*, 485 U.S. 58, 63 (1988). "Only slight evidence will create the
8  factual issue necessary to get the defense to the jury, even though the evidence is weak,
9  insufficient, inconsistent, or of doubtful credibility." *United States v. Gurolla*, 333 F.3d
10  944, 951 (9th Cir. 2003) (citing *United States v. Becerra,* 992 F.2d 960, 963 (9th
11  Cir.1993 (quotations omitted)); *United States v. Sotelo-Murillo*, 887 F.2d 176, 178 (9th
12  Cir. 1989) ("Where a defendant's requested instruction is supported by some evidence,
13  a trial court's failure to give it is reversible error.") "To raise entrapment. . . Defendant
14  need not present the evidence himself; he can point to such evidence in the
15  government's case-in-chief, or extract it from cross-examination of the government's
16  witnesses. The burden then shifts to the government to prove beyond a reasonable
17  doubt that defendant was not entrapped." *United States v. Poehlman*, 217 F.3d 692, 698
18  (9th Cir. 2000) (citing *United States* v. *Jacobson*, 503 U.S. 540, 549 (1992).)

19       "A defendant is entitled to an entrapment instruction if he or she can present
20  *some* evidence that (1) a government agent induced him or her to commit an illegal act
21  that (2) he or she was not predisposed to commit." *Sotelo-Murillo*, 887 F.2d at 179
22  (emphasis added).[1] "To avoid a finding of entrapment [at trial], the *government* must
23  prove that: (1) [the defendant] was predisposed to commit the crime before government

---

[1]  This standard is far lower than that necessary to establish entrapment *as a matter of law*.  *See United States v. Mohamud*, 843 F.3d 420, 432 (9th Cir. 2016) (requiring the defendant to show "undisputed evidence making it patently clear that an otherwise innocent person was induced to commit the illegal act by trickery, persuasion, or fraud of a government agent.")

8

1  agents contacted him, or (2) government agents did not induce him to commit the

2  crime." *Mohamud*, 843 F.3d at 432) (citations omitted) (emphasis added).

3  According to Ninth Circuit Model Criminal Jury Instruction 6.2, "In determining

4  whether the defendant was predisposed to commit the crime before being approached

5  by government agents, [the jury] may consider the following: 1. whether the defendant

6  demonstrated reluctance to commit the offense; 2. the defendant's character and

7  reputation; 3. whether government agents initially suggested the criminal activity; 4.

8  whether the defendant engaged in the criminal activity for profit; and 5. the nature of

9  the government's inducement or persuasion." Criminal conduct that occurred

10  subsequent to the government's inducement is of limited relevance to the question of

11  predisposition. *See Sherman v. United States*, 356 U.S. 369, 375 (1958) ("It makes no

12  difference that the [drug] sales for which petitioner was convicted occurred after a

13  series of sales. They were not independent acts subsequent to the inducement but part

14  of the course of conduct which was the product of the inducement."); *Poehlman*, 217

15  F.3d at 704-05 ("In short, Poehlman's erotic e-mails cannot provide proof of

16  predisposition because nothing he says in them helps differentiate his state of mind

17  prior to the government's intervention from that afterwards. . . [O]nly those statements

18  that indicate a state of mind untainted by the inducement are relevant to show

19  predisposition.") "Inducement can be any government conduct creating a substantial

20  risk that an otherwise law-abiding citizen would commit an offense, including

21  persuasion, fraudulent representations, threats, coercive tactics, harassment, promises

22  of reward, or pleas based on need, sympathy or friendship." *Poehlman,* 217 F.3d at 698

23  (quoting *United States v. Davis,* 36 F.3d 1424, 1430 (9th Cir.1994)); *see also* Ninth

24  Circuit Model Criminal Jury Instruction 6.2.

## IV.  ARGUMENT

26  There is no evidence Mr. Domingo even considered using a weapon of mass

27  destruction prior to meeting with the CHS.  The government admitted at the March 9,

28  2019, status conference that it was the CHS – not Mr. Domingo – who first raised the

idea of using a weapon of mass destruction as part of an attack.  Prior to that, Mr. Domingo had only discussed using firearms in committing an attack within the United States.  This lack of predisposition to use a weapon of mass destruction, combined with the CHS and UCE's repeated attempts to *persuade* Mr. Domingo to use a weapon of mass destruction, their *promises of reward* resulting from Mr. Domingo's act of jihad, their *fraudulent representations* about being Mr. Domingo's brother and family, and their *pleas based on friendship and sympathy*, constitutes "some evidence" warranting an entrapment instruction.  *Sotelo-Murillo*, 887 F.2d 176, 179 (9th Cir.1989)

Furthermore, the government's citations on the standard for an affirmative defense instruction are inapt.  *See* Dkt. 61 at 14.  None of the cases discuss entrapment and each suffered from significant evidentiary deficiencies that do not exist in the case at bar.  They should be rejected.

