NICOLA T. HANNA
United States Attorney
CHRISTOPHER D. GRIGG
Assistant United States Attorney
Chief, National Security Division
REEMA M. EL-AMAMY (Cal. Bar No. 237743)
DAVID T. RYAN (Cal Bar No. 295785)
Assistant United States Attorneys
Terrorism and Export Crimes Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:  (213) 894-0552/4491
    Facsimile:  (213) 894-2979
    E-mail:     reema.el-amamy@usdoj.gov
                david.ryan@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

              Plaintiff,

                    v.

MARK STEVEN DOMINGO,

              Defendant.

No. CR 19-313-SVW

GOVERNMENT'S OPPOSITION TO
DEFENDANT'S MOTION TO EXCLUDE
STATEMENTS

        Plaintiff United States of America, by and through its counsel

of record, the United States Attorney for the Central District of

California and Assistant United States Attorneys Reema M. El-Amamy

and David T. Ryan, hereby files its Opposition to Defendant's Motion

to Exclude Statements (the "Opposition").

//

//

//

1    This Opposition is based on the attached memorandum of points

2 and authorities, the files and records in this case, and any further

3 evidence or argument the Court may allow.

4  Dated: June 15, 2020              Respectfully submitted,

5                                    NICOLA T. HANNA
                                     United States Attorney
6
                                     CHRISTOPHER D. GRIGG
7                                    Assistant United States Attorney
                                     Chief, National Security Division
8

9                                    _____/s/_____
                                     REEMA M. EL-AMAMY
10                                   DAVID T. RYAN
                                     Assistant United States Attorney
11
                                     Attorneys for Plaintiff
12                                   UNITED STATES OF AMERICA

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................i

MEMORANDUM OF POINTS AND AUTHORITIES................................1

I.    INTRODUCTION..................................................1

II.   STATEMENT OF FACTS...........................................2

    A.    Category One: Defendant's Statements Regarding His
        Hatred Of and Desire To Kill Jews........................2

    B.    Category Two: Defendant's Statements Regarding His
        Desire to Destroy the West and Impose Sharia Law.........4

    C.    Category Three: Defendant's Statements Regarding His
        Support for ISIS.........................................5

    D.    Category Four: Defendant's Statements Regarding His
        Desire to Commit Mass-Casualty Attacks and Provoke
        Civil Unrest.............................................5

    E.    Category Five: Defendant's Post-Arrest Statements
        Regarding Why He Chose to Attack the Long Beach Rally
        and That He "Wanted To Kill Americans"....................7

III.  ARGUMENT.....................................................8

    A.    Defendant's Statements Are Highly Probative of His
        Knowledge, Motive, and Intent to Commit the Charged
        Crimes...................................................8

    B.    The Danger of Unfair Prejudice Does Not Substantially
        Outweigh the Probative Value of the Evidence............10

    C.    Defendant's Consumption and Promotion of Violent ISIS
        Propaganda Is Admissible to Rebut an Entrapment
        Defense.................................................12

    D.    Admission of Defendant's Repugnant Statements Does Not
        Implicate His First Amendment Right.....................12

