UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

Case No.  2:19-cr-00313-SVW-1                                                               Date: 7/31/2020

The Honorable: Stephen V. Wilson

Interpreter: NA

| Deputy Clerk | Court Reporter / Recorder | Assistant U.S. Attorney |
|---|---|---|
| Paul Cruz | NA | Reema M El-Amamy, David T Ryan |

| U.S.A. v. Defendant(s) | Present | Cust | Bond | Attorneys for Defendants: | Present | App | Ret |
|---|---|---|---|---|---|---|---|
| Mark Steven Domingo | | X | | Angela Viramontes, David Wasserman | | X | |

**Proceedings:** TENTATIVE ORDER DENYING THE GOVERNMENT'S MOTION TO PRECLUDE AN ENTRAPMENT DEFENSE [61]

     Defendant Mark Steven Domingo ("Defendant") is charged with one count of violating 18 U.S.C. § 2339A (Providing Material Support to Terrorists), and one count of violating 18 U.S.C. § 2332a(a)(2) (Use of a Weapon of Mass Destruction). These charges arise from his attempt to detonate a bomb at a planned white supremacist rally in Long Beach, California (the "Long Beach rally") on April 28, 2019. Defendant was contacted online by several individual Government agents and sources after he made certain comments expressing a desire for retribution following the New Zealand mosque shootings that occurred on March 15, 2019.[1] The Government has filed a motion seeking to preclude an entrapment defense by Defendant, which he opposes.

     The Court will adopt the nomenclature used by the parties to describe the key individuals in this order. The confidential human source ("CHS") is the individual who interacted with Defendant at length on multiple occasions after initially reaching out to him online, and the undercover officer ("UCE") is the individual who provided what Defendant believed to be an improvised explosive device ("IED").[2] The Government's briefing and the transcripts provided to the Court reference but do not define an "OCE" individual as well. The Court's understanding is that this individual is another Government agent or informant who interacted with Defendant online but never met him in person.

---

[1] The New Zealand mosque shootings occurred on March 15, 2019, although the Government states that Defendant made his initial online postings on March 14, 2019. Given New Zealand's geographic location, this appears to be possible based on the respective time zones New Zealand and the West Coast of the United States are located in.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

"The entrapment defense has two elements: '(1) the defendant was induced to commit the crime by a government agent, and (2) he was not otherwise predisposed to commit the crime.'" *United States v. Spentz,* 653 F.3d 815, 818 (9th Cir. 2011) (citing *United States v. Barry,* 814 F.2d 1400, 1401 (9th Cir. 1987)). "A defendant is not entitled to have the issue of entrapment submitted to the jury in the absence of evidence showing some inducement by a government agent *and* a lack of predisposition by the defendant." *Rhodes,* 713 F.2d at 467 (emphasis in original); *see also United States v. Kabir*, 2015 WL 631961, at *2 (C.D. Cal. Feb. 13, 2015).

"Inducement can be any government conduct creating a substantial risk that an otherwise law-abiding citizen would commit an offense, including persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy or friendship." *United States v. Gurolla*, 333 F.3d 944, 954 (9th Cir. 2003) (quoting *United States v. Poehlman,* 217 F.3d 692, 698). "[E]ven very subtle governmental pressure, if skillfully applied, can amount to inducement." *Poehlman*, 217 F.3d at 701-02.

The Ninth Circuit has identified five factors to consider in determining whether a defendant was predisposed to commit the charged crimes: (1) the character or reputation of the defendant, including any prior criminal record; (2) whether the suggestion of the criminal activity was initially made by the Government; (3) whether the defendant was engaged in the criminal activity for profit; (4) whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion; and (5) the nature of the inducement or persuasion supplied by the Government. *United States v. Cortes,* 757 F.3d 850, 858 (9th Cir. 2014) (quoting *United States v. Busby,* 780 F.2d 804, 807 (9th Cir. 1986)). "Although none of these factors is controlling, the defendant's reluctance to engage in criminal activity is the most important." *Id.* (quoting *Busby,* 780 F.2d at 807).

