CUAUHTEMOC ORTEGA (Bar No. 257443)
Interim Federal Public Defender
David I. Wasserman (Bar No. 275987)
(E-Mail:  david_wasserman@fd.org)
ANGELA C. C. VIRAMONTES (Bar No. 228228)
(E-Mail: angela_viramontes@fd.org)
LISA SHINAR LABARRE (Bar No. 246429)
(E-Mail: lisa_labarre@fd.org)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone:  (213) 894-2854
Facsimile:  (213) 894-0081

Attorneys for Defendant
MARK DOMINGO

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>        v.<br><br>MARK DOMINGO,<br><br>             Defendant. | Case No. 19-313-SVW<br><br>**MARK DOMINGO'S REPLY TO THE GOVERNMENT'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION *IN LIMINE* TO PRECLUDE HIS ENTRAPMENT DEFENSE** |

Defendant Mark Domingo, by and through his attorneys of record, David I. Wasserman, Angela C. C. Viramontes, and Lisa S. LaBarre, hereby files his reply to the government's supplemental brief in support of its motion *in limine* to preclude his entrapment defense.

//
//
//
//
//
//

1    This Reply is based on the attached memorandum of points and authorities, the

2    files and records in this case, and any further evidence or argument the Court may

3    allow.

4                                                Respectfully submitted,

5                                                CUAUHTEMOC ORTEGA
                                                 Interim Federal Public Defender
6
     DATED: August 11, 2020                      By /s/ David I. Wasserman
7                                                DAVID I. WASSERMAN
                                                 ANGELA C. C. VIRAMONTES
8                                                LISA SHINAR LABARRE
                                                 Deputy Federal Public Defenders
9                                                Attorneys for MARK DOMINGO

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I. INTRODUCTION ...................................................................................................... 1

II. ARGUMENT .......................................................................................................... 1

    A.    THE COURT'S TENTATIVE ALREADY CONSIDERED THE FACTS PROFFERED BY THE GOVERNMENT AND DETERMINED THAT A JURY SHOULD WEIGH THE CONFLICTING EVIDENCE. ........................................................ 1

        1.    Mr. Domingo's Alleged "Affirmative Steps" are Insufficient to Preclude an Entrapment Instruction ................................................. 2

        2.    The Nature and Substance of Any Purported Firearms-Related Attack is Not Substantially Similar to the Use of a Weapon of Mass Destruction and, as such, Does Not Preclude an Entrapment Instruction. .................................................................... 4

        3.    The Nature of Mr. Domingo's Relationship with the CHS and His Vacillation vis-à-vis the Charged Offense Indicates "Slight" Evidence of Reluctance Sufficient to Warrant an Entrapment Instruction. .................................................................................. 5

    B.    BECAUSE THE DEFENSE HAS SHOWN "SLIGHT" EVIDENCE OF INDUCMENT AND LACK OF PREDISPOSITION, AN ENTRAPMENT INSTRUCTION IS WARRANTED. ............................... 7

        1.    The Ninth Circuit Approved of the Entrapment Instruction in *United States v. Mohamud*, Where the Evidence of Inducement and Predisposition was Far Weaker than in the Case at Bar. ............. 7

        2.    The Cases Cited By The Government are Distinguishable and Inapposite. ................................................................................... 8

        3.    Mr. Domingo's Entrapment Theory is Rooted in Admissible Evidence ................................................................................... 11

III. CONCLUSION ...................................................................................................... 13

i

# <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*United States v. Benveniste*,
   564 F.2d 335 (9th Cir. 1977) ....................................................................... 11

*United States v. Busby*,
   780 F.2d 804 (9th Cir. 1986) ...................................................................... 8, 9

*United States v. Diaz-Maldonado*,
   727 F.3d 130 (1st Cir. 2013)...................................................................... 9, 10

*United States v. Fleishman*,
   684 F.2d 1329 (9th Cir. 1982) ......................................................................... 9

*United States v. Garza-Juarez*,
   992 F.2d 896 (9th Cir. 1993) ........................................................................ 10

*United States v. Gurolla*,
   333 F.3d 944 (9th Cir. 2003) ........................................................................... 1

