UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

UNDER SEAL

### CRIMINAL MINUTES – GENERAL

Case No.    2:19-cr-00313-SVW                                                  Date: November 18, 2020

Present: The Honorable:    Stephen V. Wilson, U.S. District Judge

Interpreter    NA

| Paul M. Cruz | N/A | N/A |
|---|---|---|
| *Deputy Clerk* | *Court Reporter / Recorder* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant(s) | Present | Cust | Bond | Attorneys for Defendants: | Present | App | Ret |
|---|---|---|---|---|---|---|---|
| Mark Steven Domingo | | X | | N/A | | | |

**Proceedings:** IN CHAMBERS ORDER GRANTING [74] DEFENDANT'S MOTION TO ADMIT STATEMENTS, GRANTING [71] GOVERNMENT'S MOTION TO EXCLUDE EXPERT TESTIMONY, AND LIMITING GOVERNMENT'S EXPERT TESTIMONY.

Before the Court is Defendant Mark Steven Domingo's motion to admit hearsay statements made by Defendant, Dkt. 74, and a motion by the United States of America ("the Government") to exclude the opinions proffered by Defendant's expert, Dkt. 71.

For the below reasons, both motions are GRANTED. Additionally, the Court will limit the testimony of the Government's expert as described below.

### I.    Factual and Procedural Background

Defendant is charged with two counts. Count one charges Defendant with providing material support and resources to terrorists in violation of 18 U.S.C. § 2339A. Dkt. 18. Count two charges Defendant with attempting to use a weapon of mass destruction against a person or property within the United States in violation of 18 U.S.C. § 2332a. *Id.* The Court extensively discussed the facts underlying these charges in its prior orders, *see, e.g.*, Dkt. 141, and it need not recount them here.

On June 2, 2020, the Government filed a motion in limine to limit the testimony of Defendant's expert witness Dr. Marc Sageman. Dkt. 71. The same day, Defendant filed a motion in limine to admit statements made by Defendant to (1) the Government's confidential human source ("CHS") and (2) Dr. Melinda Garabedian, a therapist that Defendant visited in 2018. Dkt. 74.

On August 18, 2020, this Court found that a hearing was required to consider Daubert issues regarding Dr. Sageman's testimony and evidentiary issues regarding Dr. Garabedian's testimony. Dkt. 150. The Court

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

ordered Defendant to file Dr. Sageman's expert report with the Court and also allowed each party to file supplemental briefs regarding the proposed testimony of Dr. Sageman and Dr. Garabedian. *Id.*

The Court held a Daubert hearing on November 5, 2020. Dkt. 169. After the hearing the Government filed the report of its expert, Mr. William Braniff, with the Court. Dkt. 173.

**II. Discussion**

    **A. The Hearsay Statements Made to Dr. Garabedian Are Admissible.**

Defendant seeks to admit the following statements he made to Dr. Garabedian, a therapist who treated Defendant from February 2018 to June 2018. *See* Dkt. 105, Ex. A.

1. Defendant "has felt depressed since the 6th grade."
2. Defendant "wants someone to listen to him and wants to be needed."
3. Defendant "feels worthless and hopeless."
4. Defendant "feels hurt, isolated, and abandoned on the daily basis."
5. Defendant's "abandonment issues stem from his family dynamic."

Dkt. 74 at 4.

The Court finds that these statements are relevant to Defendant's entrapment defense and admissible under Federal Rule of Evidence ("FRE") 803(4).

First, the proffered statements are relevant to Defendant's entrapment defense. Defendant argues that, when the CHS connected with him on the internet, Defendant was depressed and desired friendship, family, and belonging. *Id.* at 5. Defendant further argues that these circumstances rendered him vulnerable to the CHS's alleged inducement. *Id.* at 6. Accordingly, the above proffered statements are relevant to Defendant's entrapment defense.

Second, the proffered statements are admissible under FRE 803(4). That exception to the hearsay rule applies to statements that are (1) made for and reasonably pertinent to medical diagnosis or treatment, and (2) describe the declarant's medical history, past or present symptoms or sensations, their inception, or their general cause. FRE 803(4).

