1          UNITED STATES OF AMERICA
           UNITED STATES DISTRICT COURT
2          CENTRAL DISTRICT OF CALIFORNIA
               WESTERN DIVISION
3
                  - - -
4          HONORABLE STEPHEN V. WILSON
     UNITED STATES DISTRICT JUDGE PRESIDING
5                 - - -

6
     UNITED STATES OF AMERICA,          )
7                                       )
                    PLAINTIFF,          )
8                                       )
     VS.                                )    CASE NO.:
9                                       )    CR 19-0313-SVW
     MARK STEVEN DOMINGO,               )
10                                      )
                    DEFENDANT.          )
11                                      )
     _____)
12

13

14
            REPORTER'S TRANSCRIPT OF PROCEEDINGS
15
             THURSDAY, NOVEMBER 5, 2020
16
                LOS ANGELES, CALIFORNIA
17

18

19

20

21          LAURA MILLER ELIAS, CSR 10019
           FEDERAL OFFICIAL COURT REPORTER
22         350 WEST FIRST STREET, ROOM 4455
           LOS ANGELES, CALIFORNIA 90012
23              PH: (213)894-0374

24

25

1

APPEARANCES OF COUNSEL:

2

ON BEHALF OF PLAINTIFF:

3

          BY:  REEMA EL-AMAMY
4
             DAVID RYAN
        ASSISTANT UNITED STATES ATTORNEY
5
        1100 UNITED STATES COURTHOUSE
        312 NORTH SPRING STREET
6
        LOS ANGELES, CA 90012

7

ON BEHALF OF DEFENDANT:

8

        OFFICE OF THE FEDERAL PUBLIC DEFENDER
9
        BY:  ANGELA VIRAMONTES
             LISA LaBARRE
10
        DEPUTY FEDERAL PUBLIC DEFENDER

11
        321 EAST SECOND STREET
        LOS ANGELES, CA 90012
12

13

14

15

16

17

18

19

20

21

22

23

24

25



1

2

                                    INDEX

3

4      PROCEEDINGS                                    PAGE

5

       DAUBERT HEARING

6

       EXAMINATION OF DR. SAGEMAN

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1      LOS ANGELES, CALIFORNIA; THURSDAY, NOV. 5, 2020; 10:00 A.M.

 2                              - - -

 3              THE COURT:  Calling Case No. CR 2019-313.

 4              United States of America versus Mark Steven

 5      Domingo.

 6              Counsel, please state your appearance.

 7              MS. EL-AMAMY:  Good morning, Your Honor.  Reema

 8      El-Amamy and David Ryan on behalf of the United States.

 9              THE COURT:  How do you spell your last name again,

10      Ms. El-Amamy?

11              MS. EL-AMAMY:  E-l A-m-a-m-y.

12              THE COURT:  Okay.

13              MS. VIRAMONTES:  Good morning, Your Honor.  Angela

14      Viramontes on behalf of Mark Domingo who is present via VTC

15      from the Metropolitan Detention Center as well as Lisa

16      LaBarre.

17              MS. LaBARRE:  Good morning, Your Honor.

18              THE COURT:  Good morning.  Would you spell your

19      last name, the first lawyer who spoke?

20              MS. VIRAMONTES:  Sure.  It's V-i-r-a-m-o-n-t-e-s.

21              And Your Honor, please let me know if you're unable

22      to hear me.  The Court earlier said my microphone wasn't

23      working well.

