1 | TRACY L. WILKISON
Acting United States Attorney
2 | CHRISTOPHER D. GRIGG
Assistant United States Attorney
3 | Chief, National Security Division
REEMA M. EL-AMAMY (Cal. Bar No. 237743)
4 | DAVID T. RYAN (Cal Bar No. 295785)
Assistant United States Attorneys
5 | Terrorism and Export Crimes Section
       1500 United States Courthouse
6 |     312 North Spring Street
       Los Angeles, California 90012
7 |     Telephone:  (213) 894-0552/4491
       Facsimile:  (213) 894-2979
8 |     E-mail:     reema.el-amamy@usdoj.gov
                   david.ryan@usdoj.gov
9 |

10 | Attorneys for Plaintiff
UNITED STATES OF AMERICA
11 |

                    UNITED STATES DISTRICT COURT
12 |

                FOR THE CENTRAL DISTRICT OF CALIFORNIA
13 |

UNITED STATES OF AMERICA,            No. CR 19-313-SVW
14 |
            Plaintiff,               GOVERNMENT'S REPLY TO DEFENDANT'S
15 |                                 OPPOSITION TO THE GOVERNMENT'S
                 v.                  MOTION TO ADMIT TESTIMONY
16 |                                 REGARDING DEFENDANT'S
MARK STEVEN DOMINGO,                 PREDISPOSITION TO USE WEAPONS OF
17 |                                 MASS DESTRUCTION
            Defendant.
18 |

19 |

20 |

21 |      Plaintiff United States of America, by and through its counsel

22 | of record, the Acting United States Attorney for the Central District

23 | of California and Assistant United States Attorneys Reema M. El-Amamy

24 | and David T. Ryan, hereby files its Reply to Defendant's Opposition

25 | to the Government's Motion to Admit Testimony Regarding Defendant's

26 | Predisposition to Use Weapons of Mass Destruction (the "Reply").

27 | //

28 | //

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

This Reply is based on the attached memorandum of points and authorities, the files and records in this case, and any further evidence or argument the Court may allow.

Dated: July 6, 2021                    Respectfully submitted,

TRACY L. WILKISON
Acting United States Attorney

CHRISTOPHER D. GRIGG
Assistant United States Attorney
Chief, National Security Division


_____/s/_____
REEMA M. EL-AMAMY
DAVID T. RYAN
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

ii

1          **MEMORANDUM OF POINTS AND AUTHORITIES**

2    **I.    INTODUCTION**

3         Defendant Mark Steven Domingo ("defendant") has previously

4    argued that "[t]he focus of the Court's inquiry is rightfully placed

5    on the question of whether [he] was predisposed to the attempted use

6    of a weapon of mass destruction."  (Dkt. 96 at 7.)  In support of his

7    entrapment defense, defendant has argued that "[t]here is no evidence

8    [defendant] even considered using a weapon of mass destruction prior

9    to meeting with the [Confidential Human Source ('CHS')]."  (Id. at

10   15.)  Not true.  Defendant's former platoonmate, D.R., can provide

11   firsthand, eyewitness testimony of defendant's prior threats to use

12   weapons of mass destruction, as well as the training he received

13   regarding various forms of explosive devices, well before meeting the

14   CHS.[1]

15        Because defendant has raised an entrapment defense, the

16   government has the burden to prove his predisposition to attempt to

17   use a weapon of mass destruction beyond a reasonable doubt.

18   Accordingly, testimony regarding his prior knowledge of explosive

19   devices and prior threats to use them is highly probative and should

20   be admitted.

21   **II.   PROPOSED TESTIMONY OF D.R.**

22        The FBI has interviewed D.R. twice.  Prior to the government's

23   first interview with D.R., it was aware of defendant's disturbing

24   _____

25        [1] "[V]arious definitions of [the term weapon of mass
     destruction] . . . exist across the [United States government] and
26   international communities."  See
     https://www.jcs.mil/Portals/36/Documents/Doctrine/pubs/jp3_40.pdf.
27   For purposes of this motion, the term "weapon of mass destruction"
     includes any destructive device as defined in Section 921 of Title 18
28   of the United States Code.  See 18 U.S.C. § 2332a(c)(2)(A).  This
     definition includes both grenades and IEDs.

conduct in the military related to ammunition, but was not aware of his troubling conduct involving grenades.[2]  D.R. has now provided a detailed firsthand eyewitness account of defendant's conduct, and has identified several others who also observed the grenades on which defendant wrote individuals' names.