**A.    Predisposition and Inducement**

The government provided more than a mere opportunity for Mr. Domingo to commit the instant offense.  On the contrary, the CHS was persistent in his efforts to dissuade Mr. Domingo from committing a shooting-attack in favor of using a weapon of mass destruction instead.  That is, the CHS dissuaded Mr. Domingo from using one *means* of attack in favor or another.  That *means* (i.e., the use of a weapon of mass destruction) lies at the heart of the offenses charged in this case.

In determining whether there is "some evidence" of lack of predisposition, Courts looks to the five factors outlined *supra* from Ninth Circuit Model Criminal Jury Instruction 6.2 (government suggestion of the crime, defendant's reluctance, defendant's character and reputation, profit motive, nature of government inducement or persuasion).  In evaluating inducement, the Court may "consider *any* government conduct creating a substantial risk that an otherwise innocent person would commit an offense, including persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy or friendship."

10

Ninth Circuit Model Criminal Jury Instruction 6.2. (emphasis added).  Again, the defense need only show *some* evidence of entrapment to warrant the instruction.

### 1.   Government agents initially suggested that Mr. Domingo use a weapon of mass destruction

Noticeably absent from the government's motion is evidence suggesting that Mr. Domingo sought to use a weapon of mass destruction *prior* to his contact by government agents.  That's because it is clear that government agents initially suggested the criminal activity charged in this case.  In fact, the government acknowledged at the March 9, 2019, status conference that the CHS – not Mr. Domingo – raised the idea of using a weapon of mass destruction in connection with the offense. This factor weighs in favor of giving an entrapment instruction.

### 2.   Mr. Domingo demonstrated reluctance to use a weapon of mass destruction in two distinct ways

Mr. Domingo demonstrated reluctance to commit the charged offense in at least two distinct ways.

First, in initially expressing his desire to commit an attack in the United States, Mr. Domingo discussed using *firearms* – not an IED.  On March 18, 2019, prior to the CHS indicating he had a "brother" who could make an IED, Mr. Domingo described his plan to kill law enforcement. This plan involved the use of firearms – not an IED. The CHS implored Mr. Domingo, "If you want to do it right, have a plan.  Don't just go and kill people on the street."  The CHS continued by explaining that a *shooting* in response to a *shooting* (i.e., Christchurch) is not the way to go.  The CHS stated, "You have to hit *harder* than what they did if you really want to do it" (emphasis added).  He explained, "You have to have a plan – like, we hit.  We don't get caught.  You know? Like, that's [what] we used to [do it] overseas.  It's not a big deal.  Your plan is not going to work.  I'm telling you."  The CHS repeatedly urges Mr. Domingo not to go through with a plan that involves him simply shooting people on the street.

In response, Mr. Domingo tried to reassure the CHS that he *did* have a plan – a plan that involved the use of firearms.  Mr. Domingo talked about having an AK-47, multiple magazines, and a knife.  ***Nowhere in this plan did he discuss using an IED.***

11

In response, the CHS says "That's not going to work; were going to get caught. . .  not the plan you have; the plan you have will, we'll end up in jail."  After downplaying the operational capacity of such an attack by highlighting problems associated with using firearms registered to Mr. Domingo and issues related to fingerprints on firearms and ammunition, ***the CHS says he has a brother who makes IEDs***.  Only then does Mr. Domingo say "that's even better."  The CHS, not Mr. Domingo, then describes a plan to put the IED underneath cars using glue.

Notwithstanding the discussion on March 18, 2019, Mr. Domingo's desire to use *firearms* is echoed in an April 3, 2019, diagram wherein Mr. Domingo designed a crude plan to shoot police officers in their vehicles.  Once again, there was no reference to using an IED *even after the CHS had raised the issue on March 18*.  And even on April 26, 2019 – the night of Mr. Domingo's arrest – Mr. Domingo explained to the UCE that it was the CHS' idea to use an IED and that Mr. Domingo initially wanted to use his firearms to ambush people; that he modified the pin on his 30-round magazines so they would actually carry 30 rounds; that he has the wire stock on his AK-47 to carry it in a backpack; and that his original plan was to kill cops with firearms.[2]

Second, even after Mr. Domingo and government agents putatively agreed to use of a weapon of mass destruction, Mr. Domingo was reluctant to use the weapon at the April 28, 2019, rally.  Instead, he wanted to wait until after Ramadan and potentially use it in July at the Santa Monica Pier.  But in the final days leading up to his arrest, when Mr. Domingo began expressing doubts about the Long Beach rally, government agents repeatedly encouraged Mr. Domingo to stop stalling.