IV.   CONCLUSION..................................................13

**TABLE OF AUTHORITIES**

**Cases**

Wisconsin v. Mitchell

  508 U.S. 476 (1993)...........................................13

United States v. Mehanna,

  735 F.3d 32 (1st Cir. 2013).................................11

United States v. Abu-Jihaad,

  630 F.3d 102 (2d Cir. 2010)..................................9

United States v. Brady,

  579 F.2d 1121 (9th Cir. 1978)...............................11

United States v. Busby,

  780 F.2d 804 (9th Cir. 1986)................................12

United States v. Curtin,

  489 F.3d 935 (9th Cir. 2007)................................10

United States v. Farhane,

  634 F.3d 127 (2d Cir. 2011)..................................9

United States v. Goseyun,

  789 F.2d 1386 (9th Cir. 1986)...............................11

United States v. Livoti,

  196 F.3d 322 (2d Cir. 1999).................................10

United States v. Mohamud,

  843 F.3d 420 (9th Cir. 2016).................................9

United States v. Mostafa,

  16 F. Supp. 3d 236 (S.D.N.Y. 2014)........................9, 10

United States v. Rahman,

  189 F.3d 88, (2d Cir. 1999)..................................9

United States v. Salameh,

  152 F.3d 88 (2d Cir. 1998)..................................11

**Statutes**

18 U.S.C. § 2332a(a)(2)..........................................8, 9

18 U.S.C. § 2339A....................................................8

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.   INTRODUCTION

3     Defendant Mark Steven Domingo ("defendant") moved to exclude
4 broad swaths of evidence that demonstrate his intent to carry out the
5 charged conduct.  Specifically, he seeks to exclude: (1) statements
6 regarding his hatred of and desire to kill Jews (whom he proposed
7 targeting in his initial meetings with the CHS); (2) statements
8 regarding his desire to destroy the "West" and impose Sharia law;
9 (3) statements regarding his support for ISIS (whose propaganda he
10 said inspired his desire to commit an attack); (4) statements
11 regarding his desire to commit mass-casualty attacks and provoke
12 civil unrest in the United States (which he said was the purpose of
13 the attack in this case); and (5) post-arrest statements explaining
14 why he chose to attack the Long Beach rally and saying agents should
15 kill him because he "wanted to kill Americans."

16     Once again, defendant attempts to sanitize his abhorrent acts
17 through the artificial and illogical exclusion of probative evidence.
18 Defendant's efforts are unavailing.  (See Defendant's Motion to
19 Exclude Evidence of Other Terrorist Attacks (Dkt. 56), Motion to
20 Exclude Prejudicial Language (Dkt. 57), Motion to Exclude Violent
21 Materials (Dkt. 75)).  First, defendant's statements are directly
22 relevant to the charged crimes and probative of his intent.  Second,
23 while his statements are objectionable, they are not inadmissible
24 simply because they paint him in a bad light.  Third, if defendant
25 presents an entrapment defense, the statements are also probative of
26 his predisposition to commit the charged crimes.  Lastly, the First
27 Amendment is inapplicable; defendant cannot invoke his free speech
28 rights to preclude otherwise admissible evidence at trial.

## II.   STATEMENT OF FACTS

The government set forth a detailed statement of facts in support of its Motion in limine to Preclude an Entrapment Defense (Dkt. 61 at 2-13), and incorporates those facts by reference.  As relevant here, the statement of facts set forth how defendant repeatedly made statements on the five broad topics which defendant now seeks to exclude.  Indeed, his statements that touch on those five categories are not isolated; they permeate the evidence in this case.  Defendant repeatedly spoke about these topics, including while discussing his motive and intent to commit the charged crimes.  The government intends to introduce those statements– many of which touch on several of the five categories defendant seeks to exclude – as evidence of defendant's intent, motive, and predisposition to commit the charged crimes.

### A.   Category One: Defendant's Statements Regarding His Hatred Of and Desire To Kill Jews

Defendant made several statements about his hatred of and desire to kill Jews, including in connection with his attack planning in this case.  Those statements were often combined with expressions of his desire to destroy the West and impose Sharia law (category two), support for ISIS (category three), and his desire to commit mass-casualty attacks (category four).

For example, on May 22, 2017, defendant's friend J.B. sent defendant a private message on Facebook with the text, "It was the kikes[1] all along . . . Straight to the oven."  Defendant replied, "to

---

[1] "Kikes" is a derogatory term for Jews.

2

be fair, they must be given the chance to convert to islam lol.  Now if they refuse ALLAH HU AKBAR!!!!!!"

On March 21, 2019, defendant sent J.B. a picture of ISIS fighters charging forward on a battlefield, and the word, "baqqiyah," which is an Arabic term for "everlasting" or "it shall remain," and which is commonly used by ISIS supporters to project strength despite the group's territorial losses.  Defendant wrote that he hoped St. Peter's basilica "will go thru the same thing."  J.B. responded, "Most likely, but I don't really care for all that.  Let's just get rid of all the kikes for now."  Defendant replied, "agreed.  We'll start off venture blvd."[2]  J.B. replied, "Lawl more like Beverly.  Jews everywhere there."