A defendant need only present "slight evidence" of entrapment to present the defense to the jury. *Gurolla,* 333 F.3d at 956 (9th Cir. 2003). "Only slight evidence will create the factual issue necessary to get the defense to the jury, even though the evidence is weak, insufficient, inconsistent, or of doubtful credibility." *Id.* at 951 (citing *United States v. Becerra,* 992 F.2d 960, 963 (9th Cir.1993)). Again, however, the defendant must show slight evidence of both elements. *Id.*

1. **Admissibility Issues**

In the Government's Reply brief, they raise the issues of the admissibility of Defendant's recorded statements, arguing that while they are entitled to introduce Defendant's out of court statements because they are the statement of a party opponent, excluded from the hearsay rule under Fed. R. Evid. 801(d)(2)(A), Defendant cannot present his own prior statements because they are hearsay when submitted in his defense. Dkt. 120 at 4-5.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

The Court is not persuaded that the hearsay rule bars Defendant from admitting each of the potentially relevant recorded statements he made during the course of planning the bombing. Unlike in the case cited by the Government in support of this argument, *United States v. Nakai*, 413 F.3d 1019, 1022 (9th Cir. 2005), where the excluded out-of-court statement was only relevant to the extent that it was it was truthful, Defendant's statements may be relevant to the predisposition analysis for reasons unrelated to their truth or falsehood, given the nature of the predisposition inquiry at issue here.

As the Court will explain in more detail below, some of Defendant's statements made on April 23rd and 24th, where he discusses delaying the bombing and then is repeatedly told by the CHS that they should go through with the planned April 28, 2019 date, may constitute evidence that Defendant expressed limited reluctance prior to engaging in the charged criminal activity. To the extent that these statements are offered not to prove the truth of any factual issue in dispute, but rather to show that Defendant expressed reluctance (at a point prior to his arrest) to engage in the charged criminal activity. *See* Fed. R. Evidence 801 advisory committee's note ("verbal conduct which is assertive but offered as a basis for inferring something other than the matter asserted, [is] also excluded from the definition of hearsay by the language of subdivision (c)"); *see also United States v. Arteaga*, 117 F.3d 388, 397 (9th Cir. 1997) (describing "circumstantial evidence of state of mind" as a non-hearsay use for out of court statements).

Additionally, an exception to the hearsay rule exists for statements of "then-existing mental, emotional, or physical condition. *See* Fed. R. Evid. 803(3). This exception includes "statement[s] of a declarant's then-existing state of mind (such as motive, intent, or plan)" although it does not include a statement of memory or belief to prove the fact remembered or believed. *Id.* Defendant's statements regarding his current mental or emotional state[3], present desire to postpone the bombing, or even his belief they should not "rush into this head first" may also be admissible to suggest reluctance to engage in the bombing, which would be relevant to the predisposition analysis. *See United States v. Mohamud*, 666 F. App'x 591, 596 (9th Cir. 2016) (finding that the district court likely erred by excluding contemporaneous communications that "reflected a lack of predisposition to commit the crime charged").

2. **Inducement**

During the course of the government's contact with Defendant through the CHS, they spent a substantial period of time together. They shared meals, discussed Islamic faith and current affairs, prayed together, and discussed Defendant's relationship and family problems in detail. All of this conduct occurred before the Defendant took any substantial step towards the charged conduct in this case. At various times, the CHS told him that Defendant that he was "pure" in his Islamic faith, that if the CHS had a sister, he would give her to

---

[3] The Court acknowledges that there are limits to this exception, and that extended portions of the recordings detailing workplace or relationship issues experienced by Defendant would not fit within this exception.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

Plaintiff as a wife (after Defendant expresses his desire for an "Arab wife"), and Defendant offers on April 8, 2019 to fly overseas to escort a women (who the CHS expressed a wish to have enter the US) into the country for the CHS. The CHS refers to Defendant as his "brother" on countless occasions, spends substantial time praising Defendant's "holiness," purity, and mental and physical fitness, and tells him in the days leading up to the planned bombing that they are "family." He also suggested and facilitated the introduction of the IED into the planned criminal activity, and in the days leading up to the planned bombing made repeated references to how he drew strength from Defendant's courage and willingness to participate in the planned bombing.