*United States v. Hill*,
   655 F.2d 512 (3rd Cir.1981), cert. denied, 464 U.S. 1039 (1984) ........................ 11

*United States v. Joost*,
   92 F.3d 7 (1st Cir. 1996)................................................................................ 10

*United States v. Kessee*,
   992 F.2d 1001 (9th Cir. 1993) ......................................................................... 1

*United States v. McLernon*,
   746 F.2d 1098 (6th Cir. 1984) ....................................................................... 11

*United States v. Mohamud*,
   843 F.3d 420 (9th Cir. 2016) ................................................................... 4, 7, 8

*United States v. Newman*,
   849 F.2d 156 (5th Cir. 1988) ..................................................................... 11, 12

*United States v. Rhodes*,
   713 F.2d 463 (9th Cir. 1983) ........................................................................... 9

*United States v. Williams*,
   547 F.3d 1187 (9th Cir. 2008) ......................................................................... 4

ii

# **TABLE OF AUTHORITIES**

Page(s)

**Other Authorities**

Fed. R. Evid. 803(4) .................................................................................. 12

Fed. R. Evid. 704(b) .................................................................................. 12

Fed. R. Evid. 803 ....................................................................................... 12

iii

# I.  INTRODUCTION

In its supplemental brief the government re-hashes the same arguments this Court already considered and rejected in its tentative order.  As the Court rightly concluded, "A defendant need only present "slight evidence" of entrapment to present the defense to the jury.  *United States v. Gurolla*, 333 F.3d 944, 956 (9th Cir. 2003).  "Only slight evidence will create the factual issue necessary to get the defense to the jury, even though the evidence is weak, insufficient, *inconsistent*, or of doubtful credibility."  *Id*. at 951 (citing *United States v. Becerra*, 992 F.2d 960, 963 (9th Cir.1993)) (emphasis added).  For the Court to "definitively state" that Mr. Domingo expressed a predisposition, or lack thereof, to commit the charged offense "would require weighing the contradictory evidence presented to it."  As the Court correctly concluded, this is "inappropriate in this procedural posture."  Dkt. 141 (Tentative Order) at 12 (citing *United States v. Kessee*, 992 F.2d 1001, 1003 (9th Cir. 1993) (reversing a district court's decision to decline to give an entrapment instruction where testimony by defendant was heavily contradicted by other evidence).  The government's proffer, at best, highlights inconsistent and contradictory evidence.  It is precisely because of this fact that a jury should decide whether Mr. Domingo was entrapped by government agents.  The government's motion should be denied.

# II.  ARGUMENT

## A.  THE COURT'S TENTATIVE ALREADY CONSIDERED THE FACTS PROFFERED BY THE GOVERNMENT AND DETERMINED THAT A JURY SHOULD WEIGH THE CONFLICTING EVIDENCE.

In its supplemental brief, the government identifies three categories of information to show that Mr. Domingo was predisposed to commit the charged offense. The government contends that Mr. Domingo took affirmative steps to act on his online statements supporting terrorism by buying and modifying firearms, attempting to recruit an associate to join in his attack planning, and meeting up with the CHS. Further, the government argues that Mr. Domingo suggested attacks which were

substantially similar to the charged crimes and that his attempt at postponing the attack does not provide evidence of reluctance.  Each of these arguments were considered and rejected in the Court's tentative ruling and the government provides no new evidence which can sway the Court otherwise.

> **1.    Mr. Domingo's Alleged "Affirmative Steps" are Insufficient to Preclude an Entrapment Instruction.**

The best evidence that Mr. Domingo failed to take "any affirmative steps to act on his online statements supporting terrorism or engaged in similar criminal activity before the Government became involved" is the fact that no attack occurred and no concrete plan for attack was created prior to meeting with the CHS.  The government makes much of Mr. Domingo's firearms purchases, his discussions with and admiration of Jihadi fighters around the world, Mr. Domingo's contention that he could kill his neighbor to measure police response times, and even his musing about shooting people on Ventura Boulevard.  But no violence actually materialized.  Mr. Domingo never travelled outside of the United States to join with foreign-fighters.  He never attempted to kill his neighbor to measure response times.  And until he met the CHS, there was no concrete discussion of how to kill anyone, whether it be people on Ventura Boulevard or at the Long Beach Rally.  And even then, the CHS aggressively dissuaded Mr. Domingo from any plan involving the use of an AK-47 and encouraged him to use an IED instead.  That is, until he met the CHS, Mr. Domingo was all "talk" and no action.  It was not until Mr. Domingo actually met with the CHS that *any* plans for attack started to materialize.  While this evidence can certainly be considered by the jury in analyzing predisposition, the aforementioned "steps" by no means preclude his entrapment defense.