Here, Defendant sought mental health treatment from Dr. Garabedian, a therapist whose treatment is covered by FRE 803(4). *See Swinton v. Potomac Corp.*, 270 F.3d 794, 808 (9th Cir. 2001) (affirming admission of statements made to therapist under FRE 803(4)). Moreover, the statements describe Defendant's emotional condition and mental feelings for which he sought treatment. They also describe the cause of those feelings: his family dynamic. These statements are accordingly admissible under FRE 803(4).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

The Government's arguments to the contrary are without merit. First, the Government argues Defendant only visited Dr. Garabedian for treatment because his girlfriend forced him to. Dkt. 105 at 5. However, as Defendant notes, the Government confuses the motivation for seeking treatment with statements made for the purpose of treatment. Dkt. 121 at 6. Indeed, the Government offers no authority for the premise that the motivation for seeking treatment is relevant to the admissibility of the statements. Nor do the Federal Rules contain such a limitation.

Second, the Government argues that Defendant improperly cherry-picks statements regarding depression while ignoring statements made regarding his anger issues. Dkt. 105 at 5. However, the Government is free to cross-examine Dr. Garabedian regarding Defendant's statements on other issues, and the Government has at its disposal FRE 801(d)(2).

Finally, the Government's reliance on Federal Rule of Criminal Procedure 12.2 is inapt, as Defendant states that Dr. Garabedian will not be testifying as an expert but rather providing Defendant's statements to establish context for Defendant's entrapment argument.

However, in light of this characterization by Defendant, Dr. Garabedian will not be permitted to opine regarding Defendant's susceptibility to being persuaded to commit an illegal act.

**B.     The Hearsay Statements Made to the CHS Are Admissible Subject to Two Limitations.**

Defendant seeks to admit the following statements he made to the CHS:

1. Defendant's "brother no longer loves him because he converted to Islam."
2. Defendant's "faith is weak."
3. Defendant "feels as if no one likes him no one wants him, and [Defendant] feels rejected by Muslim co-workers."
4. Defendant "was not in the best of moods."
5. Defendant "wanted to go raiding. [The CHS is] the one who said, no we should be more safe and we should just IED."

Dkt. 74 at 3.

The Court finds that these statements are relevant to Defendant's entrapment defense and partially admissible under FRE 803(3).

First, the proffered statements are relevant to Defendant's entrapment defense. Defendant argues that he was depressed and desired friendship, family, and belonging when the CHS connected with him on the internet. *Id.* at 5. Defendant further argues that these circumstances rendered him vulnerable to the CHS's alleged inducement. *Id.* at 6. Accordingly, the first four statements are relevant to the inducement prong of Defendant's entrapment defense.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

The fifth statement is relevant to the predisposition prong of Defendant's entrapment defense. Specifically, Defendant argues that he was not predisposed to using a weapon of mass destruction and was instead interested in using firearms. *Id.* The fifth statement supports that argument and is therefore relevant.

All five statements are also admissible—or at least partially admissible—under FRE 803(3). That rule covers statements of the declarant's "then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health)." FRE 803(3).

Here, the first four statements plainly relate to Defendant's mental feelings that his "brother no longer loves him," his "faith is weak," he "feels as if no one likes him no one wants him, and he feels rejected by Muslim co-workers," and he "was not in the best of moods." And the fifth statement demonstrates Defendant's intent, *i.e.*, that Defendant intended "to go raiding."

However, FRE 803(3) "does not permit the witness to relate any of the declarant's statements as to *why* he held the particular state of mind." *United States v. Fontenot*, 14 F.3d 1364, 1371 (9th Cir. 1994) (emphasis added) (quoting *United States v. Emmert*, 829 F.2d 805, 810 (9th Cir. 1987)). Here, a portion of the first statement includes a "why." Specifically, the first statement asserts that Defendant's brother no longer loves him "because he converted to Islam." This is plainly a statement of causation for Defendant's state of mind and is therefore inadmissible under FRE 803(3).

Additionally, the second portion of the fifth statement—in which Defendant states that it was the CHS "who said, no we should be more safe and we should just IED"—is inadmissible because it focuses on the intent of the CHS rather than the declarant. *See United States v. Pheaster*, 544 F.2d 353, 379 (9th Cir. 1976) (citing House Committee on the Judiciary Report No. 93-650, Note to Paragraph (3), 28 U.S.C.A. at 579) (noting that "statements of intent by a declarant [are] admissible only to prove his future conduct, not the future conduct of another person").

Accordingly, subject to the two limitations just described, the Court finds that the proffered statements made to the CHS are admissible under FRE 803(3).

**C.   Dr. Sageman's Expert Opinions Are Inadmissible.**

Defendant proffers the following three opinions from Dr. Sageman:

1. Defendant was "very unlikely to have been recruited into a terrorist organization, whether al Qaeda or the Islamic State, or even if recruited by mistake, he would not have been sent for a mission on its behalf." Dkt. 155, Attachment (Sageman Report) at 1.