24              THE COURT:  No, I hear you very clearly, thank you.

25              Okay.  Now, I scheduled this Daubert hearing to
```

```
1    give the parties an opportunity to inform the Court about
2    their positions regarding expert witnesses, in particular
3    Dr. Sageman.  And the parties have briefed the matter
4    extensively, but in a Daubert hearing, I would allow
5    examination and if the parties want to examine the expert,
6    they have leave to do that.
7              I want to ask the government a question about their
8    anticipated presentation at trial.  Does the government
9    intend to introduce any evidence that defendant was a member
10   of Isis?
11             MS. EL-AMAMY:  No, Your Honor.
12             THE COURT:  And does the government intend to
13   introduce any evidence to suggest that he had some informal
14   tie to Isis?
15             MS. EL-AMAMY:  No, Your Honor.
16             THE COURT:  And as I understand it from your
17   pleadings, your position is that he was inspired by Isis
18   literature; is that correct?
19             MS. EL-AMAMY:  He was -- yes, Your Honor, he was
20   inspired by.
21             THE COURT:  And in that vein, how was he
22   influenced?  In other words, specifically, do you have any
23   evidence from searchs that he accessed certain websites or
24   other forms of communication that described the activities or
25   goals?
```

```
 1              MS. EL-AMAMY:  Yes, Your Honor.
 2              THE COURT:  Describe that for me, if you would.
 3              MS. EL-AMAMY:  Yes, Your Honor.
 4         At trial the government would demonstrate that
 5    defendant was inspired by a number of ideology.  Isis being
 6    one of them; however, also as reflected in Dr. Sageman's
 7    report, he was inspired by white supremacist ideology.  As
 8    noted by Dr. Sageman, this defendant was obsessed with
 9    violence.
10              THE COURT:  You're going, Ms. El-Amamy, you're
11    going beyond what I was interested in for the moment.  I'm
12    not interested in what Dr. Sageman said or didn't say at this
13    point.  I'm just asking you in terms of the evidentiary
14    presentation at the trial, what specifically will you
15    introduce that demonstrates a connection between the
16    defendant and a particular book, website or any matter that
17    was either sponsored by Isis or described Isis ideology?
18              MS. EL-AMAMY:  We will introduce his Facebook
19    communication as early as 2017 with an individual
20    Mr. Bedikian who has no ties to the government in which
21    defendant was talking about his inspiration from Isis.  We
22    will introduce his communication over the chat communication
23    discourse in which he indicates his inspiration regarding
24    Isis-type propaganda.
25              THE COURT:  When you describe the chat discourse,
```

1     what specifically are you referring to?  What chat room?

2             MS. EL-AMAMY:  So there was an Isis-inspired chat

3     room that the defendant communicated with with various

4     individuals, some of them government employees, many of them

5     not.

6             THE COURT:  When you say government employees, you

7     mean government employees who infiltrated the chat rooms for

8     informational purposes?

9             MS. EL-AMAMY:  Correct, Your Honor.

10            THE COURT:  Okay, go ahead.

11            MS. EL-AMAMY:  And in these chat rooms, the

12    defendant shared not only his statements regarding his

13    inspiration from Isis, but the propaganda video in the chat

14    room.  The government has also seized the defendant's digital

15    devices and also in those digital devices, he has

16    Isis-inspired videos in a very graphic nature.  Due to the

17    graphic nature, the government will be redacting those

18    presentations at trial, but they involve beheading as well as

19    other very violent forms of death.

20            THE COURT:  But why is it necessary to show those

21    videos?

22            MS. EL-AMAMY:  To the extent -- it is definitely

23    not necessary to show the beheadings and people being set on

24    fire; however, to the extent that we need to demonstrate

25    defendant's intent and motive, particularly if an entrapment

 1    defense is being presented, it is relevant to this

 2    defendant's predisposition to be engaged in murder.

 3           THE COURT:  But would you be able to say to the

 4    jury that the government is not contending that he was a

 5    member of Isis?

 6           MS. EL-AMAMY:  Correct, Your Honor.

 7           THE COURT:  And does the government want to examine

 8    Dr. Sageman?

 9           MS. EL-AMAMY:  Yes, Your Honor.

10           THE COURT:  All right.  Is he here, Dr. Sageman?

11    He should be here; right?

12           MS. LaBARRE:  I am requesting that Dr. Sageman join

13    us right now.

14           THE COURT:  Let me say before he gets on that I

15    have carefully read his report and I've read -- so it

16    wouldn't be terribly helpful to just hammer once again the

17    points that you made in your pleadings.  If there's something

18    that you think you need to develop or inform the Court of

19    beyond what you said, then an examination would be fruitful,

20    but I'll leave that to you.

21           MS. EL-AMAMY:  The government will employ its best

22    efforts to do that.

23           MS. VIRAMONTES:  Your Honor, if I may, this is

24    Ms. Viramontes.  Is the interest of the Court in

25    Dr. Sageman's qualifications or is it more of the content of