The members of D.R.'s platoon, including defendant, received training with respect to IEDs on at least three separate occasions: at Fort Campbell, Kentucky; at a base in Kyrgyzstan; and at Bagram, Afghanistan.  Each training was about a day in length, and they were taught by Explosives and Ordinance Disposal specialists.  The platoon received training multiple times because of the potential for frequently encountering IEDs while deployed.  The training courses included instruction regarding the types of IEDs, detection of IEDs, trigger devices, and the protocol to follow if an IED was discovered.[3]  Members of the platoon watched videos of IED explosions during training.  The point of viewing the videos was to learn how crucial timing was to effective use of an IED.

Members of the platoon also received training regarding pressure cooker bombs.  They learned that a pressure cooker bomb was designed to be in a sealed container, which could lead to a bigger explosion when used as an IED.  They also learned about various types of

---

[2] The grenades were 40mm grenade rounds that were able to be fired from a Mark 19 belt-fed automatic grenade launcher.  The Mark 19 was capable of causing more damage than a hand grenade, and is considered a mass casualty weapon.  A 40mm grenade is capable of causing damage similar to a pressure cooker bomb.

[3] The point of IED training was awareness and how to detect IEDs, not to teach soldiers how to make IEDs.  Someone who had received the IED training given to D.R.'s platoon would have needed additional instruction in order to build an IED on their own, particularly on how to make and incorporate a trigger device.

1 shrapnel that could be used in an IED, including nails, ball

2 bearings, glass, and rocks.  The purpose of using nails in an IED

3 would be to cause more damage and wounding.[4]

4      The platoon usually received training in separate sessions

5 broken down by squad.  After each session, the squad that had

6 received training was required to do a "briefback" as a group in

7 which they recounted to the rest of the platoon what was learned.

8 This was standard procedure after training in order to reinforce the

9 learning process.  D.R. recalled that defendant participated in these

10 "briefbacks."

11 **III.  ARGUMENT**

12      It is without question that defendant's training, experience,

13 and knowledge regarding IEDs, pressure cooker bombs, the shrapnel

14 that goes inside an IED, and weapons of mass destruction is relevant,

15 admissible, and highly probative.  Defendant has extensively analyzed

16 his communications with the CHS in arguing for an entrapment

17 instruction.  (Dkt. 96 at 8-13.)  Nowhere in defendant's conversation

18 with the CHS does he ask what an IED is or how much damage an IED can

19 cause – because he already knew.  In light of defendant's argument

20 that he was not predisposed to use an explosive device, firsthand

21 testimony regarding defendant's extensive preexisting knowledge

22 regarding IEDs and prior threats to use explosive devices are highly

23 probative and should be admitted.

24      Additionally, defendant's plot to use grenades to kill others is

25 also relevant and admissible.  Defendant seeks to argue to the jury

26

27 [4] Defendant bragged to the CHS and UCE about the length of nails that he purchased to use as shrapnel in the IED.  He did not receive instruction from the CHS or UCE to buy nails as long as he did – that

28 decision was made by defendant.

3

1    that there was no evidence that he intended to use a weapon of mass

2    destruction prior to meeting with the CHS, and that he therefore

3    lacked the predisposition to use such a weapon.  D.R.'s testimony,

4    based on his direct, firsthand observations and interactions with

5    defendant, that defendant was indeed willing to commit mass murder

6    using a weapon of mass destruction, directly rebuts this defense.

7    The government should be permitted to introduce this evidence at

8    trial.

9    **IV.   CONCLUSION**

10        For the foregoing reasons, the government respectfully requests

11   that this Court permit D.R. to offer testimony regarding the

12   following topics during its case-in-chief: (1) defendant's training

13   with respect to IEDs and other weapons of mass destruction;

14   (2) defendant's homicidal threats towards D.R. and others in the

15   platoon; (3) defendant's willingness to use weapons of mass

16   destruction to kill D.R. and others; and (4) defendant's statements

17   regarding his disdain for the United States and support of the

18   Taliban.

19

20

21

22

23

24

25

26

27

28