---

[2] The CHS confirms this by telling the UCE about the April 19, 2019, visit where Mr. Domingo came to the residence with an AK-47.  This is consistent with Mr. Domingo's March 22, 2019, statements to the CHS about how he had modified one of his AK-47 rifles to be fired more easily from inside a car during a drive-by shooting. The CHS said that defendant had just converted to Islam and was "so pure," and said, "you don't need to, like you don't have to do this. You know that, right?" Defendant responded by pointing to a police car and saying that police cars have bulletproof windows but sometimes roll them down.

12

For example, on April 23, just days before his arrest, Mr. Domingo communicated to both the CHS and UCE that his faith was "weak" and that he wanted to wait until after Ramadan to do anything. Everyone agreed to wait and not proceed on April 28 (the date of the Long Beach rally). And on April 24 – in a phone conversation – Mr. Domingo reiterated to the CHS that the three of them already agreed to wait until after Ramadan to execute any sort of plan. In response, the CHS repeatedly urged Mr. Domingo to go through with the plan on April 28, 2019, and not wait until after Ramadan. The CHS explicitly said "we can't wait anymore." Not only did Mr. Domingo affirm that he wanted to wait, he reminded the CHS: "I'm the one who wanted to go raiding. You are the one who said, no we should be more safe and we should just IED."

Finally, statements endorsing the use of an IED or Mr. Domingo's purchase of materials for an IED made *after* government contact are irrelevant in considering whether Mr. Domingo was entrapped because his alleged desire to use an IED was not an "independent [act] subsequent to the inducement but part of the course of conduct which was the product of the inducement." *Sherman*, 356 U.S. at 375. Throughout the government's interactions with Mr. Domingo, he expressed reluctance; first to the use of an IED instead of firearms, and then in terms of when and where the weapon of mass destruction attack would take place. And in both instances, it was the government's ideas and pressure that induced Mr. Domingo into committing the charged offense. Mr. Domingo's demonstrated reluctance weighs in favor of an entrapment instruction.

### 3. Mr. Domingo's general disdain for non-Muslims has little bearing on whether he was entrapped into using a weapon of mass destruction

In its motion, the government confuses a desire to commit an attack in general with the specific desire to provide material support for terrorists by way of an attempted use of a weapon of mass destruction. This distinction is critical, as it properly calibrates the Court's focus on facts which suggest a character and reputation for *using a weapon of mass destruction* rather than for violence more generally. That there are no facts in the record to indicate that Mr. Domingo had a character and reputation for

13

using a weapon of mass destruction prior to meeting with the CHS speaks volumes. Mr. Domingo's feelings toward non-Muslims are a non-issue in this analysis and weigh in favor of giving an entrapment instruction.

**4.**    **Mr. Domingo committed the instant offense, not for profit, but because government agents induced him by exploiting his depression and feelings of being an outsider, making him feel like he was part of a larger community and family, and promising him rewards in the afterlife if he committed violent jihad using a weapon of mass destruction**

Although there is no evidence suggesting that Mr. Domingo engaged in the proffered activities for profit, there is substantial evidence showing that the nature of the government's inducement and persuasion served as a predominant factor in Mr. Domingo's choice to use a *weapon of mass destruction* rather than his own *firearms* to carry out an attack.

As noted in Mr. Domingo's motion to admit evidence under Federal Rule of Evidence 803, the CHS and UCE employed persuasion, fraudulent representations, promises of reward, and pleas of sympathy and friendship to induce Mr. Domingo's conduct in this case. Mr. Domingo's desire for friendship, adulation, and acceptance into a community that wanted and valued him are by-products of his mental health history (i.e., depression, feelings of worthlessness and hopelessness, isolation, and abandonment). The CHS professed brotherhood and helped further immerse Mr. Domingo into the Islamic tradition. He took Mr. Domingo out to eat at Middle Eastern restaurants, shared lessons on Arabic with Mr. Domingo, prayed with him, promised heavenly rewards for committing jihad, and made Mr. Domingo feel accepted and part of the Muslim community.