On March 15, 2019, defendant wrote in an online chat about his desire to commit an attack in retaliation for the Mosque shootings in Christchurch, New Zealand the previous day. Defendant wrote that he was "enraged" and "these fuckers do need to bleed [. . .] one way or another."  In discussing how many people defendant would like to kill, defendant wrote, "Was thinking more like a group theres a bunch of [J]ews around this one street not a lot of parking so they[']re forced to find parking and walk to the synagogue."  Defendant wrote that the synagogue had surveillance cameras, but he did not care about "getting caught" because "some things are worth more."

On March 18, 2019, defendant met the CHS and discussed possible targets for an attack.  Defendant pointed out possible targets to the CHS, including police cars, churches, and a National Guard Armory.

---

[2] "Venture blvd" appears to be a misspelled reference to Ventura Boulevard, a major thoroughfare in the San Fernando Valley where defendant lived, north of Los Angeles.

1   At one point, defendant said, "This is the business street [. . .]

2   the Yahud come here on Saturday.  They're all up and down the street,

3   but there's cameras everywhere.  I mean it's a business you know."

4       **B.    Category Two: Defendant's Statements Regarding His Desire**

5       **to Destroy the West and Impose Sharia Law**

6       Defendant also made several statements about his desire to

7   destroy the West and impose Sharia law.  For example, on June 16,

8   2017, defendant wrote to J.B., "why haven't you burned down a church

9   yet?"  J.B. replied, "Risk:Reward ratio . . . not worth it."

10  Defendant replied, "pussy lol."  J.B. replied, "Burning 1 church

11  wouldn't do jack shit in theory . . . They will just go to the next

12  church down the street.  If you want to traumatize their beliefs you

13  might have to burn down a few dozen local churches.  Sounds like a

14  lot of work and very little reward."  Defendant replied, "sounds like

15  a job for allahs mujahedeen."[3]

16      On March 7, 2019, defendant wrote in an online chatroom that he

17  was looking forward to the collapse of the United States, which would

18  provide "a chance for a conquest . . . to spread the deen."[4]

19      On March 20, 2019, defendant told the OCE that Muslims were

20  taking over the United Kingdom "block by block" and "if our bros had

21  weapons the [United Kingdom] [would] be done."  The OCE asked, "do

22  you think we can do that here?"  Defendant replied, "yep.  US

23  mil[itary] is overrated . . . we'll have to start out in an urban

24  setting . . . turn this place like damascus."

25      On April 11, 2019, a member of the invite-only online chatroom

26  _____

27      [3] "Allah" is Arabic for God, and "mujahedeen" is Arabic for
    those engaged in Jihad.

28      [4] The "deen" is an Arabic word referring to one's faith or
    religion.

                                    4

wrote that ISIS had "launched a massive global military campaign" and is "set to win long term if its enemies continue to proceed with no coherent strategy."  Defendant wrote that he wanted to "just be a martyr already," and that he was "impatient now for war."  Defendant wrote that there was "tension in the air in usa . . . the country is on the verge of mass riots."

### C.   Category Three: Defendant's Statements Regarding His Support for ISIS

Defendant's statements about his support for ISIS permeate the evidence in this case.  The statement of facts set forth in the government's Motion in limine to Preclude an Entrapment Defense shows that defendant repeatedly – both before and during his attack planning – consumed and promoted ISIS propaganda, and expressly stated that he supported ISIS, was inspired by ISIS propaganda and ISIS fighters, and desired to commit an ISIS-style attack inside the United States.

### D.   Category Four: Defendant's Statements Regarding His Desire to Commit Mass-Casualty Attacks and Provoke Civil Unrest

Defendant also directly explained on several occasions that he was motivated to commit the charged crimes in order to harm the United States and provoke civil unrest.  For example, on March 3, 2019, defendant wrote about conducting a mass attack similar to the October 1, 2017 shooting in Las Vegas, Nevada which killed 59 people, stating, "America needs another vegas event [. . .] something to kick off civil unrest [. . .] and its not about winning the civil war its about weakening America giving them a taste of the terror they gladly spread all over the world."