At the April 23rd meeting Defendant repeatedly expressed concerns regarding the blast radius and how close they would have to be to successfully detonate it. The next day, the CHS told Defendant shortly before the rally that he had discovered that his bomb-making source (in reality the UCE) could make a remote timer to ensure that they could remain hidden at the time of detonation, and repeatedly expressed to Defendant that "we can't wait any more," while appealing to his religious beliefs and telling him how excited the CHS was to experience the "reward" conducting the bombing would bring. The CHS suggested that Defendant was "scared," prompting Defendant to deny that he was scared and assert his willingness meet "face to face" with his enemies. The next day, Defendant sent a message to the UCE instructing him to begin making the IED.

This activity occurred over the course of approximately six weeks from mid-March 2019 until late April 2019, a substantially shorter period of time than in other cases related to friendship or sympathy-based inducement by government actors. *See Poehlman*, 217 F.3d at 698-700 (six months of emails during which Government contact persistently urged defendant to articulate fantasies regarding underaged girls); *Jacobson v. United States*, 503 U.S. 540, 550 (1992) (26 months of repeated mailings and communications by Government agents). But at this stage Defendant must present only "slight evidence" of government inducement, and it is readily apparent from the evidence before the Court that the CHS sought to become a friend to Defendant, gained his trust and respect, and ultimately urged him to follow through with his plan to bomb the Long Beach rally. A jury could draw an inference from this pattern of conduct that the CHS' actions during this time period encouraged and persuaded Defendant to take the substantial steps toward the planned bombing that resulted in his arrest, and find that they would not have occurred absent his encouragement and persuasion. Because the relevant standard to permit an entrapment defense is only "slight evidence" of inducement, the Court finds that even this limited course of Government conduct is sufficient to satisfy Defendant's burden with regard to this factor.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

3. **Predisposition**

   a. *Character and Conduct and Profit Motive*

There is no evidence that suggests that Defendant previously engaged in similar criminal activity to the charged offense. Nor is there any evidence presented by the Government that indicates that Defendant engaged in this activity for profit.

The Government does present substantial evidence that for years leading up to the planned bombing, beginning in May 2017, Defendant had encouraged and supported Islamic terrorist activities, including bombings, through his online activities. Defendant also expressed his belief (without expressly stating that he planned to undertake such activities himself) that another mass shooting event like the October 1, 2017 mass shooting in Las Vegas, Nevada was needed to "kick off civil unrest" and spread terror to the United States. On March 14, 2019, Defendant wrote following the shootings that had just occurred at two mosques in New Zealand that "there must be retribution" for those events. This precipitated the online contact first initiated by the OCE and the CHS.

The Court finds that it is inappropriate in the context of this type of criminal activity (which is very rarely motivated by financial gain), to give substantial weight to the fact that Defendant was not motivated by profit and did not have a prior criminal history of any kind. *See United States v. Kabir*, 2015 WL 631961, at *3 (C.D. Cal. Feb. 13, 2015). As noted by that court, finding these factors to be dispositive would give all first-time offenders committing crimes that are not financially motivated a *per se* finding of lack of predisposition, regardless of the facts presented on the other relevant factors to the predisposition analysis. *Id.* However, the Government has not presented any evidence that Defendant engaged in any tangible action, or even substantial planning, in advance of the Government's attempts to contact him. *Cf. Kabir*, 2015 WL 631961, at *4 (C.D. Cal. Feb. 13, 2015) (finding no evidence that would support a lack of predisposition sufficient to warrant an entrapment instruction when undisputed evidence showed that defendant had formed the specific intent to join and fight with terrorist forces overseas months before the initial government contact occurred). Although the Government presents strong, clearly admissible evidence that might persuade a reasonable jury that Defendant's substantial history of endorsement of violent Islamic terrorism suggests that he was clearly predisposed to engaged in the charged criminal activity, a jury could alternatively draw the conclusions that he was predisposed to "talk" but not necessarily to "do"— particularly given the fact that (prior to Government contact) it does not appear that he made any substantial step toward criminal activity despite posting online messages during the two-year period referenced by the Government.

The Government can certainly present evidence that Defendant's prior character and conduct favors a predisposition to engage in this manner of criminal activity. *See Mohamud*, 843 F.3d at 434 (finding that a defendant's online activities and advocacy for terrorist activities, without direct action, constituted evidence of a predisposition to provide material support for terrorism). But the Court finds that the fact that Defendant did not

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

take any substantive action during this two-year period could alternatively support an inference that he was not inclined to act until the Government contacted him, and thus that a reasonable jury could potentially weigh this factor in Defendant's favor.