Furthermore, the government cannot show that Mr. Domingo's purchase and modification of firearms constituted affirmative steps to act on his online statements.  First, the government has not identified when and where Mr. Domingo purchased and modified his firearms.  Was it before he began speaking to people online about

2

terrorism?  After?  Before or after the Las Vegas attacks?  Before or after New Zealand attacks?  Second, the government has no independent evidence showing that the *reason* for the purchases and modifications were related to some unspecified future terrorist attack.  Although Mr. Domingo's statements about the usefulness of such weapons and modifications during an attack may constitute circumstantial evidence of such intent, it is undisputed that Mr. Domingo is a military veteran who is a gun hobbyist that purchased his weapons in his own name.  At most, the government's proffer creates a question of fact for a jury to consider when deciding the merits of an entrapment defense.  Third, the government already proffered this evidence in its initial motion *in limine*.  *See* Dkt. 61 (Gov't Mot. to Preclude Entrapment Def.) at 8.  The Court has already considered this evidence and correctly concluded that "weighing the contradictory evidence presented to it [is] inappropriate" at this juncture in the proceedings.  Dkt. 141 at 12.

Similarly, the government previously noted for the Court that Mr. Domingo expressed a desire to meet like-minded people from the internet in-person.  Dkt. 61 at 7- 9.  But this too is insufficient to show that Mr. Domingo wanted to take part in the charged offense (i.e., attempted use of a weapon of mass destruction), rather than simply muse about terrorism or, at worst, commit some other unspecified attack.  First, recruitment is not the same as planning.  Second, the recruitment was specifically aimed at determining whether or not anyone was an informant — again, not to create a concrete plan of attack.  And third, the attempted recruitment occurred prior to April 19, 2019 — the date on which the CHS asked Mr. Domingo if he wanted the CHS to ask his friend (the UCE) to build an IED and the two discussed the Long Beach Rally. That is, prior to meeting the CHS, Mr. Domingo made no concrete steps to plan an IED attack.  This evidence was considered by the Court and the Court correctly concluded that "this course of events may be susceptible to varying interpretations by a reasonable jury."  Dkt. 141 at 7.  As such, the question of predisposition should be presented to a jury and the government's motion should be denied.

3

**2.      The Nature and Substance of Any Purported Firearms-Related Attack is Not Substantially Similar to the Use of a Weapon of Mass Destruction and, as such, Does Not Preclude an Entrapment Instruction.**

The Court is correct in noting that "that there is a greater difference between potentially shooting an individual (or multiple individuals) on Ventura Boulevard and committing a large-scale bombing of the Long Beach rally than the difference between committing a robbery of a stash house rather than a bank." Dkt. 141 at 7 (citing *United States v. Williams*, 547 F.3d 1187, 1198 (9th Cir. 2008); *United States v. Mohamud*, 843 F.3d 420, 433 (9th Cir. 2016).[1] This conclusion is buttressed by the fact that the *United States Congress* found the attempted use of a weapon of mass destruction so different in nature from material support for terrorists that it set the statutory maximum penalty at life imprisonment as opposed to the fifteen year maximum penalty for material support. The government has been silent on this issue throughout its briefing.

Moreover, it was not until Mr. Domingo met with the CHS that the topic of using an IED in a domestic attack was seriously considered. Mr. Domingo's online observations of the efficacy of IEDs did not amount to a suggestion or plan to use them domestically, let alone in connection with the conduct specifically charged in the indictment. Further, a close reading of his March 15, 2019, online discussion talks about using an IED as a distraction that would disorient people and permit him to "run up and blast enemies." This is not the same as using an IED to kill and *then come out firing*. Additionally, this was not even the plan that materialized between the CHS and Mr. Domingo. As even the government acknowledges, it was on April 19, 2019, after Mr. Domingo spoke of using semi-automatic assault rifle during an attack that the *CHS suggested using an IED* because it would do more damage that a rifle-attack. That Mr.