2. There is "no evidence that Mr. Domingo was participating in a bombing plot for either al Qaeda or the Islamic State." *Id.* at 2.

  3.  Defendant was incapable of manufacturing and using a bomb in an attack against people in the United States and was extremely unlikely to participate in a bomb plot in the United States because such plots are extremely rare. *Id.* at 5–9.

The Court will address each opinion in turn.

  *1) Dr. Sageman's First Opinion is Likely to Confuse the Issues.*

At the outset, the parties dispute whether Dr. Sageman's first opinion is relevant. The Government argues that the opinion is irrelevant because Defendant is not charged with providing material support to a terrorist organization but rather to an individual actor. Dkt. 159 at 1–2. Defendant argues that the evidence allows the jury to infer that "the government provided Mr. Domingo more than a 'mere opportunity' to commit the instant offense and that Mr. Domingo lacked the intent and capacity to produce a bomb without the assistance of federal authorities." Dkt. 163 at 5.

The Court is not entirely persuaded that this opinion is relevant. As discussed below, this case is not about Defendant's connections to terrorist organizations. Accordingly, the likelihood that Defendant would join or be recruited to a terrorist organization is, at best, tangential to this case.

At the same time, "[t]he relevancy bar is low" when addressing expert testimony, *Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014), and the proffered opinion might be relevant to entrapment because the unlikelihood of Defendant being recruited into a terrorist organization suggests—albeit very minimally—that Defendant was not predisposed to commit the charged offense.

The Court need not make a finding regarding the opinion's relevancy, however, because the Court finds that the opinion is subject to exclusion under FRE 403. Specifically, the Court finds that the probative value of the opinion is outweighed by the likelihood that the opinion confuses the issues and misleads the jury.

At bottom, this case is not about Defendant's connections to terrorist organizations. Although Defendant uses terminology related to terrorism and may have been inspired by high-profile terrorist attacks, the issue here is not the extent of Defendant's relationship with terrorist organizations. Rather, the issue is whether Defendant intended to use a weapon of mass destruction against persons in the United States and whether he would have formed that intent absent government intervention. Dr. Sageman's opinion regarding the unlikelihood that Defendant would have been recruited into a terrorist organization is more distracting from those fundamental issues than it is probative.

To be clear, counsel may argue that, based on the evidence presented to the jury, Defendant lacked any connection to terrorist organizations and was therefore not predisposed to committing the charged offense. However, the Court concludes that an expert opinion to that effect would likely mislead the jury and lead to a confusion of the issues.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

Accordingly, Dr. Sageman's first opinion is excluded.

    2) *Dr. Sageman's Second Opinion is Improper Expert Testimony and Is Likely to Confuse the Issues.*

The parties dispute whether Dr. Sageman's second opinion is relevant. The Court finds that it is relevant for the same reason his first opinion is relevant: the fact that Defendant was not participating in the bombing plot on behalf of al Qaeda or the Islamic State suggests—albeit minimally—that Defendant was not predisposed to committing the charged offense.

However, Dr. Sageman's second opinion is improper expert testimony. Specifically, the conclusion that Defendant was not participating in a bombing plot for either al Qaeda or the Islamic State does not require any specialized knowledge. *See* FRE 702(a) (expert testimony admissible if "specialized knowledge will help the trier of fact"). Indeed, in forming this opinion, Dr. Sageman simply relied on the discovery materials in the case. *See* Sageman Report at 2–5. A jury assessing that evidence could reach the same conclusion.

Additionally, the probative value of Dr. Sageman's second opinion is outweighed by the likelihood that the opinion confuses the issues and misleads the jury. As noted above, this case is not about Defendant's connections to terrorist organizations. Thus, the issue of whether Defendant participated in this plot on behalf of a terrorist organization distracts from the fundamental issues in the case: whether Defendant intended to use a weapon of mass destruction against persons in the United States and whether he would have formed that intent absent government intervention.

Once again, the Court emphasizes that Defendant's counsel may argue to the jury that, based on the evidence presented to the jury, Defendant lacked any connection to terrorist organizations and was therefore not predisposed to committing the charged offense. However, the Court concludes that an expert opinion to that effect would likely mislead the jury and lead to a confusion of the issues.

Accordingly, Dr. Sageman's second opinion is excluded.

    3) *Dr. Sageman's Third Opinion is Improper Expert Testimony and Is Irrelevant.*

Because Dr. Sageman's third opinion is effectively two separate opinion, the Court will address each in turn.