```
 1    what he would be testifying to?
 2            THE COURT:  Well, I mean, I think I have a good
 3    idea of his what he's going to testify to because that's in
 4    his report.  Did you intend to Ms. El-Amamy, examine him
 5    about his qualification?
 6            MS. EL-AMAMY:  No.  More the content of his report
 7    and the nature of his opinions and how he reached them.
 8            THE COURT:  Didn't he describe those in the report?
 9            MS. EL-AMAMY:  Yes, but the government would submit
10    there are flaws with those.
11            THE COURT:  And you mean those are flaws that you
12    haven't described in your pleadings?
13            MS. EL-AMAMY:  Correct.
14            THE COURT:  All right.
15            MS. LaBARRE:  He's having some difficulties logging
16    in.
17            MS. VIRAMONTES:  Your Honor, if he's unable to
18    connect via Jabber, would the Court like him to call in?
19            THE COURT:  I prefer that he be on the screen if he
20    can do that.  It's not crucial, but I think it would be
21    helpful.  Now, if he can't log in in the present format,
22    could we log out and re-log in in some way that maybe we can
23    assist him to get on the screen?
24            THE CLERK:  If I had his contact information, I can
25    speak with IT and have them call him.
```

```
 1              THE COURT:  Well, then can we sign off for a few
 2     minutes and see if we can't make some progress.
 3              Okay, is that you, Dr. Sageman?
 4              THE WITNESS:  Yes.
 5              THE COURT:  We can see and hear you.  Thank you for
 6     being here this morning.  We'll begin with the government
 7     asking some questions of Dr. Sageman.
 8              MS. EL-AMAMY:  Should he be placed under oath?
 9              THE COURT:  Yes.
10              THE CLERK:  Mr. Sageman, please raise your right
11     hand.
12                          (Witness sworn.)
13              THE CLERK:  Thank you.
14                          ^EXAMINATION
15     BY MS. EL-AMAMY:
16     Q.   Good morning, Dr. Sageman.
17     A.   Good morning.
18     Q.   I'm well aware of your credentials, and so I'm going to
19     skip to some questions regarding the facts of this specific
20     case if that's okay with you?
21     A.   Okay, sure.
22     Q.   In advance of the hearing today, you reviewed a number
23     of documents, didn't you?
24     A.   Uh, and videotapes, correct, yes.
25     Q.   One of the documents that you reviewed was an
```

 1    October 16, 2020 filing by the government related to your

 2    testimony; is that correct?

 3    A.    Yeah, just did that -- yes, the day or the day before,

 4    yes.

 5    Q.    And in response to that filing, you sent counsel for the

 6    defendant an email with your thoughts regarding the filing;

 7    is that correct?

 8    A.    Uh, I think so.

 9    Q.    And that email to the best of your recollection was

10    dated November 3rd; is that correct?

11    A.    Probably, yes.

12    Q.    In the email you stated,

13            "Angela, the government makes the wrong assumption

14    about my third opinion that he lacks predisposition because

15    of his mental state.  Note my opinion is that he lacks

16    predisposition because of lack of capability.  He did not how

17    to build one nor would be likely to learn and opportunity

18    because his probability of meeting a trained terrorist was

19    one in several million.  Neither capability nor opportunity

20    are mental state issues.  Best, Mark."

21            Does that sound like an email you wrote?

22    A.    Uh, yeah.

23    Q.    Am I correct in understanding that you intend to offer

24    an opinion about defendant's predisposition to commit the

25    charged crimes based on other factors, but not the

1    defendant's mental state?

2    A.   Uh, yes.  Again, you use the word predisposition in

3    different way that I use the word predisposition.  I use the

4    word predisposed.  I don't use the word predisposition.  I

5    believe I said in my report predisposed.  I use the word as

6    it -- with its conventional meaning namely, inclined

7    beforehand, liable, likely.

8         This is the Oxford English Dictionary definition

9    dating back to 1646 in English.  That's how I use the word

10   predisposition.  So basically, I'm going to say that the

11   defendant was unlikely or not inclined to have committed this

12   act absent the FBI because of lack of means and lack of

13   opportunity.

14   Q.   Dr. Sageman, are you familiar with the legal definition

15   of or legal defense of entrapment?

16   A.   Uh, yes, I am, but that's not how I use the word

17   predisposition or predisposed here.

18   Q.   Is that something that you applied when looking at the

19   facts of this case?

20   A.   Absolutely not.  It has nothing -- I do not apply mental

21   state to this case.  I just notice that he had no capability

22   of building a bomb and his opportunity to participate in a

23   plot was basically zero.

24   Q.   Prior to testifying today, were you given the legal

25   definition of entrapment?