For example, on March 18, 2019, the CHS told Mr. Domingo that the two would try Iraqi kabab after previously eating Syrian food together. They also prayed together after searching the city for an open Mosque. During that prayer session, the CHS guided Mr. Domingo through the prayer as Mr. Domingo spoke broken-Arabic. On April 19, 2019, the two prayed at the CHS' residence, ate dinner together – with the CHS offering chicken kabab from a halal Indian restaurant – while they discussed

14

Islamic history.  On April 19, 2019, the CHS told Mr. Domingo that the ultimate reward in Islam comes from "jihad."

Furthermore, both the CHS and the UCE showered praise upon Mr. Domingo and embraced him as a member of the Muslim community.  On April 19, 2019, the CHS told Mr. Domingo how smart and "good at history" he was.  On April 23, 2019, the UCE congratulated Mr. Domingo on his conversion to Islam and said "I can tell you're a warrior; your mind and body are fit."  And, after further instructing Mr. Domingo about Islam, the CHS and UCE affirmed to Mr. Domingo that "we are family now."

All of these, of course, were fraudulent representations.  The CHS never cared about Mr. Domingo, nor did he consider him a brother in Islam.  There would be no rewards since the entire crime was the product of a sting operation.  Mr. Domingo is not some great Islamic scholar, nor does he have an accurate understanding of history.  Nonetheless, the CHS and UCE played on Mr. Domingo's loneliness and desperation.  It was because of the CHS's suggestion to use a weapon of mass destruction that Mr. Domingo – wanting to maintain the brotherhood between himself and the government agents – chose to use an IED.  *See* April 24, 2019 conversation (Mr. Domingo to the CHS: "I'm the one who wanted to go raiding.  You are the one who said, no we should be more safe and we should just IED.")

Based on the foregoing, it is clear that Mr. Domingo can make a *prima facie* showing that there exists *some evidence* he was not predisposed to using a weapon of mass destruction and that government agents induced him to do so.  As noted in Section IV (C) *infra*, the government's citations to *Simas*, *Poehlman*, *Reynoso-Ulloa*, and *Davis* fail to prove otherwise.

**B.    Prevailing Supreme Court and Ninth Circuit authority approve an entrapment instruction on the facts at bar**

Indeed, both the Supreme Court and Ninth Circuit have consistently held that a jury should be given an entrapment instruction even in the face of an inconsistent or seemingly doubtful defense theory.  *Osborn v. United States*, 385 U.S. 323, 331 (1966)

15

(issue of entrapment was for a jury to determine); *Masciale v. United States*, 356 U.S. 386, 388 (1958) (majority of the Court finding it proper to submit an entrapment defense to the jury over a dissent claiming that the issue should not have gone to jury and instead denied by the trial judge); *United States v. Kessee*, 992 F.2d 1001, 1004 (9th Cir. 1993). This is so because when the defense's version of events, if true, could justify a finding of entrapment, then a genuine issue of fact exists and the jury should be so instructed. *Id*.; *see also United States v. Griffin*, 434 F.2d 978 (9th Cir. 1970) ("The Supreme Court held that this issue is for the jury rather than the court in [*Sorrells v. United States*, 287 U.S. 435 (1932)] and this Court has consistently followed that position.") (citing *Erwing v. United States*, 394 F.2d 829, 830 (9th Cir. 1968) and *Pulido v. United States*, 425 F.2d 1391, 1393 (9th Cir. 1970)).

### 1.   *United States v. Kessee*, 992 F.2d 1001 (9th Cir. 1993)

In *Kessee*, the defendant conceded that he committed the charged offense, but testified that he did so due to financial desperation and only after his initial rejection of the CI's repeated suggestions. The Court recognized that "Kessee's credibility suffered from cross-examination and impeachment by tapes of his telephone calls which made his story hard to believe." *Kessee*, 992 F.2d at 1003. Notwithstanding the evidence confounding defendant's narrative, the Court concluded that an entrapment instruction was warranted. *Kessee*, 992 F.2d at 1004 ("We are compelled by the record in this case to conclude that a juror could have a reasonable doubt as to whether the government had sustained its burden to prove that it did not induce Kessee to break the law or that he was predisposed to commit the crime. If his story was believed, he had not previously sold narcotics, and had no inclination to sell narcotics, until [the CI] proposed that he do so.")