On April 3, 2019, during a meeting with the CHS, defendant said that placing an IED on a freeway "would do damage. [. . .]  An IED, like the ones in Iraq [. . .] blows up on the freeway, hundreds and maybe thousands of US citizens injured."  The CHS asked, "And then what?"  Defendant replied, "Then the fun starts."  Defendant said, "a dead police that will get, like, that will get like the police riled up.  But I need you bro, just the one IED that's going to stir up the hornet's nest, bro."  Defendant said his plan was to "go in fast" and "kill enemies here and there, then we flee."  Defendant said if they caused "small casualties here and there," that would "put the stress" on America and lead to martial law.

On April 26, 2019, after driving to the attack location to finalize plans for the attack, defendant explained his goal, saying "it's designed to cause fear and terror through the capital yeah. But this is also because, I mean you feel it, the tension in the air, left and right . . . there's a civil war brewing bro.  A divided America. . . .  It's not just for the movement but just for the world in general, bro."  Defendant continued, "All around the world America goes on sticking its fucking cock in everyone's fucking business. Now, divided America! . . . I'm banking on a lot of the US fleets, the Navy, that are constantly patrolling to have a strike for us anywhere in the world, they will be forced to duck back here, and, you know, martial law, to bring back order.  Because it's common sense right?  Why patrol the world when your own house is on fire?" Defendant explained that provoking civil war in the United States and causing the US military to impose martial law would "give[] our brothers around the world, the Mujahideen, a little stress off their back. . . .  If we can cause enough civil tension here and bring back

1    the US troops, they all come back here and give our brothers a little

2    more time to fight."

3           E.    **Category Five: Defendant's Post-Arrest Statements Regarding**
                  **Why He Chose to Attack the Long Beach Rally and That He**
4                 **"Wanted To Kill Americans"**

5           After his arrest, defendant participated in a recorded,

6    <u>Mirandized</u> interview.  The government identified the portions of that

7    interview that it seeks to admit in its Opposition to Defendant's

8    Motion to Admit Post-Arrest Statements.  As relevant here, defendant

9    seeks to exclude two of the government's portions.

10          First, in the middle of the interview, the agent said, "You got

11   the chance here to really tell us what the message is that you were

12   trying to send.  Because obviously the attack's not going to happen,

13   so that message can't be sent through a bomb."  Defendant answered,

14   "Perhaps not our attack, but you got a bunch of white nationalists

15   who are armed, who will show up armed . . .  Some swastikas, maybe

16   not swastikas, but, who will show up.  So, maybe not an attack from

17   an Islamic standpoint but, I mean, I mean, surely you must know you

18   get a bunch of Antifa motherfuckers next to a bunch of far-right

19   motherfuckers, you already know what's gonna happen."  The agent

20   asked, "So how does those two being there play into your attack?"

21   Defendant answered, "More bodies."  The agent asked, "What do you

22   mean?"  Defendant answered, "Just more bodies.  Instead of one

23   political party showing up it's two, both opposing parties."  The

24   agent asked, "And by more bodies you mean more people killed?"

25   Defendant answered, "Not necessarily, I mean, it was a wide open area

26   . . . Wide open area, bodies of people have the luxury of moving

27   around, people will move around.  So not necessarily more casualties,

28   but I guess more confusion, so yea."  The agent asked, "what did you

                                        7

imagine would happen after that goes off, after the bomb goes off?"
Defendant answered, "Oh you know the media gets into hysteria, plays
the blame game.  Oh, 'this side did it,' no 'this side did it.'  Then
the fucking normies eat it up as they will, as they do.  They do.
They eat that shit like fucking candy."