      *b.* ***Whether Defendant initially suggested the criminal activity.***

      Both the CHS and the OCE contacted Defendant online shortly after he posted that "there will be retribution" for the New Zealand mosque shootings. In the initial conversation with the OCE, in response to the OCE's query "[w]hat's one kuffar killed? With some planning we could really take revenge and show the world you don't fuck with the *Ummah*[4]" Defendant stated that he was "thinking more like a group," and that "there[']s a bunch of jews around this one street not a lot of parking so they[']re forced to find parking and walk to the synagogue." When asked when the individuals would be there, he stated that they attend nearby synagogues on Saturdays for worship. The conversation that turned to Defendant's weapons and various other topics, without additional reference to his prior statements. Defendant's initial online conversation with the CHS, besides discussing general anger over the mosque shooting and using an AK-47 more generally, does not discuss definitive plans to engage in any criminal activity. Defendant later vaguely references the high rate of unsolved murders in his neighborhood.

      On March 18, 2019, the Defendant and the CHS met in-person. During the course of their conversation, Defendant again references the presence of Jews on Ventura Boulevard, their Saturday synagogue attendance, and implies that although there are "cameras" at that location, he may do something for "the honor of our religion." CHS asks him if he really wants to do "it" (without expressly defining what "it" is), and Defendant asserts that he does "wanna do it." The CHS responds that they will "put him in jail." The CHS says that his "plan" won't work, that he will become a martyr or be caught, to which Defendant responds "if they catch me." Defendant later states that it would be "better not to be taken alive," and that he has nine AK-47 magazines, five of which are loaded. After detailed discussion of his other armaments, the CHS again tells Defendant that he does not believe that Defendant's plan will work, and that "they" will be caught. Defendant acknowledges this, and states that they will "chill for a bit" instead. The CHS then states that he has a brother, a refugee who may be able to help them and knows "stuff." Later, the CHS explains that his brother "used to make IEDs," to which Defendant replies "[t]hat's even better."

      Defendant argues that the fact that the CHS initially proposed the use of an IED demonstrates that the Government initially suggested the criminal activity charged in this case, supporting his argument that he was not predisposed to engage in the charged criminal activity. The Government argues in response that Defendant initially referenced the possibility of targeting Jews on Ventura Boulevard in his online conversations with the OCE, and later articulated a plan to shoot Jews on Ventura Boulevard on a Saturday, in response to the New Zealand mosque shooting. Defendant argues that because the elements of the charged crimes in the indictment

---

[4] "Ummah" refers to the collective Muslim religious community.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

expressly required the use of a weapon of mass destruction such as the IED suggested by the CHS, that the Government should be considered the party that initially suggested the criminal activity in this context.

Prior Ninth Circuit cases suggest that an initial suggestion of criminal activity that is substantially similar to the charged conduct is sufficient to find that this factor weighs against a defendant. In *United States v. Williams*, 547 F.3d 1187 (9th Cir. 2008), the Ninth Circuit held that when a defendant initially stated a plan to commit bank robbery, and the Government agent instead proposed a stash house robbery, the defendant initially suggested the criminal activity, because those criminal schemes, while "not identical," were substantively similar. *Id.* at 1198. Other circuit courts have reached similar conclusions, rejecting a "narrow and hyper-technical view of predisposition" when a defendant argued that while he was predisposed to molest children, he was not predisposed to *travel across state lines* to do so. *See United States v. Al-Cholan*, 610 F.3d 945, 951 (6th Cir. 2010) (declining to adopt rule that predisposition cannot be shown "without specific evidence of inclination to commit every element of the precise crime of conviction"). In contrast, when the charged criminal activity differs substantially in seriousness, courts have found that previously engaging in a less culpable form of criminal activity does not necessarily suggest a predisposition to engage in a more serious offense. *See United States v. McGill*, 754 F.3d 452, 458 (7th Cir. 2014) (evidence of a predisposition to possess child pornography does not suggest a predisposition to *distribute* child pornography, absent other evidence). In the relatively similar context of *United States v. Mohamud*, 843 F.3d 420 (9th Cir. 2016), the Ninth Circuit's analysis of this factor placed particular emphasis on the fact that the defendant initially suggested the possibility of a using a car filled with explosives to the Government agent, although it also noted that the defendant had expressed a generalized desire to "wage war" in the United States as well beforehand. *Id.* at 433. The Court finds that this precedent establishes that determining which party initially suggested the "criminal activity" for purposes of this analysis requires consideration of the seriousness and substantive similarity of the proposed conduct, rather than a narrow view of the elements of the suggested versus the actual crime ultimately charged against the defendant.