---

[1] As discussed *infra*, even though the defendant in *Mohamud* suggested the precise type of activity ultimate leading to indictment and appeared to display no reluctance, the district court *still charged the jury with the entrapment instruction*.

4

Domingo agreed does not extinguish the crucial fact that the *CHS* suggested the means of attack charged in the indictment and that, throughout the conversations, the use of firearms was ancillary and repeatedly discouraged by the CHS.  Once again, the jury can consider all of the surrounding facts, including Mr. Domingo's initial suggestion of using assault rifles and his repeated attempts to delay the attack as the Long Beach Rally drew closer in determining whether he was in fact predisposed to such conduct. "But because this course of events may be susceptible to varying interpretations by a reasonable jury," Mr. Domingo has made prima facie showing that he was not predisposed to commit the charged criminal activity.  Dkt. 141 at 7.

3.      **The Nature of Mr. Domingo's Relationship with the CHS and His Vacillation vis-à-vis the Charged Offense Indicates "Slight" Evidence of Reluctance Sufficient to Warrant an Entrapment Instruction.**

As the Court correctly noted, attempts to "definitively state [that Mr. Domingo] expressed no reluctance whatsoever" would be "inappropriate in this procedure posture" as it would "require weighing the contradictory evidence presented" to the Court.  Dkt. 141 at 12.  It is undisputed that Mr. Domingo repeatedly informed the CHS and the UCE that his "faith [was] weak" and "not the strongest," and that he wanted to wait until after Ramadan to conduct any sort of operation.  It is further undisputed that *after the three decided not to conduct the Long Beach attack*, the CHS contacted Mr. Domingo and pressured him into changing his mind, explaining "[w]e can't wait anymore."  Dkt. 141 at 10.  The CHS challenges Mr. Domingo, asking whether he is "scared."  Mr. Domingo responds in the negative, but reaffirms that he initially suggested using firearms but that the CHS insisted on using an IED.  This statement, at the latest stages of planning, is crucial in light of the government's proffer that there are no corroborating circumstances of Mr. Domingo's reluctance.  Rather, Mr. Domingo's repeated emphasis on using firearms rather than an IED or of waiting to commit the attack fit his pattern of interactions with the CHS.

Initially, on March 18, 2019, Mr. Domingo spoke to the CHS about using firearms to commit an attack on the streets of Los Angeles. The CHS dissuaded him, explaining that the two would get caught and that an IED would cause more damage. Mr. Domingo acknowledged the idea of an IED, but then on March 22, 2019, continued talking about his firearms. On April 19, 2019, Mr. Domingo brought an AK-47 to the CHS' residence and discussed committing an attack that very evening. The CHS, in response, told Mr. Domingo that this was unwise and then suggested planning an attack using an IED. The two then began discussing the Long Beach Rally. On April 22, 2019, Mr. Domingo talks about his difficulty in obtaining the proper lights for the IED. After trying to find them at a couple of places, he gives up, says that "it's not the end of the world" if they can't get them at that time because the UCE can get them on Amazon, and instead travels to Los Angeles to meet with his girlfriend. On April 23, 2019, Mr. Domingo discusses that he does not want to rush into commencing the attack and the parties settle on waiting until after Ramadan. But then, on April 24, 2019, the CHS pressures Mr. Domingo after they already agreed to wait. At worst, Mr. Domingo vacillates between wanting to commence the attack and not. At best, Mr. Domingo's comments evidence his repeated attempts to distance himself from the completion of the CHS' suggested plan, whether through the use of firearms or by simply waiting. Either way, there exists "slight" evidence of reluctance warranting an entrapment instruction for the jury's consideration.