The Court finds that the second part of this opinion—that Defendant was extremely unlikely to have participated in a bombing plot due to the infrequency of such plots—is irrelevant. Defendant argues that the opinion is relevant to predisposition because it shows that Defendant "lacked the intent and capacity to produce a bomb without the assistance of federal authorities." Dkt. 163 at 5.

However, the issue regarding predisposition is not how often these bombing plots occur. Rather, the issue is whether the Defendant was predisposed to participating in such a plot—even if such plots are extremely

rare—*when he was actually presented* with the opportunity to do so. Accordingly, the underlying frequency of such plots is irrelevant, as is Dr. Sageman's opinion regarding that frequency.

As for the first part of the opinion—that Defendant was incapable of manufacturing and using a bomb—the Court finds that this opinion is relevant to predisposition.

However, the Court nevertheless excludes that opinion for two reasons. First, Dr. Sageman specifically opines that Defendant "was definitely not 'predisposed' to even attempt to use a bomb and would not have done so absent the FBI." Sageman Report at 6. This is an opinion regarding the element of the entrapment defense that is flatly prohibited by FRE 704(b). *See United States v. Campos*, 217 F.3d 707, 711 (9th Cir. 2000).

Moreover, even if that specific language were excluded, this opinion would still be inadmissible as improper expert testimony because it does not require specialized knowledge. *See* FRE 702(a) (expert testimony only admissible if "specialized knowledge will help the trier of fact"). Specifically, Dr. Sageman simply relied on discovery materials to conclude that Defendant was incapable of producing a bomb. Sageman Report at 5–6. However, a jury assessing that evidence could reach the same conclusion, and counsel can argue that conclusion to the jury based on the evidence presented at trial.

Accordingly, all three of Dr. Sageman's opinions are excluded. To the extent that Defendant wishes to offer Dr. Sageman as a rebuttal witness to the Government's expert, Mr. Braniff, he may do so. However, any such rebuttal should be quite limited because, as discussed next, Mr. Braniff's testimony will be limited pursuant to FRE 403.

### D. Mr. Braniff's Tesimony is Limited to Explaining Certain Terms, Persons, and Events, and Much of His Current Explanations Will be Excluded.

The Government proffers the report of Mr. Braniff, who will "testify about the meaning of certain terms and events that defendant frequently discussed in recorded communications in this case." Dkt. 173 at 2. The Government also asserts that Mr. Braniff will

> provide brief testimony to explain and provide context for defendant's frequent statements about the activities and ideology of ISIS and al-Qa'ida. The evidence at trial will show that defendant drew inspiration from ISIS, frequently discussed ISIS's strategies and activities, and frequently shared ISIS propaganda videos, photographs, and songs with various associates. Mr. Braniff's testimony will help the jury generally understand defendant's recorded statements regarding these organizations.

*Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

The Court will exclude this second type of testimony.[1] As noted above, this case is not about Defendant's relationship with terrorist organizations. The Government itself acknowledges this by noting that Defendant is not charged with—and Mr. Braniff will not testify regarding—Defendant's membership in a foreign terrorist organization or that Defendant planned to execute his attack on behalf of any foreign terrorist organization. *Id.* at 2.

Yet, the second type of testimony proffered by the Government is in fact closely related to Defendant's relationship with—or the inspiration he drew from—foreign terrorist organizations. Accordingly, the Court finds that allowing Mr. Braniff to testify about Defendant's frequent statements regarding the activities and ideology of ISIS and al Qa'ida is likely to mislead the jury and confuse the issues.

The Government may argue to the jury, based on the evidence presented at trial, that Defendant was inspired by certain events or terrorist propaganda. However, an expert opinion to that effect would likely mislead the jury and lead to a confusion of the issues.

As for Mr. Braniff's explanation of terms, events, and persons referenced by the Defendant, the Court will allow Mr. Braniff to explain those terms to the jury. However, the Court finds that the proffered explanations are largely irrelevant and, once again, likely to confuse the issues. Indeed, the Court—having reviewed many of Defendant's statements in resolving the Government's motion to exclude Defendant's entrapment defense—notes that Defendant's references to the terms, events, and persons described by Mr. Braniff are not extensive. The jury does not need a detailed history lesson on these terms in order to do its job. Finally, the references to violence and particular plots are likely to cause unfair prejudice to the Defendant.