```
 1   A.   I'm aware of it.  I don't know if it was given, uh, the
 2   legal definition of entrapment.
 3   Q.   Are you aware of the fact you testified to in other
 4   matter that in addition to discovery, you were given the
 5   legal definition of entrapment and you analyzed the facts of
 6   the case in context of the legal definition of entrapment?
 7   A.   In some other cases, yes, I have, yes.
 8   Q.   You said that in this case the defendant did not know
 9   how to build and I guess you meant a bomb nor was he likely
10   to learn; is that correct?
11   A.   Yes.
12   Q.   You're not a bomb expert, are you?
13   A.   I've been trained in bomb making, but I'm not an expert.
14   Q.   You have never testified as a bomb expert in any matter,
15   have you?
16        THE COURT:  And why are you asking these questions?
17   I mean, it's plain from the transcript unless you have some
18   other evidence that this defendant didn't know anything about
19   bomb making.  And it's clear from the transcript that the
20   suggestion about the bomb came from the undercover agent.
21   What difference does it make whether this witness knows about
22   bomb making?  Unless there's something I'm missing.
23        MS. EL-AMAMY:  Yes, Your Honor, and that is
24   actually precisely the point.  This expert witness does not
25   need to offer an expert opinion regarding the defendant's
```

```
 1    capability to make a bomb.  It is plain on its face.

 2              THE COURT:  All right.  I get the point.  Go ahead.

 3

 4    BY MS. EL-AMAMY:

 5    Q.   Did you personally interview the defendant?

 6    A.   Yes, I did.

 7    Q.   Did you take any notes?

 8    A.   Yeah, I took some notes.

 9    Q.   Approximately how many pages?

10    A.   I don't know, about three, four.

11    Q.   Now, you said in your email that the defendant was not

12    likely to learn to build a bomb.  In making --

13              THE COURT:  I missed that.  Not likely what?

14              MS. EL-AMAMY:  To learn how to build a bomb.

15    Q.   When you made that statement, did you mean that he was

16    unlikely to be able to learn to build a bomb by a global

17    neo-jihadi in the United States?

18    A.   Uh, no, I meant in two ways.  He was not likely to learn

19    himself how to build a bomb because he didn't even try.  He

20    didn't even look for bomb making instruction on the Internet,

21    and as he said in the discovered material, he flunked

22    chemistry so he was not likely to learn himself how to build

23    a bomb.