Similarly, the record in this case compels the Court to conclude that a juror could have a reasonable doubt as to whether the government can sustain its burden to prove that it did not induce Mr. Domingo's attempted use of a weapon of mass destruction or that he was predisposed to the attempted use of a weapon of mass destruction. If the

16

jury believes Mr. Domingo's version of events – namely that he wanted to commit an attack via the use of firearms and that he had no inclination to use a weapon of mass destruction until the CHS proposed that he do so – then it can find him not guilty of the charged offense.  An entrapment instruction is warranted.

### 2. *United States v. Mohamud*, 843 F.3d 420 (9th Cir. 2016)

In a case with facts remarkably similar to those at bar, the district court gave the entrapment instruction and, although the Ninth Circuit declined to find entrapment as a matter of law, it called the defense of entrapment at trial "spirited and *supportable*." *United States v. Mohamud*, 843 F.3d 420, 430 (9th Cir. 2016) (emphasis added).

In *Mohamud*, the defendant was charged with the exact same offense as Mr. Domingo – attempted use of a weapon on mass destruction in violation of 18 U.S.C. § 2332a(a)(2).  He was accused of "attempting to detonate a large bomb during the annual Christmas Tree Lighting Ceremony in Pioneer Courthouse Square in downtown Portland, Oregon."  *Mohamud*, 843 F.3d. at 423.

Prior to contact by government agents, the defendant expressed his disdain for the West and his desire for "Allah to send fighters against" the "evil Zionist-crusader lobbyists who control the world."  *Id*.  He then began communicating over the internet with a radicalizing influencer and started publishing articles in an online magazine aimed at English-speaking al-Qa'ida supporters.  In those articles, he recommended physical exercise to prepare for war with the West and discussed Europe's vulnerability to a jihadi attack.  In addition, he glorified terrorist attacks against the United States and American-interests abroad.

Then the government got involved.  After the defendant's parents reached out to the FBI about the defendant's plan to attend an Islamic school in Yemen recommended by a man whom the FBI suspected had links to terrorist groups, *id*. at 424, n.5, the FBI began conducting both physical and electronic surveillance of defendant.  A CHS reached out to the defendant asking for advice "on how to get more involved in the fight for the Islamic community, [stating that he] wanted to help rid the occupiers from

1  [P]alestine."  843 F.3d. at 425.  Defendant told the CHS to move to a community with

2  more Muslims, take care when discussing issues of violence online, and to look out for

3  "spies."  *Id*.

4      The FBI then introduced an undercover agent (UC) to the defendant who asked

5  the defendant if he was "still able to help the brothers?"[3]  Defendant responded that he

6  was unable to travel at the time, but soon thereafter agreed to meet with the UC.  At

7  that meeting, "when [the UC] asked what [the defendant] was willing to do for the

8  cause, the UC testified that [the defendant] said [he] originally. . . had planned to wage

9  war within the United States, but then he dreamt that he traveled to Yemen, received

10 training, and went to Afghanistan where he led an army against the kuffar or the

11 unbelievers."  *Id*. at 427.  Defendant then explained that, were he to choose among

12 several options to assist the cause, he would choose to "become operational. . . like the

13 other brothers do when they get a car, fill it with explosives, park it near a target

14 location, and detonate the vehicle."  *Id*. at 426.

15     A few weeks later, defendant was introduced by the UC to another UC who

16 played the part of an al-Qa'ida explosives expert.  During the meeting, the defendant

17 told the agents "that he wanted to detonate a bomb in Pioneer Courthouse Square

18 during the annual Christmas Tree Lighting Ceremony on November 26, 2010, the day

19 after Thanksgiving.  [The defendant] explained that he had researched other potential

20 targets, but this was the best option because: (1) he could drive a car right into the

21 Square from the street; (2) many people would be there; (3) nobody expected an attack

22 in Portland; and (4) security would be light."  The defendant said that he planned on

23 being in the car when it blew up.  *Id*. at 427.  After the defendant explained that he had

24 long sought to commit an attack like this, the UC reminded defendant that children

25 would be present.  Defendant acknowledged this fact and explained that the intent was

26

27

28     [3] This was a reference to the defendant's since abandoned plans to attend an
   Islamic school in Yemen.

18

for Americans to "refrain from killing our children, women." *Id.* at 427. The defendant and the UCs then surveyed the target location.

The UCs then reminded the defendant he did not have to commit the offense, that he could remotely detonate the bomb (rather than do so from inside the car), and then took defendant to "detonate" a test bomb in an Oregon countryside. At the behest of the UC, defendant made a video explaining his actions and extolling the virtues of jihad.