Second, at the end of the interview, the agent asked, "Before we
go is there anything else we can get you for the time being?  I know
you've got apple juice.  Anything other than chips?"  Defendant
answered, "No I'm good.  Other than a bullet to the head, save the
taxpayers some money.  I mean surely you two pay taxes."  The agent
said, "Doesn't everyone?"  Defendant answered, "Yea.  I mean surely,
this shithead, wanted to kill Americans, why let him live?  It'd be
doing you guys a great, be doing everyone a great favor.  You can
even spin it off as a media story.  Heroic FBI raid kills extremist!
Go men and women in blue!  There, you secure funding and the love and
adoration of all the fucking normies, who will continue to do drugs
and gamble and all the other shit you guys don't want them doing."

**III.  ARGUMENT**

**A.   Defendant's Statements Are Highly Probative of His
        Knowledge, Motive, and Intent to Commit the Charged Crimes**

Statements on the five topics at issue should be admitted
because they are relevant to defendant's knowledge, motive, and
intent to carry out his planned mass-causality attack.  Defendant is
charged with a violation of 18 U.S.C. § 2339A (Providing Material
Support to Terrorists) and 18 U.S.C. § 2332a(a)(2) (Attempted Use of
a Weapon of Mass Destruction).  For count one, the government is
required to prove that defendant provided material support or
resources "knowing or intending" that they be used in furtherance of

a crime of terrorism, namely 18 U.S.C. § 2332a(a)(2). For count two, the government is required to prove that defendant "attempted" to and "intended" to use a weapon of mass destruction and made a substantial step in furtherance of commission of that crime.

Courts have routinely upheld the admission of similar statements to prove intent and motive in terrorism prosecutions. See, e.g., United States v. Mohamud, 843 F.3d 420, 432 (9th Cir. 2016) (defendant's statements celebrating prior terrorist attacks and encouraging others to engage in violent Jihad demonstrated intent and predisposition); United States v. Farhane, 634 F.3d 127, 165 (2d Cir. 2011) (affirming admission of statements "indicating that [the defendant] held radical views on Islam" which "fueled the formation of the charged conspiratorial agreement to provide material support for jihad"); United States v. Abu-Jihaad, 630 F.3d 102, 131-32 (2d Cir. 2010) (affirming admission of recorded statements by defendant regarding "support for jihad," which statements were "no more inflammatory than the charges in the indictment"); United States v. Rahman, 189 F.3d 88, (2d Cir. 1999) (affirming admission of speeches and statements by the defendant in which he demonstrated his "resentment and hostility toward the United States in order to show his motive for soliciting and procuring illegal attacks against the United States"); United States v. Mostafa, 16 F. Supp. 3d 236, 256 (S.D.N.Y. 2014) (admitting dozens of recorded statements of defendant in which he expressed his support for Jihad, justified killing non-Muslims, and expressed his support for attacking the United States as probative of defendant's knowledge, motive, and intent).

Here, defendant's statements describing his support for ISIS and desire to kill Jews and commit attacks to weaken the United States

1   are probative of a primary material fact the government needs to

2   prove and that defendant seeks to dispute – his intent to commit the

3   charged crimes.   Indeed, defendant told his own friends online that

4   he was inspired to act by ISIS, by his hatred of the United States,

5   and by his desire to weaken the United States by provoking civil

6   unrest, and he repeatedly proposed targeting Jews and synagogues for

7   his attack before ultimately settling on the Long Beach rally.

8       These statements are especially probative because defendant was

9   prevented from carrying out his attack and defendant intends to argue

10  that he never in fact intended to carry out his plan.   The Ninth

11  Circuit has "routinely held that circumstances surrounding an alleged

12  crime become more relevant when the defendant makes his intent a

13  disputed issue."   United States v. Curtin, 489 F.3d 935, 952 (9th

14  Cir. 2007) (en banc).   Defendant's statements demonstrate his motive

15  and intent to commit the charged crimes, and they should be admitted

16  for that purpose.