The Court concludes that this factor may potentially weigh in Defendant's favor. First, the Court finds that there is a greater difference between potentially shooting an individual (or multiple individuals) on Ventura Boulevard and committing a large-scale bombing of the Long Beach rally than the difference between committing a robbery of a stash house rather than a bank. *See Williams*, 547 F.3d 1187 at 1198; *Mohamud*, 843 F.3d at 433 (defendant suggested a car bombing, the precise type of activity ultimately leading to indictment for providing material support to terrorism). Second, the CHS' suggestion of an IED and his following proposal that they place an IED under a car and then utilize a timer to detonate it corresponds quite closely with the pattern of events that ultimately led to Defendant's arrest for attempted bombing of the Long Beach rally. A jury could alternatively conclude that the CHS's suggestion represents only a different tactic suggested by the CHS, one immediately and enthusiastically endorsed by Defendant. The Court also notes that on April 19, 2019, Defendant made the specific suggestion that they target the planned Long Beach rally on April 28, 2019. But because this course of events may be susceptible to varying interpretations by a reasonable jury, the Court finds

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

that this factor may lend some support to Defendant's argument that he has made *prima facie* showing that he was not predisposed to commit the charged criminal activity.

    *c.* **Whether Defendant showed expressed any reluctance to engage in the criminal activity.**

Defendant bases his argument that he can demonstrate some evidence that he was reluctant to engage in the charged criminal activity on (1) the fact that he repeatedly refers to his desire use his AK-47 and other firearms to shoot individuals during the planning stage of the bombing, rather than solely focusing on the planned detonation of an IED at the Long Beach rally, and (2) the fact that on several occasions leading up to the planned bombing of the Long Beach rally he discussed potentially delaying the bombing in order to first experience Ramadan.[5]

    *i.* <u>Defendant's references to using his AK-47.</u>

The Court has extensively reviewed the referenced portions of the recorded conversations between Defendant and the CHS that relate to his desire to use his AK-47 to shoot individuals. It does not find that any of these references support an inference that Defendant was *reluctant* use an IED. Defendant appears to have discussed at length using an AK-47 in *conjunction* with the bombing, in one case expressing a desire to make use of the chaos following the detonation of an IED to shoot additional individuals. Defendant also repeatedly discusses using his AK-47 to shoot at police cars, implies that he will use it to fight if government agents approach his home, and discusses modifications to the AK-47 at length that permit him to use it more efficiently. At no point in any of the referenced transcripts does Defendant express actual reluctance to use an IED, and indeed he repeatedly references the advantages using an IED will give them, first noting that it would be "even better" than his initial plan to engage in a mass shooting on Ventura Boulevard, and later noting that an IED "would be more damage and would be better to transport." Defendant asks the Court to draw an inference that his repeated emphasis on the possibility of using his AK-47 shows that he was reluctant to use an IED, but the Court cannot find that a reasonable jury could possibly reach that conclusion from his comments based on the evidence before the Court, and without any indication that Defendant intends to testify to that effect.

    *ii.* <u>Defendant's discussion of delaying the planned bombing.</u>

Defendant also relies on the fact that on April 23 and April 24, 2019 he discussed with the CHS delaying the planned bombing so that he could participate in Ramadan and alternatively target the Santa Monica Pier during the summer. On April 23, 2019, Defendant and the CHS discuss their plan for the Long Beach bombing and reference the possibility that the April 28, 2019 rally might be cancelled. Defendant inquires as to the possibility that the UCE might make the IED for them beforehand and let them "keep it on the side," but the

---

[5] Ramadan is month in the Islamic calendar during which observant Muslims fast from sunrise to sunset and in 2019 that took place between May 6 and June 3, shortly after the planned bombing on April 26, 2019.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