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

**B.   BECAUSE THE DEFENSE HAS SHOWN "SLIGHT" EVIDENCE OF INDUCMENTAND LACK OF PREDISPOSITION, AN ENTRAPMENT INSTRUCTION IS WARRANTED.[2]**

> **1.   The Ninth Circuit Approved of the Entrapment Instruction in** *United States v. Mohamud***, Where the Evidence of Inducement and Predisposition was Far Weaker than in the Case at Bar.**

*United States v. Mohamud*, 843 F.3d 420, 432 (9th Cir. 2016), controls in this situation.  As noted on pp. 17-19 of Dkt. 96 (Def. Opp. to Gov't Mot. to Preclude Entrap.), the defendant in *Mohamud* was charged with the same offense as Mr. Domingo.  Prior to meeting government agents the defendant expressed disdain for the West online, published numerous articles in a Jihadi-magazine, made repeated (but unsuccessful) attempts to travel approach and receive Jihadi-training, and consumed electronic media indicating a familiarity with Jihadi-related terms and content.  Government agents then conducted physical and electronic surveillance of the defendant and enlisted the assistance of a UC.  The defendant then admitted to the UC that he had been thinking about violent Jihad since he was fifteen years old and suggested using a bomb at the target location.  The parties then planned the bombing, with the defendant becoming even more enthusiastic at the date drew closer.

Eventually, the defendant was arrested near the target location.  In declining to find entrapment *as a matter of law*, the Court of Appeals noted that the entrapment defense at trial was "spirited and *supportable*."  *Id*. at 430 (emphasis added).  That is, notwithstanding the fact that the defendant sought foreign travel to train as a terrorist, was in contact with foreign terror-sympathizers, suggested the use of the bomb to the UC, and became ever more enthusiastic about the attack as it drew near, *an entrapment instruction was warranted*.  Here, notwithstanding Mr. Domingo's

---

[2] The defense concurs with the Court's tentative that there is slight evidence of inducement on the part of government agents.  The government did not address this issue in its supplemental brief.

online commentary, he never attempted to travel abroad to support terrorist operations, it is undisputed that the CHS suggested the use of the IED to Mr. Domingo, and the Court has recognized that "the CHS showed substantially more enthusiasm for proceeding with the bombing plan than Defendant." Dkt. 141 at 12. The facts at bar suggesting entrapment are far stronger than those in *Mohamud* and certainly meets the low standard of *slight evidence* sufficient to charge the jury.

### 2. The Cases Cited By The Government are Distinguishable and Inapposite.

The government cited six cases in its supplemental brief regarding the propriety of an entrapment instruction. These cases are easily distinguishable and should not persuade the Court. In *United States v. Busby*, 780 F.2d 804 (9th Cir. 1986), the Ninth Circuit concluded that the refusal of the district court to charge the jury on entrapment was not an abuse of discretion because (a) the informant at issue was not a government agent, and (b) the defendant was predisposed to committing the charged offense of drug distribution. There, the defendant committed the offense for profit, affirmatively contacted the CI about completing the crime after the CI had not reached out to the defendant, and purchased cocaine samples from the seller to facilitate the transaction. Conversely, in the case at bar, there was no profit motive for Mr. Domingo,[3] the CHS initially suggested the use of an IED (i.e., the charged offense) and repeatedly pushed Mr. Domingo to complete the target offense after they decided to postpone the attack, the CHS told Mr. Domingo what IED-components were needed and instructed him to purchase them, and "the CHS showed substantially more enthusiasm for proceeding with the bombing plan than Defendant." Dkt. 141 at 12. Based on the foregoing, it is

---

[3] In its tentative, the Court did not give substantial weight to this fact such that it the factor did not inure to Mr. Domingo. The government's contention that faith is more important currency than money is not well-taken in light of the fact that the profit-motive factor is specifically delineated in the instruction due to the general nature of most criminal activity. At most, this is an issue for the jury to decide when considering entrapment and should not counsel against giving the instruction.

not clear that Mr. Domingo, unlike the defendant in *Busby*, was predisposed as a matter of law.