Accordingly, although basic information about those terms will be helpful to the trier of fact, *see* FRE 702(a), extensive details are more likely to confuse the issues, mislead the jury, and unfairly prejudice the Defendant. Pursuant to FRE 403, the Court will therefore exclude portions of Mr. Braniff's explanations as detailed in the Appendix at the end of this order.[2]

## V. Conclusion

For the foregoing reasons, Defendant's motion to admit statements made to the CHS and Dr. Garabedian is GRANTED. The Government's motion to exclude the expert testimony of Dr. Sageman is also GRANTED. Finally, the testimony of Mr. Braniff will be limited as detailed above and in the Appendix below.

IT IS SO ORDERED.

---

[1] Although the parties did not brief the issue of Mr. Braniff's testimony, this Court has broad discretion to exclude evidence subject to FRE 403. *See United States v. Ellis*, 147 F.3d 1131, 1135 (9th Cir. 1998); *see also United States v. Howard*, 2014 WL 12690894, at *2 (D. Nev. Apr. 1, 2014) (addressing admissibility of evidence even though parties did not brief issue because courts have "general gatekeeping duty under Federal Rule of Evidence 403").

[2] Should any events at trial compel reconsideration of this decision, the Court will address those events when they occur.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

**APPENDIX**

The Court finds that the below stricken language in Mr. Braniff's explanations of "Key Terms" is excluded because the probative value of that language is outweighed by the likelihood of unfair prejudice, confusion of the issues, or misleading the jury.  *See* FRE 403.

**Abu Bakr al-Baghdadi**: Ibrahim Awwad Ibrahim Ali al Badri al Samarri, also known as Abu Bakr al-Baghdadi, was named the leader of the Islamic State of Iraq, a designated terrorist organization, in 2010. ~~On 4 July 2014, Abu Bakr al-Baghdadi led Friday prayers at a mosque in Mosul, Iraq, where he confirmed the reinstatement of the Caliphate announced days prior, and renamed himself as Caliph Ibrahim, the head of the Islamic State.~~

**Abu Muhammad al-Adnani**: An aid to Abu Musab al-Zarqawi, the founder of Jama'at Tawhid wal Jihad and al-Qa'ida in Iraq, and later the spokesman for the Islamic State under Abu Bakr al- Baghdadi. ~~Abu Muhammad al-Adnani announced the reestablishment of the Caliphate on June 29, 2014. He gave speeches calling for violence against the West on multiple occasions, including one in the Fall of 2014 called, "Indeed, Your Lord is Ever Watchful," disseminated by al-Qa'ida in Iraq's Al-Furqan Media, which encouraged followers of the movement to attack individuals from states involved in attacks against the Islamic State wherever and however possible.~~

**Alhamdulilah**: "All praise is due to God." A commonly used phrase, often meant to express gratitude.

**Allah**: "The God." Allah is Arabic for "the God," meant to denote the monotheistic God of the Abrahamic tradition.

**al-Qa'ida**: Al-Qa'ida is a designated foreign terrorist organization most well-known for perpetrating the terrorist attacks against the United States on September 11, 2001. ~~Founded in August of 1988 in the waning days of the anti-Soviet jihad in Afghanistan, the organization has played a central role ideologically, historically and organizationally in fostering the global jihadist movement against both Muslim and non-Muslim governments and populations. Many Muslim extremist organizations have affiliated with al-Qa'ida, and many individuals have been inspired to act out violently on behalf of al-Qa'ida.~~

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

**Anwar al-Awlaki**: Anwar al-Awlaki was an American who joined al-Qa'ida in the Arabian Peninsula (AQAP) and rose to senior leadership ranks in the designated foreign terrorism organization. ~~He served as a key ideologue for the organization and the broader global jihadist movement, and is often described as the most important English-speaking ideologue of the movement. For example, in Peter Bergen's 2016 book, United States of Jihad, Bergen asserts that ""of the 330 Americans charged with or convicted of involvement in jihadist terrorist activity since the 9/11 attacks, more than 80 (approx. 25%) were found to have Alwaki's writings or sermons in their possession or cited him as an influence, and a further 7 had corresponded with him or traveled to Yemen to meet him."~~


**Ayman al-Zawahiri**: Ayman al-Zawahiri is the current emir, or commander, of al-Qa'ida. ~~An Egyptian medical doctor by training, al-Zawahiri was a leader in the Egyptian Islamic Jihad (EIJ) terrorist organization, which merged with al-Qa'ida in 2001.~~