24              Then the other possibility is could he have learned

25    from a foreign terrorist organization or a global neo-jihadi
```

UNITED STATES DISTRICT COURT

1    organization.  And that I said was unlikely because before

2    the global neo-jihadi organization teaches you how to make a

3    bomb, they have to already trust you.  They take

4    responsibility for the consequences of their bomb teaching.

5            And before they do the teaching, they ask the

6    person to join the organization to pledge allegiance in

7    Arabic, allegiance to that organization.  Uh, and because the

8    defendant was too much of a loose cannon, was very

9    undisciplined, that would not have happened.

10            I have already written on this matter before in a

11   peer-reviewed publication.  It is a major aspect of my book

12   "The London Bombings" published by the University of

13   Pennsylvania Press.  It was peer reviewed.

14   Q.   Thank you, Dr. Sageman.

15            So I understand that your point is that he was

16   unlikely to learn from a neo-jihadi terrorist.  However,

17   let's focus on opportunity.  You also mentioned that the

18   defendant was associated with the alt-right movement; is that

19   correct?

20   A.   Yes.

21   Q.   And he spent time on 4chan and alt-right websites;

22   correct?

23   A.   Yes.

24   Q.   To your knowledge what is the alt-right?

25   A.   It's basically an extreme right wing movement, uh, that

1  has a large presence on the Internet, and, uh, it's a

2  movement.  And some times carries out, uh, some actions in

3  the United States and elsewhere in the world.

4  Q.   Violent actions; correct?

5  A.   Some of them are violent.  Some of them are just

6  protests.  Some of them are violent, yes.

7  Q.   You are not an expert with respect to the alt-right

8  movement; correct?

9  A.   Uh, I'm very familiar with it.  It's part of, uh, some

10  of them become terrorists so yes, I'm familiar with those.

11  Did I write anything on the alt-right movement, I don't

12  believe I did.

13  Q.   And sitting here today, you cannot give an opinion

14  regarding the frequency with which individuals associated

15  with the alt-right movement attempt to use bombs in

16  connection with their activities; correct?

17  A.   Uh, some of them do, uh, but that's not, uh, that's not

18  really relevant to this case.

19  Q.   According to you it's not relevant.

20  A.   Well, I haven't seen anything about an alt-right person

21  trying to teach Mr. Domingo how to build a bomb nor did

22  Mr. Domingo ask any alt-right friend to do that.

23  Q.   Does the name Joseph Bedikian ring a bell to you?

24  A.   Uh, it does not ring a bell right now.  Can you

25  enlighten me?

```
 1    Q.   Well, are you aware of who Mr. Bedikian is?

 2    A.   No.

 3    Q.   All right.  So you would not be familiar with

 4    Mr. Bedikian and Mr. Domingo discussing killing individuals?

 5    A.   If that was in the discovery material, I glossed over

 6    it.

 7    Q.   You glossed over it?

 8    A.   I reviewed all discovery material, and I usually focus

 9    on things that are relevant to the case.  And right now as we

10    talk, I can't recall that individual.

11    Q.   All right.  Now, you talked about the number of

12    neo-jihadi bombers, civilian people in the United States;

13    correct?

14    A.   Yes.

15    Q.   And the ability of Mr. Domingo to come into contact with

16    individuals you identify as a neo-jihadi bomber; correct?

17    A.   Correct.

18    Q.   Your analysis does not take into account someone that

19    Mr. Domingo knew like Mr. Bedikian; correct?

20    A.   That's correct, yes.

21    Q.   Now, um, you were profiled by your alumni NYU, your

22    alma mater NYU in the 2009-2010 edition; is that correct?

23    A.   I'm sorry?

24    Q.   Were you profiled by NYU in the 2009-2010 edition?

25    A.   I don't recall whether I was or not.
```

```
1   Q.   Do you recall being profiled by NYU?

2   A.   No.

3   Q.   Do you recall testifying under oath in a matter in this

4   district that you were profiled by NYU in the 2009-2010

5   edition?

6   A.   No, I don't recall.

7   Q.   Do you recall stating that you believe that the greatest

8   threat facing America today comes from terrorist wannabes who

9   gather information on the Internet and dare each other to

10  take action?

11  A.   That was, um, probably true at the time.

12  Q.   You've testified previously that this is a type of

13  home-grown threat.  Someone who's not connected to a foreign

14  terrorist organization; is that right?

15  A.   Uh, yes.

16  Q.   You agree that these individuals pose a very real

17  threat; correct?

18  A.   Yes.

19  Q.   Now, your expert report, the one that was disclosed to

20  us on October 2nd of 2020, lists six neo-jihadis; correct?