Three days before the attack, the defendant met with the UC to see the bomb parts and helped load the bomb parts into the UCs car. On the night of the putative-attack, one UC drove the van with the defendant. The UC told the defendant to connect the wires for the detonator to work. Then the UC and defendant walked several blocks to meet with the other UC. The three men then drove in another car, dropped off one UC at a train station, then the remaining UC and defendant parked a few blocks away. The defendant then pulled out his phone to remotely detonate the bomb. He dialed the number and nothing happened. The UC told him to get out of the car to get a better signal. He did so and was arrested as he tried to dial the number again. *Id*. at 430.

Importantly, the facts in *Mohamud* are nearly identical to those at bar except that the evidence of predisposition and lack of reluctance were even stronger in *Mohamud*. Unlike in *Mohamud*, Mr. Domingo did not first raise the issue of using a weapon of mass destruction – the CHS did. And here, unlike in *Mohamud*, Mr. Domingo repeatedly discussed using other means to commit an attack that did not include using a weapon of mass destruction. While the Ninth Circuit found sufficient evidence for the jury to reject the defense of entrapment because the defendant, not the government agent, suggested the use of explosives, it acknowledged the strength of the defense's case and the propriety of the entrapment instruction. In the case at bar, where the CHS and *not Mr. Domingo*, repeatedly suggested the use of explosives, an entrapment instruction is appropriate.

19

**C.**   **The cases cited by the government fail to support its position**

 **1.** *United States v. Simas***, 937 F.2d 459 (9th Cir. 1991)**

 In *United States v. Simas*, a transit worker assisted in a scheme to defraud the transit system by completing false invoices and providing kickbacks in amounts beyond the cost of services.  The Ninth Circuit affirmed the denial of defendant's request for an entrapment instruction because "The record is devoid of any evidence that the government induced Simas to commit the crimes."  937 F.2d 459, 462 (9th Cir. 1991); *cf. United States v. Smith*, 924 F.2d 889, 896-97 (9th Cir. 1991) (entrapment instruction inappropriate because there was "no proffer as to the inducement").  Unlike in *Simas*, the record in this case shows several attempts by government agents to induce Mr. Domingo's conduct through persuasion, fraudulent representations, promises of reward, and pleas of sympathy and friendship.

 ***Furthermore, the agents in the case at bar took the extra step of inducing Mr. Domingo to commit the greater crime of attempted use of a weapon of mass destruction, rather than have him simply use a firearm to commit an attack.***  Over and over again, Mr. Domingo described his plan to use firearms to attack non-Muslims in the United States.  And over and over again the CHS dissuaded him from doing so, explaining that Mr. Domingo needed to "hit harder than what they did if you really want to do it," that they should not use firearms because "that's not going to work; we're going to get caught. . .  not the plan you have; the plan you have will, we'll end up in jail," and that he must instead use a weapon of mass destruction in an attack.  ***In doing so, the government's conduct raised Mr. Domingo's statutory maximum sentence from 15 years (material support for terrorists) to life imprisonment (attempted use of a weapon of mass destruction).***  On the record in this case, it is clear that there is at least "some" evidence that the government induced Mr. Domingo to commit the charged offense.  *Sotelo-Murillo*, 887 F.2d at 179.  As a result, *Simas* does not control.

### 2.   *United States v. Poehlman*, 217 F.3d 692 (9th Cir. 2000)

The government's citation to *United States v. Poehlman*, 217 F.3d 692 (9th Cir. 2000), also fails to assist its argument.  In *Poehlman*, the Ninth Circuit not only *affirmed* the trial court's entrapment instruction but also *reversed defendant's conviction* for traveling to engage in sex with a minor because it found entrapment as a matter of law.  There, a "lonely and depressed" former member of the United States Air Force sought companionship on the internet after his wife divorced him and he was removed from the military because he liked to wear women's clothing.  He met a woman (a government agent) that raised the idea of him having sex with her children.  After the defendant was vague as to whether he was interested in such conduct, the agent "became more insistent" about him teaching her kids about sex.  *Id.* at 699.  Then the agent conditioned their relationship on defendant having sex with her children and started communicating with the defendant in a way that showed symbolic acceptance and friendship.  *Id.*  He ultimately acceded to her requests and the two met in a California hotel room.  The woman directed the defendant to an adjoining room where her children were purportedly located.  Once inside, he was greeted by federal agents.