17      **B.   The Danger of Unfair Prejudice Does Not Substantially
             Outweigh the Probative Value of the Evidence**

18

19      The statements identified above are not unfairly prejudicial

20  merely because they contain offensive language.   Under Rule 403,

21  generally "[e]vidence will not be excluded as unduly prejudicial when

22  it is not more inflammatory than the charged crime."   United States

23  v. Livoti, 196 F.3d 322, 326 (2d Cir. 1999).   Here, defendant is

24  charged with providing material support to, and attempting to commit,

25  a horrifically violent attack.   His recorded statements explaining

26  what he intended to do and why are not more inflammatory than the

27  actions he took to attempt to carry out the attack.   See Mostafa, 16

28  F. Supp. 3d at 257 ("While it is prejudicial that the defendant has

10

1    stated that he supports violent jihad, this is similar to, and no

2    more prejudicial than, the crimes with which he has been charged.")

3    As the First Circuit explained in a terrorism trial, "Rule 403 does

4    not ensure that trials—even criminal trials—will be antiseptic

5    affairs," and "terrorism-related evidence is often emotionally

6    charged." United States v. Mehanna, 735 F.3d 32, 64-65 (1st Cir.

7    2013).  That "emotional overlay is directly related to the nature of

8    the crimes" that terrorist supporters commit.  Id. at 64.

9          Indeed, courts have repeatedly held that evidence is not

10   inadmissible solely because it has a tendency to upset or disturb the

11   trier of fact.  United States v. Goseyun, 789 F.2d 1386, 1387 (9th

12   Cir. 1986) (affirming admission of photograph of victim's beaten body

13   as to show cause of death and willful, deliberate and premeditated

14   nature of the murder); United States v. Brady, 579 F.2d 1121, 1129

15   (9th Cir. 1978) (holding that graphic murder photographs are

16   inadmissible "only when the picture is of such gruesome and

17   horrifying nature that its probative value is outweighed by the

18   danger of inflaming the jury"); United States v. Salameh, 152 F.3d

19   88, 123 (2d Cir. 1998) (affirming admission of "shocking" photographs

20   of people killed in bombing, including photograph of pregnant

21   victim).

22         Here, defendant's statements are highly probative of his

23   knowledge, motive, and intent to commit the charged crimes, and their

24   probative value is not substantially outweighed by the risk of

25   prejudice under Rule 403.

26

27

28

**C. Defendant's Consumption and Promotion of Violent ISIS Propaganda Is Admissible to Rebut an Entrapment Defense**

Finally, if defendant is permitted to present an entrapment defense, the statements identified above should also be admitted to demonstrate predisposition and lack of inducement.  When a defendant presents an entrapment defense, the government bears the burden of proving beyond a reasonable doubt that either: (1) he was predisposed to commit the crime before being contacted by government agents; or (2) he was not induced by the government agents to commit the crime. See Ninth Circuit Model Jury Instruction No. 6.2 (entrapment).

The most important factor courts consider to determine whether a defendant was predisposed to commit an offense is whether the defendant was reluctant to commit the offense.  See United States v. Busby, 780 F.2d 804, 807 (9th Cir. 1986).  Here, the statements identified above – in which defendant expresses his desire to commit mass-casualty attacks and explains his motive for committing such attacks – show that defendant not only lacked reluctance, he was radicalized and inspired to commit mass-casualty terrorist attacks well before he ever met a government agent.  Accordingly, if defendant is permitted to raise an entrapment defense, the government must be permitted to rebut it with the evidence identified above.

**D. Admission of Defendant's Repugnant Statements Does Not Implicate His First Amendment Right**

The First Amendment protects free speech rights, including the right to make abhorrent and objectionable declarations.  The First Amendment does not, however, insulate a defendant from the introduction of otherwise admissible evidence at trial.  Defendant's

12

assertion that the statements at issue are "protected by the First Amendment right to freedom of speech" is inapposite.  (Mot. at 2).

As the Supreme Court held in <u>Wisconsin v. Mitchell</u>:

> [t]he First Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent.  Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like.

508 U.S. 476, 489 (1993).   The First Amendment may have protected defendant when he professed his hatred of Jews and other minorities. But the First Amendment has no bearing on the admissibility of the statements he made under its protections at trial.

**IV.   CONCLUSION**

For the foregoing reasons, the Court should deny defendant's motion to exclude statements.