CHS responds that it is highly sensitive, in response to which Defendant offers to store the IED at his home. Defendant clarifies that if the IED has no "time limit" then "we can just do this whenever." Defendant then states that they should "arm up for the time being," but that due to "drama" (relationship issues with a romantic partner he later discusses at length) his "faith is weak right now." Defendant and the CHS then discuss reimbursement for non-LED lights purchased by the CHS that are necessary for construction of the IED, and the possibility of instead targeting a different protest at Huntington Beach, scheduled for April 27, 2019. Defendant also raises the possibility of a Fourth of July bombing in the event they do not go forward with the attack "this weekend" (April 27-28, 2019), and discusses the possibility of targeting the Santa Monica Pier for a bombing on that date.

Defendant then weighs the benefits and drawbacks of the different sites. The Santa Monica Pier it is a "bigger target", "more condensed," and has "more people." Defendant and CHS would "stick out" in Huntington Beach, because it is "all white people," while Long Beach is more mixed. Defendant then references his desire to experience Ramadan "at least once," and the CHS tells him it is "up to you." Defendant then indicates that he will contact the UCE to verify that there is no time limit use the IED, and states that if there is any time limit, they will "plan I guess for a later date." Defendant again expresses his desire to experience Ramadan "at least once." Defendant and the CHS then discuss the nails Defendant already purchased for use in the IED, their length and effectiveness in piercing vital organs, and how to react to the detonation in a manner that disguises their involvement in the bombing.

Defendant and the CHS later discuss the blast radius for the bomb, where to detonate it from, how to exit the site of the bombing, and whether Defendant should bring a gun to the bombing. The UCE later arrives and the three individuals continue to discuss technical requirements for the IED, the blast radius, and the specific advantages of the April 28, 2019 Long Beach rally— specifically the possibility that both white supremacists and left-wing supporters will be there, leading to increased "civil tension" if they carry out a bombing in that atmosphere. Defendant again inquires as to the possibility of storing the IED for the future, referencing the fact that his "faith . . . is not the strongest" because he is experiencing personal issues at the moment. Defendant reiterates that he wants to the IED to be near completion, but does not want to create a danger of immediate detonation. The UCE explains that it the IED will be dangerous if stored for a long period of time and tells Defendant that they could also "walk away." Defendant responds that they are already committed, and that they are "just setting the date for some, for an operation." Defendant then notes the benefits of the Long Beach rally which brings both far-right and far-left protesters together, but states that he believes the white nationalists cancelled that rally based on their fear of an "antifa" presence, and reiterates the countervailing benefits of a Santa Monica Pier bombing at a later date.

After the UCE indicates that he needs several days to prepare the IED and travel to Los Angeles, the three conspirators discuss the possibility of utilizing a timer function so that they would not need to stay close to the blast radius to detonate it. Defendant notes that for the Santa Monica Pier, a timer would work well because

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

"homeless people leave bags everywhere." The UCE accepts non-LED lights purchased by the CHS and states that he will need to verify that they are appropriate for use in constructing the IED.

Defendant then states that he wants to do the April 28th bombing, but because his first Ramadan experience is close, he thinks that they should delay it. He states that his "warmonger" side would like to act on the 28th but his "spiritual side" would first prefer to experience Ramadan. He then offers to buy the UCE an AK-47 and discusses ambushing US military forces near Camp Pendleton near where the UCE lives. Shortly before the UCE's departure, Defendant responds to the CHS' comment that he hopes he got the "right stuff" to enable the UCE to manufacture the IED by stating that "Like I said, we're, we're not doing it this weekend," and that they can always order more supplies from Amazon.

On April 24, 2019, the CHS calls Defendant at approximately 10:00 PM. The CHS informs him that the April 28, 2019 rally is still going forward, and that the CHS has manufactured a timer that does not require them to be nearby when the IED is detonated. The CHS makes it apparent that he feels that this is a good opportunity, and that they will not be caught. The Defendant states that he is unsure, that "I don't want to rush him now," and that if he had known the night before, he would have agreed, but now he "doesn't want anyone to rush." CHS continues to emphasize the advantages of the timer, and Defendant states that he though they had agreed to wait until Ramadan is over. CHS indicates that he believes that "[w]e can't wait any more," that Defendant was previously ready to act, and that with the timer they can watch from a distance safely. Defendant responds that he appreciates the enthusiasm but does not want to "rush into this head first," and then states that "[i]f I give the go ahead," they will need to drive out to a specific location in order to prepare for the bombing.[6] Defendant and the CHS then discuss the possibility of surveillance and the need to maintain a calm demeanor after the blast or ensure that they are far away. Defendant then says he will "sleep on it," and blames his mood and emotions on the turmoil he is experiencing in his personal life. Defendant then indicates that he also received confirmation that the April 28, 2019 rally has not been cancelled and will go forward.