In *United States v. Fleishman*, 684 F.2d 1329 (9th Cir. 1982), a drug distribution case, the Court found the defendant's predisposition precluded an entrapment instruction because defendant literally bragged about his prior drug dealing and made known his familiarity with the prices and means of supplying narcotics. *Id*. at 1343. The defendant in *United States v. Rhodes*, 713 F.2d 463 (9th Cir. 1983), was similarly predisposed to participate in conspiracy to possess and distribute stolen checks as, before he met government agents, he was already involved in a conspiracy to receive, launder, and distribute stolen checks  Contrast these defendants with Mr. Domingo who explicitly told the CHS that he had no idea how to make the bomb and that instructions would be needed if the two of them were to do it without the UCE's assistance. Furthermore, even in his online postings, Mr. Domingo never evinced a sophisticated knowledge, or prior use, of IEDs.  Rather, as the Court correctly noted in its tentative, the CHS "suggested and facilitated the introduction of the IED into the planned criminal activity"  Dkt. 141 at 4.  By bringing the UCE into the fold, the CHS supplied the knowledge and "familiarity" necessary to complete the instant offense.  *Fleishman* does not support the government's arguments in this case.

Additionally, the scheduling conflicts in *United States v. Diaz-Maldonado*, 727 F.3d 130 (1st Cir. 2013) are not of the same kind and variety as those involved in this case.  In *Diaz-Maldonado*, the defendant's conflicts were not related to a *desire* to commit the offense, but rather an *inability* due to his work schedule.  Conversely, Mr. Domingo not only preferred the use of firearms to an IED, but wanted to wait and perhaps commit a separate and different attack not charged in the indictment.  And while there lacked any corroborating facts suggesting reluctance in *Diaz-Maldonado*, the history between Mr. Domingo and the CHS — as noted *supra* — is replete with interactions wherein the CHS encourages Mr. Domingo from the very beginning to take part in an IED attack and Mr. Domingo vacillates as the date approaches.  In fact,

unlike in *Diaz-Maldonado*, the CHS in this case repeatedly works on getting Mr. Domingo to a place where using an IED becomes the preferred method of attack. While the conclusion that a "scheduling conflict" can infer reluctance is correct, the facts of *Diaz-Maldonado* are inapposite and do not control here.

The government also cites *United States v. Joost*, 92 F.3d 7 (1st Cir. 1996), in support of the proposition that an entrapment instruction is not warranted because Mr. Domingo was enthusiastic about attacking the Long Beach Rally.  But, as the Court noted in its tentative, even though Mr. Domingo ultimately made the decision to follow through with the plan and instruct the UCE to prepare the IED "[t]he Court. . . cannot ignore the fact that it is plainly evident from the transcripts of their conversation that the CHS showed substantially more enthusiasm for proceeding with the bombing plan than Defendant did[.]"  Dkt. 141 at 12.  Furthermore, the First Circuit in *Joost* found that the district court erred in *not* giving an entrapment charge to the jury even when the entrapment-evidence was based on self-serving statements.  *Joost*, 92 F.3d at 12.  And, as noted *supra*, the totality of Mr. Domingo's interactions with the CHS — including his intentions vis-à-vis firearms and his desire to postpone the attack — constitute "slight" evidence that he was in fact reluctant to continue down the path as planned with the CHS and UCE.  As such, an entrapment instruction in this case is consistent with the ruling in *Joost*.

Finally, the defendant in *United States v. Garza-Juarez*, 992 F.2d 896 (9th Cir. 1993), did not even request an entrapment instruction.  Rather, *Garza-Juarez*, like the cases cited by the government in its first round of briefing, is about entrapment *as a matter of law* and is inapplicable to the question before this Court.[4]

/ /

---

[4] Furthermore, the defendant in *Garza-Juarez* knowingly sold firearms to felons without any hesitation.  Thus, based on the entrapment as a matter of law standard, the Court could not conclude that there was "undisputed evidence making it patently clear" that defendant was an otherwise innocent person induced to commit a criminal act. Again, this is not the proper standard for this Court at this stage in the proceedings.