**bai'yah to Abu Bakr al-Baghdadi**: In the context of Muslim extremism, individuals and leaders of terrorist organizations often give their oath of allegiance, or bai'yah, to another leader of a more prominent terrorist organization. ~~This allegiance is understood to indicate total subordination until the death of either the individual who makes the oath, or the individual who receives it. Following the declaration of the Caliphate by the Islamic State, and the July 2014 announcement by Abu Bakr al-Baghdadi that he would assume the role of Caliph, leaders of many terrorist organizations around the world gave their bai'yah to Abu Bakr al-Baghdadi. In addition, individuals with no formal affiliation to the Islamic State have used social media or phone calls with law enforcement officials immediately preceding or during various terrorist attacks to declare their allegiance to Abu Bakr al-Baghdadi as a way to give meaning and increased importance to their acts of violence.~~


**Baqiyah**: Arabic for "remaining," this word is part of the Islamic State's mantra to "remain and expand" as a global caliphate. ~~Supporters of the Islamic State online, who often have their accounts terminated for violating the terms of use of social media companies, use the hashtag #baqiyah to suggest that they will fight to remain online and relevant, just as the Islamic State fights to retain territory. Individuals who seek support from other supporters of the Islamic State will seek help from their #baqiyahfamily online~~.


**Caliphate**: A caliphate is an empire or state ruled by a Caliph, a ruler understood to be a successor to the Prophet Muhammad. ~~There have been many Caliphs and caliphates in Muslim history~~.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CRIMINAL MINUTES – GENERAL

**Daesh, the Islamic State (IS), Dawla, Dawla-Islamiyya, Islamic State of Iraq and the Levant (ISIL), Islamic State of Iraq and Syria/al-Sham (ISIS), Islamic State of Iraq (ISI), al-Qa'ida in Iraq (AQI), Jama'at Tawhid wal-Jihad:** The terrorist organization that now refers to itself as the Islamic State was first designated as a foreign terrorist organization by the U.S. Department of State in 2004 under the name Jama'at Tawhid was Jihad. It became an affiliate of the al-Qa'ida organization, and was based in Iraq in the mid-2000's fighting against the U.S-led coalition. ~~It attempted to seize control of the battlespace in Syria as Syria descended into a civil war in the early 2010's. This move into Syria put the organization at odds with al-Qa'ida's preferred organization in Syria, and the two entered into a violent rivalry. Al-Qa'ida's emir, Ayman al-Zawahiri disavowed the leader of the Islamic State and broke the affiliation between it and al-Qa'ida in February of 2014. On June 29, 2014, ISIL declared the re-establishment of the Caliphate, and renamed itself the Islamic State. From 2013 - 2018, the Islamic State was either the most or second most lethal terrorist organization in the world, engaging in mass casualty attacks including suicide bombings, creating improvised explosive devices, and large-scale and highly lethal hostage incidents, among other violent attacks. In 2019, the Islamic state was the third most lethal terrorist organization in the world, engaging in over 450 attacks that killed more than 1000 people.~~

**Damascus**: Damascus is the capitol of Syria located in the country's South West. It is an ancient city and has played an important role in Muslim history, ~~including as the seat of the Umayyad Caliphate. In April 2015, the Islamic State seized control of Yarmouk, a Palestinian refugee camp in Damascus, which it controlled for several years.~~

**Dawla**: Dawla is Arabic for "state." Beginning in 2006, the term is often used by Muslim extremists to refer to the Islamic State of Iraq, the Islamic State of Iraq and Sham, and the Islamic State, or "Dawla Islamiyya" in Arabic.

**Deen**: Arabic for "faith," "religion" or "creed." Deen often refers to one's manner of practice of their faith. ~~Muslim extremists will celebrate those individuals whose religious practices are aligned with their ideology and the use of violence to advance that ideology.~~

**Dua**: Arabic for "Supplication," or an earnest prayer asking something of God.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

**Eid**: Arabic for "Religious festival." Eid al-Fitr is the religious festival celebrated at the end of Ramadan. Eid al-Adha is the religious festival commemorating Ibrahim's (Abraham) willingness to sacrifice his son Ismael based on God's command.

**Fallujah**: Fallujah is a city in Anbar Province, Iraq. Fallujah first fell under partial control of the Islamic State in January 2014, signifying an early and important territorial victor for the organization. ~~Heavy fighting ultimately dislodged the Islamic State in June 2016, culminating in a five-week battle.~~

**Fi Sabilillah**: Arabic for "For the sake of God." ~~Used commonly by Muslims, but in the context of Muslim extremism, often used to communicate the violent jihad should be done for the sake of God.~~