21  A.   Yes.

22  Q.   All right.  Your expert report does not discuss an

23  individual Ahmed Ressam; correct?

24  A.   Uh, yes, because that was before 20 years.

25  Q.   It was almost exactly 20 years; is that right?
```

1    A.    Yes.

2    Q.    You're aware that he was convicted in 2001 of planning

3    to bomb the Los Angeles International Airport on New Year's

4    Eve 1999; is that correct?

5    A.    Yes, and so it's before the 20 years, yes.

6    Q.    Why did you choose a 20-year cut-off?  Why not include

7    this individual as well?

8    A.    I could have, and then the numbers would not have

9    changed.  The estimate would have been seven in 20 years or

10   25 years or 30 years divided by 330 million people.  It still

11   would be one in a billion chance.  It doesn't change that

12   much.  I mean, the numbers are so rare.  Whether it's six or

13   seven, the numbers are so rare that it really doesn't change

14   the odds very much.

15   Q.    You also specifically exclude from your analysis the

16   target of other FBI operations where individuals were

17   planning to conduct acts of violent; is that correct?

18   A.    Uh, yes.

19   Q.    Do you recall giving a talk at the University of

20   Southern California in May 2011 where you discussed your

21   methodology and your study?

22   A.    No.  I've lectured in hundreds of universities.  I don't

23   particularly recall that.  I do recall having been at USC,

24   yes.

25   Q.    And do you recall testifying under oath in a matter in

1    another district about the presentation that you gave at USC?

2    A.   I've testified dozens of times.  I don't recall whether

3    I did or not.  I probably did, but I don't know.

4    Q.   Okay.  Would it sound right to you that you gave a Power

5    Point presentation and gave some comments about the targets

6    of FBI operations like Defendant Domingo?

7    A.   I may have.  I don't recall.

8    Q.   Do you recall specifically saying that there was no

9    doubt in your mind that individuals engaged in those cases

10   had the intent to commit the crimes for which they are

11   charged?

12   A.   Yes.

13          MS. VIRAMONTES:  Your Honor, I'm going to object to

14   the government's questioning.  It's vague.

15          THE COURT:  I don't find it vague.  If it's vague,

16   you can ask questions when you have a chance if you wish to

17   clarify anything.  Go ahead, Ms. El-Amamy.

18          MS. EL-AMAMY:  Thank you.

19   Q.   In May of 2020 or approximately May of 2020, you

20   provided defense counsel a summary of your expert opinion in

21   this matter; is that correct?

22   A.   According to the proffer, yes.  We talked about it.  I

23   didn't provide it.  She wrote it.

24   Q.   Right, but you gave your opinion to her to write; is

25   that correct?

1    A.   We discussed it.

2    Q.   All right.  And you did this before you ever interviewed

3    the defendant; is that right?

4    A.   Yes, probably.  Uh, I forget when I interviewed him, but

5    it might have been so, yes.

6    Q.   All right.  Um, and you did it based on your review of

7    the discovery in this matter?

8    A.   Yes.

9    Q.   Although you don't know if you reviewed the materials

10   related to Mr. Bedikian; is that correct?

11   A.   I probably did review them.  I reviewed all the

12   discovery material.  It just doesn't stick in my mind because

13   I didn't think it was as important as you make it out to be.

14   Q.   Okay.  Putting that aside, the opinion you provided

15   defense counsel was that the defendant was (A) attempting to

16   garner friendship and sympathy.  (B) --

17            THE COURT:  You cut off for a minute.  Would you

18   say that again.

19            MS. EL-AMAMY:  All right.

20   Q.   In the summary that you provided to defense counsel, you

21   said that Defendant Domingo was attempting to garner

22   friendship and sympathy, satisfy a personal need to exact

23   revenge on society and project masculinity.  Does that sound

24   right to you?

25   A.   Uh, that's what the counsel said.  It's not my wording.

1    As I say we discussed it.  I did not write this and this is

2    what the counsel wrote not what I said.

3    Q.   Okay.  You have previously testified about applying --

4         THE COURT:  You know, you just glossed over his

5    answer.  I didn't understand the question and answer.  I'm

6    understanding that in May, this witness had a conversation

7    with defense counsel regarding a proffer of his expert

8    testimony.  And you got to the point where you were evidently

9    describing the defense counsel's report or notes in which it

10   was stated that the defendant and the witness gave a

11   description of what he believes motivated the defendant.

12        And is what I said true so far, Mr. Sageman or not?

13        THE WITNESS:  Yes, correct.

14        THE COURT:  And that while he didn't use the exact

15   words that are in the report of May 2020, the basic thoughts

16   were his.  Is that true?

17        THE WITNESS:  Uh, no.  I discussed some things and

18   for instance, I would never use in testimony the notion of

19   masculinity.  I'm not sure what it means.  I know I'm a

20   psychiatrist, but I always deal with lawyers who tend

21   psychologize far more than I do.  And so that's why I say

22   it's not my words.

23        THE COURT:  I see.  If you could best recall what

24   you said, not, you know, as we used to say in the schoolyards

25   of New York City in hyperba, you know, we used to talk that