Under these facts, the Ninth Circuit agreed that the defendant had been "induced by government agents who used friendship, sympathy and psychological pressure to "beguile[ ] him into committing crimes which he otherwise would not have attempted." *Id.* at 698.  So too did the government induce Mr. Domingo by using friendship and sympathy, among other things, to get Mr. Domingo's agreement to use a weapon of mass destruction.  Yes, Mr. Domingo used the internet to spew and endorse hateful ideas about non-Muslims.  And, yes, Mr. Domingo discussed using *firearms* to commit an attack.  But he never expressed the desire to use a *weapon of mass destruction* in the United States until the CHS raised the issue with him.  So too did the CHS offer Mr. Domingo important symbols of acceptance and friendship by praying with him, teaching him Arabic, eating halal food with him, and introducing him to the UCE (another purported Muslim brother).  In conjunction with these overtures, the CHS

21

became more insistent about using a weapon of mass destruction rather than firearms to commit the attack.  As the *Poehlman* court explained:

> Cases like *Jacobson*, *Sherman* and *Sorrells* demonstrate that even very subtle governmental pressure, if skillfully applied, can amount to inducement.  In *Jacobson*, for example, the government merely advanced the view that the law in question was illegitimate and that, by ordering the prohibited materials, defendant would be joining in "a fight against censorship and the infringement of individual rights." []  In *Sorrells*, the inducement consisted of repeated requests, made in an atmosphere of comradery among veterans.  []  In *Sherman*, the inducement consisted of establishing a friendly relationship with the defendant, and then playing on his sympathy for the supposed suffering of a fellow drug user.  []  In [*United States v. Hollingsworth*, 27 F.3d 1196 (7th Cir. 1994)], the inducement was nothing more than giving the defendant the idea of committing the crime, coupled with the means to do it.  []

*Poehlman*, 217 F.3d at 701-02 (internal citations omitted).

In the case at bar, the inducement consisted of repeated requests made in an atmosphere of comradery by those who established a friendly relationship and played on Mr. Domingo's vulnerabilities.  Government agents bet on Mr. Domingo's desire for acceptance into a larger community of Muslim brothers and sisters.  To fulfill these needs, Mr. Domingo ignored his own plans to use firearms and acquiesced to the suggestions of law enforcement that using a weapon of mass destruction was the preferable means by which to provide material support to terrorists.  On these facts, *Poehlman* requires that the Court instruct the jury of Mr. Domingo's theory of entrapment.[4]

### 3. *United States v. Reynoso-Ulloa*, 548 F.2d 1329 (9th Cir. 1977) and *United States v. Davis*, 36 F.3d 1424 (9th Cir. 1994)

The government's citations to *United States v. Reynoso-Ulloa*, 548 F.2d 1329, 1338 (9th Cir. 1977) and *United States v. Davis*, 36 F.3d 1424 (9th Cir. 1994), are also unavailing.  In *Reynoso-Ulloa*, a drug trafficking defendant testified at trial that he committed the charged offenses for pecuniary gain, that he convinced his co-defendant

---

[4] It matters little that the CHS and UCE in this case told Mr. Domingo that he did not have to go through with the plan.  In *Poehlman*, the agent repeatedly told the defendant that if he did not "share [her] views [on having sex with her children], [she] underst[ood]."  The Court still found entrapment *as a matter of law*.  *See also Mohamud* (evidence sufficient for an entrapment instruction even though government agents told defendant he did not have to go along with the charged offense).

to sell heroin, and that he was unconcerned with his involvement in the drug deal. Conversely, Mr. Domingo was not motivated by profit, nor was there any indication that Mr. Domingo wanted to use a weapon of mass destruction to commit the charged offense prior to the CHS's suggestion.  *Reynoso-Ulloa* is inapposite.

And the government fails to note that the Ninth Circuit approved an entrapment instruction in *Davis* as to one defendant because there was a factual dispute while excluding it as to the other defendant because there was "no evidence that [the informant] even asked [that defendant] to take part in a crack deal."  *Id.* at 1431.  In the case at bar, it is clear that the CHS communicated with Mr. Domingo and there exist several factual disputes.  The issue of entrapment should be submitted to the jury.

**D.    Any rebuttal evidence proffered by the government must be limited to that which shows a predisposition and lack of inducement to attempt to use of a weapon of mass destruction, not simply a general propensity for criminal conduct**

The government requests that if the Court instructs the jury on entrapment, it be permitted to rebut the defense with evidence of (1) defendant's statements before the investigation began demonstrating his support for ISIS and his desire to wage violent jihad against the United States, and (2) his statements during the investigation about his support for ISIS, his motive for the planned attack, and his "impatience" to carry it out. But each of the cases cited by the government stand for the proposition that the government can introduce other acts evidence to rebut an entrapment defense when that other acts evidence *is material to an element of the charged offense*.  The cases do not stand for the proposition that the government can introduce evidence of general criminal propensity in response to an entrapment defense.  The government's request should be denied.