Defendant describes "types" of individuals the rally will attract, and CHS asks him if he is scared. Defendant responds that he isn't, that "[he's] the one who wanted to go raiding. You are the one who said, no we should be more safe and we should just IED." He emphasizes that he wanted to meet these people "face to face," and the CHS responds by telling Defendant that he draws his strength from Defendant, and from his Islamic faith. Defendant then states that:

> . . . this is a good opportunity, but I think- It's just a gut feeling that we might be rushing into this a little too hastily. Because I want us to be motivated. I want us to be into it like we are, but I want us to be, like, you know, like calculated, you know? I can't, you know, we see something and we just rush forward to it, you know.

---

[6] The location is redacted in the transcripts filed with the Court, and does not appear to be relevant to the analysis in this Order.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

After further discussion regarding the role of the UCE, Defendant says that they will "sleep on it," and that they are still as motivated, he'll give the "go ahead." The CHS proposes placing the bomb the day before the event, which Defendant says is risky, because there are people on the beach— "Coast Guard, [] homeless, druggies" who might go through the bag at night. CHS suggests placing it in a trash can, and Defendant notes that the risk there is that too few casualties will result, because "no one likes to be around the trash can on the beach." He notes that the Santa Monica Pier has trash cans that might be more effective, because people are funneled onto the pier, but that a trash can on the open beach might be less effective. Defendant concludes that a better course of conduct would be to place it during the rally "when it's starting to get a little crazy, a little tense." The CHS proposes leaving early in the morning at 6:00 AM, but Defendant insists that they need to arrive when the rally begins to avoid the risk of transporting the IED from one location to another. Defendant states that he should carry the IED, because he "blend[s] in more," and expresses concern that the UCE will be "jittery" when they begin to drop off the bomb.

The CHS continued to emphasize his excitement and the "reward" they will receive for accomplishing the bombing. Defendant reaffirms he'd "rather wait," but that that he understands that CH and UCE are excited and states that "we'll do Long Beach." Defendant later vacillates, stating first that "[he's] been going through a lot" and that "[he's] not in the best fucking position in [his] life right now, but then states that he is "a little pumped up" by the CHS' enthusiasm, and ultimately tell the CHS that he will text the UCE to "make [the IED] as fast as you fucking can." The next day on April 25, 2019, Defendant sent the "go ahead" message to the UCE. On April 26, 2019, Defendant met with the CHS and UCE, inspected the IEDs, practiced operating the remote detonators, and drove to Long Beach to identify how to enter the rally, where to detonate the IEDs, and how to exit the area. After returning to the planned meeting location, and placing one of the IEDs in the UCE's vehicle, Defendant was arrested the FBI. In his post-arrest interview, Defendant stated that "I would've preferred to wait til after Ramadan just so I could say I went through Ramadan, right, just so I could fuckin say I went through Ramadan, but, you know." The interviewing agent asked, "And what would you have done after Ramadan?" Defendant answered, "Fuck if I know, probably something similar. I just wanted a break because my life's been kinda crashing around me."

The Court finds that although this evidence is consistent with the Defendant being a willing and enthusiastic participant in the bombing plan, it cannot ignore the limited evidence that might permit an inference of reluctance by Defendant on April 23rd and April 24th. While there is no additional evidence in the record before the Court that Defendant expressed any reluctance to engage in criminal activity, a number of the statements made by Defendant shortly before the bombing could, viewed in the light most favorable to Defendant, raise an inference of hesitation or ambivalence regarding the bombing plan with regard to the Long Beach rally. Defendant's repeated references to his current emotional condition, the fact that Defendant repeatedly references the advantages of a delay because his

faith is currently weak, and his concern about "rushing" into the April 28th bombing might all be reasonably interpreted to suggest hesitance or reluctance about carrying out the planned activity.