10

### 3. Mr. Domingo's Entrapment Theory is Rooted in Admissible Evidence.

The government spends the end of its supplemental brief discussing evidence the Court *did not consider* in coming to its conclusion that the government's motion should be denied. The Court rooted its tentative in recorded statements Mr. Domingo made during the course of planning the bombing because those "statements may be relevant to the predisposition analysis for reasons unrelated to their truth or falsehood," and because they reflect his "current mental or emotional state, present desire to postpone the bombing, or even his belief they should not rush into this head first" into the charged conduct. Dkt. 141 at 3. The Court is correct that these facts alone warrant an entrapment instruction.

Furthermore, as the defense has maintained throughout its briefing, Dr. Sageman will not testify to the ultimate issue of whether Mr. Domingo was in fact induced, predisposed, or otherwise intended to commit the charged offense. Rather, consistent with Ninth, Third, Fifth, and Sixth Circuit case law, Dr. Sageman will testify as to the defendant's psychological characteristics and their relationship to the inducement and predisposition prongs of the entrapment defense. *See United States v. Benveniste*, 564 F.2d 335 (9th Cir. 1977); *United States v. McLernon,* 746 F.2d 1098 (6th Cir. 1984); *United States v. Newman*, 849 F.2d 156 (5th Cir. 1988); *United States v. Hill*, 655 F.2d 512 (3rd Cir.1981), cert. denied, 464 U.S. 1039 (1984). "[E]xpert[] opinion, based on observation, psychological profiles, intelligence tests, and other assorted data, may aid the jury in its determination of the crucial issues of inducement and predisposition." *Hill*, 655 F.2d at 516. Dr. Sageman's proposed testimony is based on his opinion that due to Mr. Domingo's personality characteristics, Mr. Domingo sought friendship, belonging, and sympathy, and had a personal need to exact revenge on society at large for perceived slights that he sustained over his life. This testimony will assist the jury in understanding that Mr. Domingo was not predisposed to using a weapon of mass destruction, and instead was induced to do so upon the specter of obtaining sympathy,

11

friendship and acceptance from the informant.  This evidence will help jurors to determine whether Mr. Domingo was "more susceptible than the usual person to persuasion by government agents[.]"  *Newman*, 849 F.2d at 165.  Thus, this testimony does not run afoul of Fed. R. Evid. 704(b)'s prohibition against stating whether or not a defendant did or did not have a mental state or condition that constitutes an element of the crime charged or a defense.

As to Mr. Domingo's statements to Dr. Garabedian, the defense already acknowledged in its reply brief that the *reasons* for his then-existing emotional and physical state would not be introduced.  Dkt. 112 (Def. Reply ISO Mot. to Admit Fed. R. Evid. 803 Statements) at 5.  However, in contesting the nature of Mr. Domingo's visit with Dr. Garabedian, the government fails to acknowledge the circumstances outlined in the defense's reply brief, including Mr. Domingo's conversations with the CHS and his documented medical history, each of which corroborate the statements made to Dr. Garabedian.  *Id*. at 5-6.  Moreover, the government cannot reconcile the logical fallacy inherent in its argument.  As noted in the defense's reply brief, the government's argument that Mr. Domingo saw Dr. Garabedian — not for treatment, but to appease his girlfriend — amounts to the following: if someone's mental health status interfered with their professional development and they went to see a psychologist to discuss their mental health status, their statements would not qualify under Fed. R. Evid. 803(4) because the reason they went to the psychologist was not for treatment of the mental health issue, but was motivated instead by purposes related to professional development.  That is, the government is confusing the *motivation for going* to treatment with the *statements being made for the purpose* of treatment.

Ultimately, both Dr. Sageman's testimony vis-à-vis Mr. Domingo's susceptibility to inducement and his putative predisposition, as well as Mr. Domingo's statements to Dr. Garabedian, are admissible under the Rules of Evidence and established case law.

//

12

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## III.  CONCLUSION

Based on the foregoing, the Court should deny the government's motion to preclude Mr. Domingo's entrapment defense.


Respectfully submitted,

CUAUHTEMOC ORTEGA
Interim Federal Public Defender

DATED:  August 11, 2020          By  */s/ David I. Wasserman*
                                    DAVID I. WASSERMAN
                                    ANGELA C. C. VIRAMONTES
                                    LISA SHINAR LABARRE
                                    Deputy Federal Public Defender
                                    Attorney for MARK DOMINGO