**Halal**: The Arabic word for "permissible."

**Hijra**: Arabic for "Emigration." Hijra refers specifically to the emigration of the Prophet Muhammad and his companions (refered to as muhajiroon, those who made the hijra) from Mecca, where they were persecuted, to present-day Medina in 622 A.D. ~~Upon arriving in Medina, the Prophet Mohammad was recognized as the head of the first Muslim city-state. After this time, the Prophet Muhammad led his army against the Meccans in a military struggle (a jihad) to protect his community. The hijra is understood by many as an archetypal moment in Muslim history and the point at which Islam took its proper place as the organizing principle of society. Modern-day Muslim extremists call on others to make the hijra to conflict zones, like Afghanistan, Iraq or Syria, as a precondition to waging violent jihad.~~

**Inshallah**: "God willing." A commonly used phrase, meant to recognize that what will happen is the will of God.

**Islam**: Islam is the third of the Abrahamic faiths. ~~Like Christianity and Judaism, Islam is a monotheistic faith in which prophets of the God of Abraham provide guidance and inspiration to humankind. Born into the Arabian Peninsula in the 7th century, Islam spread rapidly during the life of the Prophet Muhammad, who Muslims regard as the last of the Abrahamic prophets, and the lives of the successors to the Prophet Muhammad. Islam is a fast growing global religion practiced in diverse ways by diverse communities, and claims the second largest number of adherents to Christianity.~~

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

**Jihad**: "To struggle or strive." ~~In traditional Muslim belief, the most important interpretation of the word jihad, or "the greater jihad," is to struggle or strive to live a more pious life. Martial jihad, or violent struggle on behalf of the faith, is traditionally understood to be the lesser jihad(lesser in importance). In violent extremist discourse, violent jihad is emphasized as more important, and often described as an individual duty incumbent upon every man, woman and child.~~

**Jihadi**: As a noun, an individual who engages in violent jihad. As an adjective, used to describe something, like a text, video, or song, associated with violent jihad.

**Jihadi John**: Mohammad Emwazi, aka Jihadi John, was an English-speaking fighter for the Islamic State ~~and former British resident who beheaded James Foley in August 2014, Steven Satloff in September 2014, and Peter Kassig in November 2014. These beheadings were featured in propaganda videos in which Emwazi taunted the United States. Emwazi was featured in additional Islamic State beheading videos regarding victims from the UK, Syria and Japan. Emwazi was killed in a drone strike in Raqqa, Syria, in late 2015.~~

**Junaid Hussain**: Junaid Hussain was a ~~notorious~~ online recruiter and hacker for the Islamic State.  ~~Hussein, using Twitter handle @AbuHu55ain, was in direct contact via Twitter with an Islamic State supporter in the United States that acted on Hussein's incitement. This individual was Elton Simpson, who was using the Twitter name "Sharia is Light" and handle @atawaakul. Simpson and a second perpetrator, Nadir Soofi, were killed in May of 2015 by law enforcement during an armed assault of a cartoon contest in Garland, Texas, in which participants were invited to draw caricatures of the Prophet Muhammad. Hussein was active on social media as the attack occurred, demonstrating foreknowledge of the plot, and threatened additional attacks on social media in the aftermath of the attack~~.

**Kaffir (s), Kuffar (pl):** This is a Quranic term for polytheists or pagans, ~~who were common features of the religious landscape in the 7th and 8th century Arabian Peninsula from which the Qur'an dates. The term is now used more broadly by violent jihadists to mean "infidel," and engender an "us versus them" mentality between "true" Muslims and those who hold different beliefs. Violent~~ jihadists use the term to describe ~~other self-professed Muslims, Jews, Christians and~~ adherents of other faiths. ~~By labeling these individuals as infidels, violent jihadists contend they are therefore deserving of death.~~

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

**Martyrdom**: In the Abrahamic tradition, a martyr is someone who sacrifices themselves for God and their faith. Martyrs are considered heroes, and in the Muslim tradition, martyrs are also promised great rewards in the afterlife. Modern Muslim extremists have used the term to describe fighters who die in battle, ~~but include those who engage in acts of suicide terrorism despite the prohibition against suicide in traditional Islam. Terrorist organizations invest heavily in propagandizing the value of suicide terrorism as an act of martyrdom, and celebrate the individual attackers as a 'shaheed,' or martyr, to incentivize others to sacrifice themselves for the cause.~~

**Muhammad**: According to Muslim tradition, Muhammad is the final prophet in the line of prophets found in the Abrahamic tradition. ~~Born in 570, he first received divine revelation in 610 while living in Mecca. He led the Muslim community in both Mecca and Medina until his death in 632. In the Muslim tradition, the Prophet Muhammad was not divine, but served as the best example of what it means to be a Muslim. The examples provided by his sayings and deeds, and those of his immediate companions, are revered as the second highest source of authority in Islam behind the Qur'an.~~