```
 1    way.
 2            THE WITNESS:  Right.
 3            THE COURT:  Can you tell us, you know, just
 4    basically what you said?  I mean you said something about
 5    what motivated him.  What was it?  If not what was in the
 6    report, what did you say?
 7            THE WITNESS:  I probably said, and I don't recall
 8    the conversation.  I remember that I had conversation with
 9    attorneys, and I think that it was a big rush to get some
10    kind of proffer, but I did not write the proffer nor did I
11    use the word masculinity.  It's not something that I use.
12            I probably said that his desire to cooperate with
13    the FBI agent or confidential informant was due to the --
14    probably due to the fact that he wanted friendship, this was
15    a lawyer, and also he liked to brag and show off.  That's
16    basically, uh, my understanding of it.  The rest I can't
17    recall exactly what the proffer said, but those are not my
18    words.
19            THE COURT:  I see.  All right, thank you.
20    BY MS. EL-AMAMY:
21    Q.   Following on that, you previously testified about
22    applying a 65-indicator test for violence in other
23    defendants' cases.  Do you recall that?
24    A.   Uh, no, that's not quite correct.  I have done a
25    three-year research study comparing people who are violent
```

1   with, uh, their friends and relatives who are not and tried

2   to distinguish, uh, between the two.  And I found a

3   progression of indicators that I put in about five

4   categories, uh, that are progressively concerning, are

5   serious and basically would decrease, uh, the index of

6   suspicion that the person could be violent.

7          And I briefed the FBI at the FBI academy around

8   2010 on this fairly large research report.  It's about 7,

9   800 pages that I'd done for the Air Force, uh, and indeed it

10  had 65-indicators that are progressive.  For instance, if one

11  of my last indicator is basically pressing on the trigger of

12  the bomb to make, uh, to explode the bomb.  You know, if you

13  have that indicator, you have a pretty good chance that the

14  person is violent.

15         And so it's a little bit like the weather.  The

16  early indicators are not so good, but they're there, uh, and

17  you get to be better about an hour before the storm, you

18  know, in terms of looking at the indicator whether a storm is

19  coming or not if I can use that metaphor.  It's a little bit

20  the same with, uh, with violence.  You're very good a second

21  before a person is violent, you're not as good, uh, three

22  days prior to the violence and you're definitely not very

23  good two months prior to the violence.

24  Q.   Did you use your indicator analysis to analyze the

25  defendant in this case?

1    A.   I've never used it, uh, because the FBI started using it
2    as a checklist.  I completely rejected it.  I told them not
3    to do it because that's not how it's supposed to be.  Again,
4    it's a progressive, uh, it's progressive as I said.  You
5    know, the indicators within a few minutes or hours before the
6    act of violence are pretty good.  The ones earlier are not so
7    good.  And so we have a problem with specificity which is why
8    you cannot use it as a checklist.
9            And so no, I have never used, uh, those indicators
10   to -- to look at that.  This was really to separate people
11   who are violent versus people who are not violent.  I've
12   never used it in any single case because I was horrified by
13   the way the FBI was attempting to use it.
14   Q.   And you were not happy with the FBI when they used your
15   analysis in that manner; correct?
16   A.   Yes.  Uh, I told them, you know, that's not how, you
17   know, it's not a checklist and I still maintain that.
18   Q.   And you're still unhappy with the FBI today.
19   A.   No.  The FBI used this checklist that's all.
20   Q.   So if you did not use the indicator test, is your
21   opinion regarding the defendant based on his recorded
22   statements and his statements to you?
23   A.   No.  It's really on what I saw in the discovery material
24   and my own experience in, uh, terrorism cases either running
25   terrorist operation, defending terrorist operation,