### 1.    *United States v. Cutler*, 806 F.2d 933 (9th Cir. 1986)

There are two reasons to reject *Cutler's* application to this case.  First, the testimony of Cutler's affiliation with and background on the Aryan Nation were relevant to show defendant's motive to hire a hit man to kill persons who might testify against the group – the precise charges for which he was on trial.  *Cutler*, 806 F.2d 933,

934-935 ("Cutler was convicted of contracting for the murder of a government informant and witness.")  Again, the government's evidence about Mr. Domingo's prior statements do not go to his use of a weapon of mass destruction, but instead speak in generalities about his putative criminality.  Second, Mr. Domingo explicitly states to the CHS that the attack was not intended to be carried out to support any foreign terrorist organization.  *See* April 3, 2019 conversation (wherein Mr. Domingo states, "I'm doing this for [the religion]. Not affiliated with [ISIS]. Not affiliated with Al-Qa'ida. . . .  Not the racist Taliban.")  Hence, Mr. Domingo's purported support for ISIS is irrelevant given that the instant offense was not associated with ISIS.  *See United States v. Sahakian*, No. CR 02-938 (A) VAP, 2008 WL 11383346, at *7 (C.D. Cal. 2008) (excluding evidence of racial animus and distinguishing *Cutler* since the group on which the testimony was proffered was not a group with which the defendant was associated).

### 2.    *United States v. Al Kassar*, 660 F.3d 108 (2d Cir. 2011)

The government cites *Al Kassar* in support of its argument, but fails to note the direct connection between the evidence proffered and the charges in that case.  In *Al Kassar*, the defendants were charged with conspiracy to engage in illegal arms sales and conspiracy to kill Americans.  Hence, their "positive reaction to the idea that the arms would be used to kill Americans and harm U.S. interests" were directly relevant to the *elements of the offenses charged*.  Not so in the case at bar.  The government's proffered evidence speaks only in general terms about Mr. Domingo's "support for ISIS," "his desire to wage violent jihad," and his "impatience" to carry out an attack.  None of this evidence speaks directly to whether he wanted to use a *weapon of mass destruction* in doing so.  In fact, there is significant evidence – as noted above – that he wanted to use different weapons to commit an attack and was, only days before his arrest, reluctant to go through with the April 28, 2019, attack.  The Court's conclusion in *Al Kassar* supports both Mr. Domingo's contention that the proffered other acts evidence is irrelevant to rebut his defense and that an entrapment instruction is

24

warranted.  As the *Al Kassar* Court notes, "A reasonable jury thus could have concluded that the defendants were predisposed to commit *the crimes for which they were convicted*. This may have been a close call, especially with respect to al Ghazi, *but it was a call for the jury to make*."  *Al Kassar*, 660 F.3d at 120 (emphasis added).  The focus for the Court in admitting any evidence of predisposition is on whether the evidence tends to prove not some general criminal propensity, but whether it evidences predisposition to commit *the crimes charged*.

### 3.    *United States v. Thickstun*, 110 F.3d 1394 (9th Cir. 1997)

Nor does *Thickstun* support the government's argument.  The eagerness in *Thickstun* was an eagerness to *engage in the charged conduct* (i.e., bribery of a government agent).  This differs from the case at bar.  The evidence of eagerness that the government wants to proffer here is a generalized desire to commit a crime – not a specific eagerness to commit the charged offense.  Without a connection between Mr. Domingo's putative impatience and the crime charged (i.e., the attempted use of a weapon of mass destruction), the proffered evidence is irrelevant and does not rebut Mr. Domingo's entrapment defense.

### 4.    *United States v. Wolf*, 691 Fed. Appx. 438 (9th Cir. May 24, 2017)

The defendant in *Wolf* was changed with illegal possession of a machine gun.  The evidence proffered by the government in *Wolf* to rebut the entrapment defense showed that the defendant wanted to obtain powerful weapons (i.e., an illegal machine gun).  None of the government's proffered evidence in Mr. Domingo's case shows that he wanted to obtain or use a weapon of mass destruction in committing an attack prior to meeting with the CHS.  As noted, this was the CHS's idea, not Mr. Domingo's.  The facts of *Wolf* do not square with the facts at bar and, as such, *Wolf* should be rejected.

### V.  CONCLUSION

Based on the foregoing, the Court should deny the government's motion and permit Mr. Domingo to present an entrapment defense.