There is some persuasive precedent that raising a scheduling objection, like waiting until after Ramadan, could be viewed as a "polite way" of declining to become involved in a criminal activity. *See United States v. Diaz-Maldonado*, 727 F.3d 130, 138 (1st Cir. 2013) ("we do not entirely disregard the possibility that a target who does not want to commit a crime might raise a scheduling objection as a "polite way" of declining to get involved"). The Court also cannot ignore the fact that it is plainly evident from the transcripts of their conversation that the CHS showed substantially more enthusiasm for proceeding with the bombing plan than Defendant did at this point in time, even though Defendant did ultimately make the decision to follow through with the plan and instruct the UCE to prepare the IED.

There is abundant additional evidence that Defendant was not actually reluctant— that he was solely concerned with the effectiveness of bombing whichever event he ultimately targeted, that his repeated discussion of the logistics and advantages of different locations demonstrates that he was not actually reluctant, only cautious about changing the plan at the last minute. The discussion regarding delaying the bombing also arises out of an initial belief by Defendant and the CHS that the Long Beach rally will be cancelled, requiring them to consider other possible targets.

However, the Court finds that to definitively state that Defendant expressed no reluctance whatsoever would require weighing the contradictory evidence presented to it, which it finds inappropriate in this procedural posture. *See United States v. Kessee*, 992 F.2d 1001, 1003 (9th Cir. 1993) (reversing a district court's decision to decline to give an entrapment instruction where testimony by defendant was heavily contradicted by other evidence). The Court concludes that there is slight evidence that Defendant expressed reluctance prior to engaging the planned criminal activity.

  d. **The nature of the inducement by the Government.**

As the Court concluded above, there is some admissible evidence that suggests that the CHS developed a close relationship with Defendant, and at various points strongly urged Defendant to move forward with the bombing plan rather than delaying it. However, the Court does not find that the Government's action supports a finding of lack of predisposition on this basis, because Defendant has not produced strong evidence of inducement. *See, e.g. United States v. Mayfield*, 771 F.3d 417, 437 (7th Cir. 2014) ("the greater the inducement, the weaker the inference that in yielding to it the defendant demonstrated that he was predisposed to commit the crime in question") (quoting *United States v. Hollingsworth,* 27 F.3d 1196, 1200 (7th Cir. 1994). Permitting only "slight evidence" of inducement to materially influence analysis of the evidence supporting a lack of predisposition would essentially tie the two requirements together and permit any showing of inducement to constitute *prima facie* evidence of lack of predisposition. The Court finds that this factor favors the Government.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CRIMINAL MINUTES – GENERAL

*e.* ***Given analysis of the above factors, the Court finds that Defendant has presented "slight evidence" of a lack of predisposition.***

Weighing these factors, and bearing in mind that whether Defendant expressed reluctance is the most important factor, *Mohamud*, 843 F.3d at 432, the Court finds that Defendant has narrowly met his burden of presenting "slight" evidence of a lack of predisposition. There is no evidence that he took any affirmative steps to act on his online statements supporting terrorism or engaged in similar criminal activity before the Government became involved. There is some evidence that a jury might conclude demonstrates that the Government initially suggested the manner of criminal activity he was ultimately charged with. Finally, his conduct in the days leading up to the bombing and inclination to delay the bombing could be interpreted by a jury to suggest some reluctance regarding carrying out the planned bombing. The Court finds that Defendant has met his burden of establishing slight evidence of a lack of predisposition prior to the Government's initial contact, heeding the Ninth Circuit's guidance that "only slight evidence will create the factual issue necessary to get the defense to the jury, even though the evidence is weak, insufficient, inconsistent, or of doubtful credibility." *Gurolla*, 333 F.3d at 951 (citations omitted).

The Court previously indicated to the parties that it was inclined to grant the Government's motion, but upon further review of the materials provided, has instead decided to tentatively DENY the Government's motion. Accordingly, the Government (rather than Defendant) will instead be given an opportunity to file a supplemental brief in response to the Court's tentative Order. The Government is instructed to file this supplemental brief by 8/7/20. Defendant may submit a reply brief by 8/11/20 to the Government's supplemental brief.

cc

                                                                                                                                                            :
**Initials of Deputy Clerk**