**Mujahid (s), Mujahideen (pl)**: "Holy Warrior," or one who wages martial jihad.

**Qur'an**: The primary religious text and source of authority of the Muslim faith. ~~The Muslim tradition holds that the Qur'an is the immutable collection of divine revelations received by the Prophet Muhammad during his Prophetic life, which began at age 40 and lasted over two decades.~~

**Ramadan**: Ramadan is the ninth month of the Muslim calendar and a holy month marking the first divine revelation received by the Prophet Muhammad. Religiously observant Muslims fast from sun up until sun down during Ramadan as an act of spiritual cleansing and piety.

**Ramadi**: Ramadi is a city in central Iraq and the capital of Anbar Province, a primarily Sunni Muslim province. ~~The Islamic State first gained control of parts of Ramadi in January 2014 and increased its control though 2015. Iraqi forces dislodged the Islamic State from Ramadi in February 2016 but only after heavy fighting resulted in widespread destruction of the city.~~

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

**Shahada**: The testament of faith in Islam, specifically, that "There is no God but God, and Muhammad is the messenger of God." The foundational belief in monotheism, and the role of the Prophet Muhammad as the final prophet of the Abrahamic tradition, are central concepts in traditional Islam. ~~Modern-day Muslim extremist groups, like al-Qa'ida and the self-proclaimed Islamic State, incorporate the shahada in the black flags they use as symbols of their organizations. Their goal is to portray themselves as authentic standard bearers of "true" Islam.~~

**Shaheed**: "One who martyrs themselves for God, or as a witness to God's greatness." ~~While suicide is prohibited in traditional Islam, modern-day Muslim extremists use the term shaheed to describe suicide bombers, as well as those who die while participating in violent jihad. In traditional Islam, martyrs earn great rewards in the afterlife, and so by conflating suicide attacks with martyrdom, violent extremists seek to incentivize suicide terrorism.~~

**Ummah**: The transnational community of Muslims, or the Muslim nation. ~~Some Muslims, including some violent extremists, downplay the importance or legitimacy of identities based on nationalism, and emphasize or recognize only identities based on one's membership in the Muslim nation. This concept is used to lend credibility to the idea that every Muslim, everywhere across the globe, is obliged at an individual-level to wage "defensive" violent jihad on behalf of any Muslim community that is occupied or oppressed anywhere else in the world.~~

**Wallahi**: Arabic for "I swear to God," and used to testify that what someone is saying is true.

**Yahud**: Arabic for "Jew."

**April 15, 2013 bombing during the Boston Marathon in Boston, Massachusetts:** On April 15, 2013, Tamerlan and Dzhokhar Tsarnaev planted two improvised explosive devices made from pressure cookers in backpacks on Boylston Street near the finish line of the Boston Marathon. The bombs killed three individuals and wounded 264 others. ~~The bombs were based on instructions found in Inspire magazine, an English-language electronic magazine produced by al-Qa'ida in the Arabian Peninsula, a designated foreign terrorism organization based in Yemen. Before being captured, Dzhokhar Tsarnaev claimed responsibility for the bombing attacks in writing, stating that they were conducted in response to the U.S. military campaigns in Iraq~~

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

~~and Afghanistan and their impact on Muslims, and that the individuals killed in Boston were "collateral damage."~~

**October 1, 2017 mass shooting in Las Vegas, Nevada:** On October 1, 2017, ~~a sixty-four-year-old~~ American named Stephen Paddock barricaded himself in a Mandalay Bay Hotel room on the 32nd floor and proceeded to ~~conduct the most lethal mass shooting in U.S. history, targeting attendees of a music festival. He~~ killed 58 individuals before killing himself. Over 850 individuals were injured during the attack. Paddock's motive remains unclear.

**March 15, 2019 mass shootings at two mosques in Christchurch, New Zealand:** On March 15, 2019, an Australian citizen named Brenton Tarrant conduced a firearms attack on two mosques in Christchurch, New Zealand, resulting in the deaths of 51 worshippers. ~~He published a manifesto describing his motivations for the attack, which are based in white supremacist ideology. In his manifesto, he indicates he was inspired by other white supremacist attacks, including the 2011 mass casualty attack in Norway. More recent white supremacist attackers have claimed inspiration from the Christchurch attack, highlighting the increasing internationalization of white supremacy.~~

                                                                        :
                                    **Initials of Deputy Clerk**    PMC