```
 1    interviewing about 50 terrorists extensively, uh, and my
 2    study of terrorism.
 3    Q.   In your report you mentioned one of the things that you
 4    reviewed is the charging documents; correct?
 5    A.   Yes, there are two charges, two counts if I believe.
 6    Q.   And you understand the defendant is not being charged
 7    with being a member of a foreign terrorist organization?
 8    A.   Yes, I'm aware of that, but your expert talks about
 9    terrorism and so my, uh, I'm a rebuttal witness.  And so I'm
10    going to rebut Mr. Brandiff who is going to talk about Isis
11    and as I say, there's no link to Isis in this case.
12    Q.   And you understand that the government does not charge
13    that this defendant was acting on behalf of Isis.
14    A.   I'm aware of that.
15            THE COURT:  Let's get to something that is more
16    helpful.
17            MS. EL-AMAMY:  Okay.  I have no further questions,
18    Your Honor.
19            THE COURT:  All right.  Anything from the
20    defendant?  You wish to further examine this witness?  I have
21    pretty good picture of what he intends to testify to, but if
22    you need some clarification or make some points, you can do
23    that if you wish.
24            MS. VIRAMONTES:  Your Honor, the defense does not
25    wish to belabor this hearing.  If the Court is inclined to
```

1    allow Dr. Sageman testify as an expert, the defense will

2    rest.  If the Court has concerns about the scope of his

3    testimony or his qualifications, the defense would request an

4    opportunity to question Dr. Sageman.

5              THE COURT:  Well, I mean, you're asking for an

6    advisory opinion and it's not my job to indicate that.  I'm

7    trying to gather as much as information as I can before I

8    make a decision.  I actually don't intend to make a decision

9    on the fly.  I intend to think about it and review some of

10   the materials further.  So if there are any points that you

11   think you ought to make beyond what has already been

12   established in the pleadings or in the testimony so far, now

13   is the time to do it.

14             MS. VIRAMONTES:  Your Honor, could I have one

15   minute to consult with Ms. LaBarre?

16             THE COURT:  Yes.  Take as much time as you want.

17             MS. VIRAMONTES:  Thank you, Your Honor.

18             Your Honor, the defense has nothing further.

19             THE COURT:  Then the Daubert evidentiary part of

20   the analysis is complete.  I'm going to take the matter under

21   submission, review the materials in light of Dr. Sageman's

22   testimony and try to get some order out as soon as I can

23   regarding this issue.

24             Thank you for your cooperation.

25             Thank you, Dr. Sageman for being here.

1            THE WITNESS:  Thank you, Your Honor.

2            THE COURT:  Hearing is concluded.

3            (Proceedings were concluded at 11:00 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          CERTIFICATE OF REPORTER

3

4    COUNTY OF LOS ANGELES       )

5                                )  SS.

6    STATE OF CALIFORNIA         )

7

8    I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED

9    STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,

10   DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE

11   FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET

12   FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN

13   FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO

14   FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION

15   OF MY STENOGRAPHIC NOTES.

16

17

18   DATE:  DECEMBER 10, 2020

19

20      /s/  LAURA MILLER ELIAS

21   LAURA MILLER ELIAS, CSR 10019

22   FEDERAL OFFICIAL COURT REPORTER

23

24

25