CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
David I. Wasserman (Bar No. 275987)
(E-Mail: david_wasserman@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
MARK DOMINGO

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 19-313-SVW |
| Plaintiff, | |
| v. | **MARK DOMINGO'S POSITION RE: SENTENCING; EXHIBITS** |
| MARK DOMINGO, | |
| Defendant. | |

Without the guidelines' terrorism enhancement, Mark Domingo's guideline range (without an adjustment for acceptance of responsibility) would be 97-121 months. As the probation office correctly notes, although "Domingo's actions were frightening, dangerous and chilling. . . it is difficult, in this case, to articulate the ways in which Domingo's actions are so many more levels serious than the actions of another person who would be found guilty of attempted murder, and then to justify a sentence of life imprisonment for Domingo." Dkt. 293, Rec. Ltr. at 5. The defense respectfully requests that this Court sentence Mr. Domingo to 15-years imprisonment followed by 20-years of supervised release (concurrent as to each count).

Respectfully submitted,
CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: October 18, 2021     By  */s/ David I. Wasserman*
DAVID I. WASSERMAN
Deputy Federal Public Defender
Attorneys for MARK DOMINGO

# TABLE OF CONTENTS

Page

I. INTRODUCTION ...................................................................................... 1

II. LAW ........................................................................................................ 1

III. A SENTENCE OF 15-YEARS IMPRISONMENT IS SUFFICIENT BUT NOT GREATER THAN NECESSARY TO ACHIEVE THE GOALS OUTLINED IN 18 U.S.C. § 3553(A) ............................................................. 3

   A.   The History and Characteristics of Mr. Domingo ........................... 3

      1.   The death of Rudy Domingo sparked a turbulence in Mr. Domingo's life that is felt to this day. ................................ 3

      2.   Mr. Domingo's grandmother isolated Mr. Domingo and prevented him from receiving mental health treatment .................... 4

      3.   In 2008, about ten years after Rudy's death, Los Angeles' Department of Children and Family Services substantiates a report that Mr. Domingo is being neglected at home. ...................... 6

      4.   With nowhere to turn, Mr. Domingo regularly contemplated suicide. ........................................................... 7

      5.   Mr. Domingo joined the United States Army, but again felt like an outcast and was sent home. .......................... 7

      6.   Mr. Domingo's adulthood was marked by transitory employment and online radicalization ................................ 8

      7.   Mr. Domingo's longstanding anger issues, combined with his desire to belong, made him uniquely suited for encouragement by the FBI CHS .......................................... 10

   B.   The Nature and Circumstances of the Offense were carefully crafted by law enforcement. ................................................. 11

   C.   Mr. Domingo was the subject of Sentencing (Imperfect) Entrapment. ...... 13

      1.   The Law of Sentencing Entrapment ................................. 13

      2.   Standard Sentencing Entrapment - Intent and Capacity ................ 14

      3.   Non-drug case Sentencing Entrapment - Ambition or Means ........ 17

      4.   Dr. Marc Sageman's report in this case supports the conclusion that Mr. Domingo was subject to sentencing entrapment ............... 21

IV. THE PRESENTENCE REPORT AND GUIDELINE CALCULATION ........ 23

   A.   Acceptance of Responsibility - 3E1.1 ........................................ 24

   B.   Reduction for Mental and Emotional Conditions - 5H1.3 ..................... 25

i

# TABLE OF CONTENTS

Page

C.    The Court Should Reject the Terrorism Adjustment, Vary Downward in Offense Level, and Depart Downward in Criminal History Category. ...................................................................................... 25

1.    The Terrorism Adjustment is not based on valid statistics and principles. ......................................................................... 26

2.    The Terrorism Enhancement is overly broad and unreliable. ........ 27

3.    The Terrorism Adjustment should be rejected because it in effect creates a separate offense. ...................................... 29

4.    Because the Terrorism Adjustment artificially inflates a defendant's criminal history category and distorts the function of the Guidelines, a downward departure in criminal history is appropriate. ...................................................................... 30

**V. CONCLUSION** ................................................................................ **33**

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Gall v. United States*,
  552 U.S. 38 (2007)........................................................................ 1

*Kimbrough v. United States*,
  552 U.S. 85 (2007)....................................................................2, 26

*United States v. Alhaggagi*,
  372 F. Supp. 3d 1005 (N.D. Cal. 2019), *vacated and remanded for
  resentencing*, 973 F.3d 693 (9th Cir. 2020)...................................30, 31, 32

*United States v. Benkahla*,
  501 F. Supp. 2d 748 (E.D. VA. 2007) ......................................... 32

*United States v. Booker*,
  543 U.S. 220 (2005)...................................................................... 1

*United States v. Briggs*,
  623 F.3d 724 (9th Cir. 2010) .............................................*passim*

*United States v. Dickey*,
  924 F.2d 836 (9th Cir. 1991) ...................................................... 24

*United States v. Ing*,
  70 F.3d (9th Cir. 1995) ............................................................... 24

*United States v. Jordan*,
  256 F.3d 922 (9th Cir. 2001) ...................................................... 26

*United States v. Mehanna*,
  No. 09-cr-10017-GAO (D. Mass. 2011) .............................28, 30, 31

*United States v. Mejia*,
  559 F.3d 1113 (9th Cir. 2009) .................................................... 14

*United States v. Naranjo*,
  52 F.3d 245 (9th Cir. 1995) ...............................................14, 15, 16, 17

*United States v. Yuman-Hernandez*,
  712 F.3d 471 (9th Cir. 2013) ...............................................14, 19, 21

*Vazquez v. United States*,
  130 S. Ct. 1135 (2010)................................................................. 2

iii

# TABLE OF AUTHORITIES

Page(s)

*Vazquez v. United States*,
    No. 09-5370, U.S. Br. at 11 (Nov. 2009) ..................................................... 2

**Statutes**

18 U.S.C. § 2332b(g)(5) ................................................................................. 28

18 U.S.C. § 2339A ......................................................................................... 27

18 U.S.C. § 2339C ......................................................................................... 27

18 U.S.C. § 3553(a) .......................................................................... 1, 2, 3, 26

Pub. L. No. 103-322, § 120004, 108 Stat. 1796 (1994) ................................ 26

Pub. L. No. 104–132, § 730, 110 Stat. 1303 (1996) ..................................... 26

**Other Authorities**

Omi Hodwitz, *The Terrorism Recidivism Study (TRS): Examining
    Recidivism Rates for Post-9/11 Offenders*, Vol. 13, Issue 2, (April
    2019) ......................................................................................................... 32

Daniel Kahneman, Paul Slovic, and Amos Tversky, eds., 1982, *Judgment
    under uncertainty: Heuristics and biases* ................................................ 21

James P. McLoughlin, *Deconstructing United States Sentencing
    Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial
    Support for Foreign Terrorist Organizations*, Law & Inequality: A
    Journal of Theory and Practice, Vol 21, Issue 1 (2010) ..................... 26, 32

Dr. Christopher Wright, *An Examination of Jihadi Recidivism Rates in the
    United States*, CTC Sentinel, Vol. 12, Issue 10 (Nov. 2019) ................... 31

**Guideline Sections**

U.S.S.G. § 2A2.1(a)(1) ............................................................................ 22, 29

U.S.S.G. § 2D1.1, App. Notes 5, 12, 17, and 27 .......................................... 15

U.S.S.G. § 2X1.1(b) ...................................................................................... 27

U.S.S.G. § 3A1.4 ....................................................................................*passim*

U.S.S.G. § 3E1.1 ........................................................................................... 24

## **TABLE OF AUTHORITIES**

Page(s)

U.S.S.G. § 4A1.3(b)(1) .......................................................................... 23, 31, 32

U.S.S.G. § 4B1.1 ............................................................................................. 31

U.S.S.G. § 4B1.4 ............................................................................................. 32

U.S.S.G. § 4B1.5 ............................................................................................. 32

U.S.S.G. Chapter 5, Part A, App. Note 2 ........................................................ 29

U.S.S.G. § 5H1.3 ....................................................................................... 23, 25

v

# I.  INTRODUCTION

The defense requests that this Court sentence Mr. Domingo to 180 months imprisonment (as to each count, to run concurrently), followed by 240 months of supervised release (as to each count, to run concurrently).  As Mr. Domingo remarked to counsel in preparation for sentencing:

> "It's been about two years and some change since the crime, and looking at the man on the evidence footage, I can honestly say I don't even recognize him.  I can understand where he is coming from, but his methods and his mentality are alien to me.  I felt uncomfortable when I watched the videos in court.  Not because they made me look bad (which, of course they did), but because I was ashamed and embarrassed of my behavior. . . .
>
> While in prison I have managed to improve my social skills.  I've learned how human friendships are built and how to maintain them, a skill I was never allowed to learn in my past.  I've learned how my conduct in the outside world was not the way a man is supposed to carry himself through life.  I've learned that innocent people don't need to die just because I am having a bad day."

A 15-year prison sentence both acknowledges and punishes Mr. Domingo's conduct in this case, while simultaneously recognizing that this was a government-controlled sting operation where law enforcement controlled the means of attack and directed many of Mr. Domingo's actions.  Fifteen years in prison followed by twenty years of supervision means that Mr. Domingo will be supervised by federal authorities for the next thirty-plus years.  This sentence will be sufficient but not greater than necessary to achieve the goals of sentencing and give Mr. Domingo the long opportunity to work on his emotional health and come out of prison a better man than when he entered.

# II.  LAW

The Sentencing Guidelines are not mandatory and a district court may not presume that the guideline range is reasonable.  *See United States v. Booker*, 543 U.S. 220 (2005); *Gall v. United States*, 552 U.S. 38, 49-50 (2007).  The guidelines are entitled to no more weight than any of the other 18 U.S.C. § 3553(a) sentencing factors. The Court must fashion a sentence that is appropriate, taking into account all of the section 3553(a) factors. *Gall*, 552 U.S. at 49-50.  Under section 3553(a), a sentence

1   should be sufficient, but not greater than necessary, to achieve the goals of sentencing.

2   *See also Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

3          Because the sentencing guidelines are advisory, the Court may vary downward in

4   sentence from the applicable guideline range based both on policy disagreements with

5   the guidelines, as well as an individualized determination that they would yield an

6   excessive sentence in a particular case.  *Kimbrough v. United States*, 552 U.S. 85

7   (2007).  In *Vazquez v. United States*, 130 S. Ct. 1135 (2010), the Supreme Court

8   remanded for reconsideration in light of then-Solicitor General Kagan's position that

9   "all guidelines are advisory, and the very essence of an advisory guideline is that a

10  sentencing court may, subject to appellate review for reasonableness, disagree with the

11  guideline in imposing [sentence] under Section 3553(a)."  U.S. Br. at 11, *Vazquez v.*

12  *United States*, No. 09-5370 (Nov. 2009).

13  //

14  //

15  //

16  //

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28

### III.  A SENTENCE OF 15-YEARS IMPRISONMENT IS SUFFICIENT BUT NOT GREATER THAN NECESSARY TO ACHIEVE THE GOALS OUTLINED IN 18 U.S.C. § 3553(A)

**A.     The History and Characteristics of Mr. Domingo**

**1.     The death of Rudy Domingo sparked a turbulence in Mr. Domingo's life that is felt to this day.**



Mr. Domingo was born in Granada Hills, California, on February 9, 1999.  He lived in Winnetka with his mother Cecilia, his father Rudy, his younger brother (by four years) James, as well as a couple of his aunts and their kids.  As the picture to the left makes clear, he was once a happy child.  But when Mr. Domingo was five years old, his father Rudy died of stomach cancer.  Mr. Domingo, his brother James, and his mother Cecilia then moved from Winnetka to live with Mr. Domingo's paternal grandmother, Dolores, in Reseda.  It was here that Mr. Domingo's journey to federal court began.

Cecilia testified at trial that Mr. Domingo and his father were very close, and that after Rudy's death, Mr. Domingo became angry and confused.  She recounted to counsel that, after Rudy's death, she found a then six-year-old Mr. Domingo sitting in front of a washing machine, watching the inside swirl.  She asked Mr. Domingo what he was doing, to which he responded, "I'm waiting for Dad to come back."  Ten months after his father's death, Mr. Domingo began thinking deeply about death and contemplating suicide.  Pain and sadness soon enveloped Mr. Domingo's entire being.

3

### 2.     Mr. Domingo's grandmother isolated Mr. Domingo and prevented him from receiving mental health treatment.

Unfortunately, according to Cecilia, Dolores' house was a "very sad place to live" and certainly not conducive to repairing Mr. Domingo's psychological ailments. When Mr. Domingo would attempt to express his feelings, Mr. Domingo would be bullied by his teenaged cousin Bobby, who would tell Mr. Domingo to grow up and stop crying.  And when Cecilia tried to take Mr. Domingo to grief counseling after Rudy's death, Dolores stepped in and prevented her from taking Mr. Domingo to treatment sessions.  According to Dolores, she did not want Mr. Domingo to seek professional help, fearing that it would tarnish his 'record' and make him feel as if he had done something wrong.  *See* Exhibit A, Department of Children and Family Services Records at 7 (hereinafter "DCFS").  Cecilia complied, feeling that she could not contradict Dolores' wishes since she was living in Dolores' house and primarily cared for the kids while Cecilia was at work and school.

Dolores made Cecilia feel uncomfortable in her home.  As Mr. Domingo testified at trial, his grandmother was from a more conservative, provincial part of the Philippines where people were both very religious and very superstitious.  *See also* DCFS at 4 (Mr. Domingo "explained that [the family] is very Catholic and PGM is superstitious"); *see also id*. at 8 (noting that "PGM is traditional Philipino [sp.] and his mom is more modern.  PGM does not believe in women[']s rights.")  For example, Dolores believed that vampires, among other spirits, lived outside the house and would take Mr. Domingo and his brother if they were permitted outside.  *Id*. ("PGM believes in vampires and demons who can steal [Mr. Domingo] and his brother. . . . At 6 [p.m.] all of the windows get closed and locked so the demons don[']t come into the home.")  As a result, Mr. Domingo did not have a social life outside of the house, nor was he permitted to have children from school come over to the house.  *Id*.  Further, as Cecilia noted at trial, Mr. Domingo didn't know her side of the family because Dolores would

4

rarely let him travel to meet them.  This, in part, was because Dolores believed Cecilia was an evil spirit who was responsible for her son Rudy's death.  DCFS at 8.

Because Cecilia was unable (and, at in some instances, unwilling) to get Mr. Domingo the treatment he needed, she was really the only person who could have possibly been there for him.  But even though they lived in the same house, Cecilia recalled at trial not having much contact with Mr. Domingo when he was a child.  She testified to having postpartum depression after giving birth to Mr. Domingo.  This, she stated, made it difficult for her to bond with him.  Cecilia's self-esteem was low at the time and due in large part to Dolores' controlling personality, she didn't feel like an adequate parent.  Because of her depression, she developed an alcohol addiction and, on at least one occasion, used methamphetamine.  In addition, because of her difficult relationship with Dolores, Cecilia would stay away from the house, and ultimately her children.  This, combined with Rudy's death, caused her to be emotionally unavailable for Mr. Domingo.  *See also* DCFS at 8 (Mr. Domingo "said he cannot talk to anyone in the house and spends most of his time in his room alone, playing video games.")

When he could not find comfort at home, Mr. Domingo searched for compassion and kinship at school.  But, as could be expected, most young children and adolescents were not equipped to provide Mr. Domingo with the empathy he needed.  For years Mr. Domingo tried to speak with other kids at school about his problems at home; he would cry at school; he would discuss his feelings; and he would receive the same response that he did at home – grow up, stop crying, move on.  In fact, he was conditioned by other students to not talk about his feelings, as this showed weakness and made Mr. Domingo the target of bullying.  So Mr. Domingo, left without proper mental health treatment and socialization as a young child, simply cried alone, in his room, every day.  *See* DCFS at 8 ("When CSW challenged [Mr. Domingo's] reality and focused on how frustrating his home life must be, [Mr. Domingo] told CSW that he is [used] to this and has learned how to manage it.  Being alone in his room with his videos games is how he copes.") (internal quotations omitted.)

5

1       **3.**    **In 2008, about ten years after Rudy's death, Los Angeles'**

2             **Department of Children and Family Services substantiates a**

3             **report that Mr. Domingo is being neglected at home.**

4       After going through elementary and middle school without intervention, high

5 school officials noticed that Mr. Domingo was in serious need of help.  In or about May

6 2008, Los Angeles County Department of Children and Family Services ("DCFS")

7 assigned a clinical social worker (CSW) to evaluate allegations of neglect in Mr.

8 Domingo's household.  DCFS at 4-5.  Over the next month and a half, CSW Kim Tran

9 interviewed Mr. Domingo, his mother, his grandmother, and school officials, to

10 determine whether the allegations of general neglect could be sustained.  The

11 investigation revealed that Mr. Domingo's mother felt she lacked the authority to truly

12 parent Mr. Domingo because she and her children were living in Dolores' house.  It

13 was, therefore, unsurprising that years after Cecilia had been told to get Mr. Domingo

14 mental health counseling, DCFS found the claim of general neglect <u>substantiated</u>.

15 DCFS at 4 ("CSW finds the allegation of general neglect to be substantiated. . . Mr.

16 Domingo has been referred for school mental health services since 2005 and mother

17 has failed to follow through in getting his counseling.").

18       On the one hand, Mr. Domingo was unable to make friends at school due to the

19 trauma he suffered at home.  On the other, he was unhappy because his grandmother

20 didn't let him live a normal life – one where he went out with friends or brought them

21 back home.  DCFS at 4, 8.  Although DCFS ultimately concluded that the "situation

22 [had] stabilized," DCFS at 6, this was likely because Cecilia told the CSW that she

23 would obtain mental health services for Mr. Domingo.  But after the DCFS

24 investigation concluded, nothing changed.  As she had before, Cecilia failed to follow

25 through on obtaining the recommended treatment for Mr. Domingo.  Cecilia's

26 deference to Dolores and inability to stand up for Mr. Domingo affected their

27 relationship deeply.  Mr. Domingo felt like his mother did not love him and failed to

28 protect him.  These feelings were reinforced when Mr. Domingo found a diary entry his

mother had written years before, shortly after James was born.  The note explained that James' birth had finally given her a reason to live and that her life now had purpose. *See also* FBI-302 of Interview with James Domingo at USAO_000006 (Mr. Domingo "fell into depression after his father's death and had problems with his mother as *she tended to James, as he was a baby, more often and didn't give [Mr. Domingo] affection* or discipline enough") (emphasis added).  Mr. Domingo understood this comment to mean that he meant nothing to her and that his feelings of abandonment and neglect were not self-conjured, but instead were valid and true.  Although he lost his father to cancer, it was almost as if he never had a mother in the first place.

### 4.    With nowhere to turn, Mr. Domingo regularly contemplated suicide.

Mr. Domingo was stuck.  He had no outlet at home, no outlet at school, and felt like no one loved him.  By the time Mr. Domingo graduated from high school, he had never received the sustained mental health treatment that had been recommended for at least six years.  DCFS at 4.  He exhibited self-doubt, self-hatred, negative thoughts, interpersonal relationship skills deficits, and social stress.  *See* DCFS at 8 (Mr. Domingo "told CSW that every night this week he has thought about taking a knife and slitting his throat.  He thinks himself through it.  CSW asked if he could tell someone in the home or call 911 when he feels like this and he said no"); *id*. at 9 (Mr. Domingo "told CSW that he is weak and a big disappointment"); *cf*. Exhibit B, Initial Diagnostic Interview and Progress Notes from Dr. Garabedian at 5 (hereinafter "Kaiser Notes") (recalling that his family called him a "wimp.")  Mr. Domingo was angry and looking for a place to let it all out.  So, upon his graduation from high school, Mr. Domingo joined the United States Army.

### 5.    Mr. Domingo joined the United States Army, but again felt like an outcast and was sent home.

In 2011, Mr. Domingo joined the United States Army and volunteered to serve as an Infantryman in Afghanistan.  Based on everything that had transpired over the

course of his childhood and adolescence, Mr. Domingo felt like he lacked a place in the world.  In addition, his isolation caused him to feel great anger toward those who told him he was "weird" or made fun of him or who neglected him when he tried to express his sadness.  In joining the military, he hoped to find a place where he could take out his anger and find other people who felt as he did.  He thought that his fellow Infantrymen would have also been through some sort of emotional turmoil at home and, as such, would welcome him and listen to him.

But the Army was nothing like he thought it would be.  At trial, Mr. Domingo's platoon-mate Dallas Richardson described Mr. Domingo as physically and mentally "weak."  After getting hazed in basic training, Mr. Domingo was denigrated by his platoon mates for being slower than everyone else.  When Mr. Domingo would try to open-up and discuss his childhood and adolescence, his fellow soldiers would tell him to keep it to himself.  Again, his openness about his feelings was a sign of weakness. In addition, Mr. Domingo was frustrated by his inability to respond to what he perceived as violence toward him and his unit.  For example, Mr. Domingo had been shot at by Taliban fighters, but was chastised for shooting back and apparently violating the rules of engagement.  It seemed that every time Mr. Domingo tried to do what he thought was consistent with his instructions as a soldier, he was disciplined, criticized, and ostracized from and by his platoon.  So, over the course of his time in Afghanistan, Mr. Domingo wrote the names of those he felt aggrieved by (fellow platoon-mates, ex-girlfriends, people from home), as well as symbols and letters, on his rifle ammunition. Because of this, among other allegations, Mr. Domingo was discharged from the military and sent home.

### 6.   Mr. Domingo's adulthood was marked by transitory employment and online radicalization.

When Mr. Domingo first returned to the United States, he moved back home, cared for his ailing grandmother, and drove his brother to and from school.  There was a brief period where Mr. Domingo traveled the world (e.g., New Zealand, Egypt, etc.)

and met several people abroad.  But even though he seemed to have finally made some friends, they were not local, and he did not feel comfortable burdening them with his longstanding emotional problems.  After all, up until then he had been taught at every turn to keep his feelings to himself.  Thus, amidst sporadic periods of employment, Mr. Domingo spent the vast majority of 2013 through 2019 at home playing video games and surfing the internet.  He also discovered Tinder and, for the first time in his life, found women who would engage with him.

On the Internet Mr. Domingo could say whatever he wanted with little consequence.  Initially, Mr. Domingo found acceptance amongst Alt-Right communities on Facebook and 4-Chan.  These communities are known for extolling – and being tolerant of – offensive viewpoints and statements.  As a part of this community, Mr. Domingo was able to project his anger and disdain for those whom he felt aggrieved him by making offensive and violent statements into the online ether. *See also* Kaiser Notes at 6 ("Pt. acknowledges that his thoughts and anger are not realistic; his anger and immaturity comes out in his use of profanity and crude language. . . . Pt. does not see himself in a positive light and uses offensive language to protect himself and keep others away.")  But this community was less tolerant of discussions about sadness and depression associated with parental neglect.  That is, the Alt-Right viewed discussions of depression and low self-esteem in much the same way Mr. Domingo's peers, his family, and the military did – as an exhibition of weakness; something that was not to be tolerated.

At the same time, Mr. Domingo – who had always been a student of history – began studying Islamic history.  He had previously been virulently anti-Islam (both as a member of the Alt-Right and as a solider in the United States Army).  But he thought it important to learn more about that which he purported to hate.  As he studied more and more, he understood Islam to be one of the world's great religions and its followers some of the most resilient in history.  Mr. Domingo felt a kinship with those who had been attacked by various countries and armies over time but somehow managed to

9

survive.  That is, he identified with their victimization.  In addition, more conservative strains of Islam aligned both with his views on traditional masculinity (which were espoused both by his grandmother, his peers at school, and the Alt-Right) as well as his desire to feel like a part of a larger community.  He understood this larger community to be one where an individual's struggles were the community's struggles, and vice versa.  It was in Islam-related chatrooms (and with other self-professed Muslims) that Mr. Domingo could demonstrate his vulnerabilities, his sadness, and his depression without ridicule.[1]  To be clear, Mr. Domingo continued to espouse violent and offensive statements – consistent with his long simmering anger and self-hate.  But he also made clear that he was sad, depressed, and felt like he lacked a reason to live.  It was against this backdrop of longstanding grievance, deep bouts of depression and sadness, and a desire to feel like part of a larger community, that Mr. Domingo made the statements which brought him to the attention of federal authorities.

### 7.  Mr. Domingo's longstanding anger issues, combined with his desire to belong, made him uniquely suited for encouragement by the FBI CHS.

Since his father's death, Mr. Domingo has been searching for a community to accept him and give him the love and attention he sought for much of his life.  *See* Kaiser Notes at 4 (Mr. Domingo stated "I want to be needed[.]")  He has suffered from depression and low self-esteem, as well as feelings of worthlessness and hopelessness, since childhood.  Kaiser Notes at 2-3.  It is no wonder that Mr. Domingo gravitated toward online communities that also felt victimized, were willing to commiserate in their feelings of shared victimhood, and whose common purpose was to vindicate that victimhood.  As discussed *infra* in the sentencing entrapment section, it is true that Mr.

---

[1] Mr. Domingo's affinity toward Islam coincided with his departure from the Alt-Right movement when, among other things, President Donald Trump (whom Mr. Domingo had supported due to Trump's perceived political incorrectness and "in your face" attitude) broke his campaign promise to avoid foreign wars by bombing the Al-Assad government in Syria.

Domingo made many outrageous statements in online forums for several years prior to the instant offense.  But he never took any concrete action until contacted by the FBI Confidential Human Source ("CHS") in this case.  And even then, it was only after the CHS's initial suggestion (and repeated encouragement) to use a bomb (i.e., a weapon of mass destruction) to commit attack (as opposed to some other, lesser means) that Mr. Domingo did the acts which ultimately led to his conviction in this case.

**B.     The Nature and Circumstances of the Offense were carefully crafted by law enforcement.**

In essence, the evidence at trial showed that Mr. Domingo made comments online regarding the need for a violent attack to occur in the United States. He also noted that there needed to be retribution for the Christchurch shooting in New Zealand where dozens of Muslims were gunned down in their mosque. These comments were observed by an FBI Online Covert Employee ("OCE") who then engaged Mr. Domingo in conversation to determine whether Mr. Domingo had a concrete plan to commit an act of violence within the United States.  Mr. Domingo did not.  The OCE then introduced Mr. Domingo to a Confidential Human Source ("CHS") online. The CHS and Mr. Domingo then agreed to meet in person as they both (purportedly) lived in the Los Angeles area.

On March 18, 2019, Mr. Domingo and the CHS met in Los Angeles for the first time in person and drove around in the CHS's car.  During the car ride the two discussed committing acts of violence against various people and targets.  Mr. Domingo raised the prospect of using a firearm to commit an attack.  He did not suggest using an IED to commit an attack.  In response to Mr. Domingo's statements about using a firearm, the CHS attempted to dissuade Mr. Domingo from committing an attack with firearms.  The CHS rebuffed Mr. Domingo's ideas as not "smart" and as "going to get [them] caught."  When the CHS noted how risky using a firearm would be, Mr. Domingo tried to explain why using a firearm was not as risky as the CHS

11

thought.[2]  In response, the CHS explained that they needed to "hit harder" than the Christchurch shooter "hit" the Muslim community.  As such, the CHS raised the idea of using an IED.  Mr. Domingo agreed that this may be the better course of action.[3]

Mr. Domingo and the CHS then met several times after this March 18 meeting and continued talking about potential attacks.  But even though Mr. Domingo had apparently agreed on the 18th that using an IED was "better" than using a firearm, Mr. Domingo would always revert to plans that used a firearm each time he met with the CHS.  For example, on April 3, Mr. Domingo and the CHS sat together in the CHS's apartment and drew a diagram illustrating different ways the two of them would corner and shoot police officers on the streets of Los Angeles.  And on April 19, Mr. Domingo came to the CHS's residence with an AK-47, purportedly prepared to use his gun that evening.  In response, the CHS rebuffed Mr. Domingo's plan to use a firearm and again raised the specter that his friend could make them an IED.  It was after this overture that the two decided to move forward with a plan that included an IED.

Mr. Domingo never referenced using an IED during the first few meetings with the CHS until the CHS brought the IED into the conversation.  Even as late as April 26, 2019 (the night of Mr. Domingo's arrest), after the two had already started planning when and where to use an IED, Mr. Domingo made clear to the CHS that it was the CHS's idea to use an IED and that Mr. Domingo originally wanted to "go raiding" with his firearms.  Finally, law enforcement candidly admitted at trial they could better control the situation by introducing an IED.  Because Mr. Domingo did not possess an IED, nor did he know how to make one, law enforcement could control this aspect of

---

[2] Mr. Domingo discussed how fingerprint and DNA technology were not as good as television shows made them out to be.

[3] Law enforcement closely monitored the CHS's conversations and interactions with Mr. Domingo. Law enforcement also surveilled Mr. Domingo 24 hours a day for over a month.  Both the CHS and the FBI Special Agent assigned to the case testified at trial that the CHS purposely tried to dissuade Mr. Domingo from committing an attack with firearms and, instead, suggested the use of an IED.  Although this permitted law enforcement to maintain control over the operation, it nevertheless encouraged Mr. Domingo to move forward with an IED rather than a firearm.

the investigation and avoid Mr. Domingo using his firearms to commit an attack without law enforcement's knowledge or inability to stop him.  By introducing the IED, law enforcement could ensure that the CHS would be a part of any plan that Mr. Domingo executed (since the CHS was the go between for Mr. Domingo and the would-be IED maker, the UCE).  In conjunction with using an IED (as opposed to firearms), the CHS (and then the UCE) instructed Mr. Domingo on what components to buy and explained to Mr. Domingo how to operate the IED.

**C.    Mr. Domingo was the subject of Sentencing (Imperfect) Entrapment.**

Mr. Domingo was charged in the indictment with two offenses, material support for terrorists and the attempted use of a weapon of mass destruction.  The defense submits that the evidence shows Mr. Domingo was the subject of sentencing entrapment as it pertains to the attempted use of a weapon of mass destruction.[4] Because Mr. Domingo was the subject of sentencing entrapment, a downward departure or variance is appropriate in this case.

### 1.    The Law of Sentencing Entrapment

"A defendant may be eligible for a downward departure or variance for sentencing entrapment where he can show he was predisposed to commit a minor or lesser offense, but was entrapped to commit a greater offense, subject to greater punishment."  Ninth Circuit Manual of Model Criminal Jury Instructions, No. 6.2A (2010 ed.) [Sentencing Entrapment] (quoting *United States v. Boykin*, 785 F.3d 1352, 1360 (9th Cir. 2015) (cleaned up).  "Typically, sentencing entrapment occurs when a government agent convinces a drug dealer to purchase or sell more drugs, than he is

---

[4] The "material support and resources" in Count One of the indictment were alleged to include "tangible property and personnel, namely himself, intending that such material support and resources be used in preparation for and in carrying out [the use of a weapon of mass destruction]."  Whereas the material support in Count One can be provided in furtherance of a multitude of offenses and, as a result, still carry a 15-year statutory maximum sentence, the specific charge in Count Two (the attempted use of a weapon of mass destruction) has a maximum sentence of life imprisonment.  As such, the defense will focus its sentencing entrapment argument on the attempted use of a weapon of mass destruction charged in Count Two.

13

otherwise inclined to deal in." *United States v. Briggs*, 623 F.3d 724, 729 (9th Cir. 2010).  In those cases, the Ninth Circuit instructs the Court to evaluate whether the defendant had the "intent" and "capacity" to purchase or sell the amount of drugs charged prior to interacting with government agents.  *See United States v. Mejia*, 559 F.3d 1113, 1118 (9th Cir. 2009); *United States v. Naranjo*, 52 F.3d 245, 250 (9th Cir. 1995).

However, the Ninth Circuit found that in stash-house robbery sting operations it is more appropriate to use "ambition" or "means" to determine whether the defendant was subject to sentencing entrapment.  *See United States v. Briggs*, 623 F.3d 724, 730 (9th Cir. 2010) (means or ambition are the proper inquiry in non-drug sales cases); *United States v. Yuman-Hernandez*, 712 F.3d 471, 475 (9th Cir. 2013) (citing *Briggs* and noting that defendant's need only show by a preponderance of the evidence a lack of means or ambition, not both). The defense submits that, under either standard, Mr. Domingo was subject to sentencing entrapment and a downward departure or variance is appropriate.

2.    **Standard Sentencing Entrapment - Intent and Capacity**

*United States v. Naranjo*, 52 F.3d 245, 250 (9th Cir. 1995) provides an instructive point of comparison for Mr. Domingo's case.  In *Naranjo*, a DEA informant tried to get the defendant to sell him cocaine.  After the defendant rejected the informant's overtures, the DEA agent instructed the informant to reverse the operation and try to put the defendant in contact with someone from whom he could buy cocaine. The informant told the DEA agent that the defendant would likely only be able to purchase one to two kilograms of cocaine.  After the defendant told the informant he could only purchase one kilogram, the DEA agent told the informant to persuade the defendant to meet with an undercover agent (who would act as the source of supply). Upon meeting, the undercover agent told defendant that he wanted to sell ten kilograms, five immediately and five within a couple of days.  After the defendant told them that he could not afford that quantity, the informant told the defendant that he

14

would buy up to four kilograms from defendant (thereby making the deal more affordable).  Later, defendant agreed to purchase two kilograms up front, with three additional kilograms to be provided immediately but with payment expected within three days.  But, when the parties met to exchange money and drugs, the defendant stated that he could no longer afford to purchase more than one kilogram at that time. The undercover agent agreed to "front" the other four kilograms.  When defendant went to retrieve the drugs from the undercover agent, the defendant was arrested and charged with distributing five kilograms of cocaine, as proposed by the undercover agent.

At sentencing, the defendant argued that "he was predisposed to dealing in substantially smaller quantities of cocaine than five kilograms" and would not have negotiated a transaction for five kilograms but for the government's "unusually favorable financial terms." *Id*. at 249-50.  The defendant relied on Section 2D1.1, App. Notes 12 and 17[5] for the proposition that when a defendant "did not intend to produce and was not reasonably capable of producing the negotiated amount," or when "the court finds [in a reverse sting] that the government agent set a price for the controlled substance that was substantially below the market value of the controlled substance, thereby leading to the defendant's purchase of a significantly greater quantity of the controlled substance than his available resources would have allowed him to purchase except for the artificially low price set by the government agent," a downward departure may be warranted.  The district court indicated that it was "not entirely comfortable with the way this case went in the sense that it does seem like there was some effort on the government's part to ensure that [the defendant] engage in a transaction involving a significant amount of drugs." *Id*. at 250.  Nonetheless, the Court denied the sentencing entrapment request because it believed the DEA had a good reason for suspecting that the defendant had been heavily involved in drug trafficking.

---

[5] App. Notes 5 and 27, respectively, in the current version of the Sentencing Guidelines.

15

The Ninth Circuit reversed and remanded for resentencing, explaining that:

> "[i]n making its findings as to sentencing entrapment, the district court merely adopted the DEA's belief that Naranjo was previously involved in drug trafficking. Yet, Naranjo has no previous arrests. More critically, apparently the only basis for the DEA's theory about Naranjo was a statement by the informant Strini, who was working for the DEA in hopes of obtaining a more favorable sentence in connection with his own conviction for drug trafficking."

*Id*. at 251. The Court continued that "[o]ur reading of the record strongly suggests that Naranjo had neither the intent nor the resources to engage in a five kilogram cocaine transaction." *Id*. The Court looked at the fact that the defendant did not have enough money to purchase five kilograms and, instead, the informant offered to purchase some of the cocaine from the defendant in an effort to get him to go along with the transaction. Further, the conversations between the informant and the defendant indicated that the defendant could not distribute more than one kilogram of cocaine and, in the event he would obtain more, needed time to pay back the source.

Just like the defendant in *Naranjo* was predisposed to committing the lesser crime of purchasing for distribution a lower quantity of drugs prior to meeting the informant, so too was Mr. Domingo predisposed to commit an attack using a firearm (as opposed to using an IED) prior to meeting the CHS. Although Mr. Domingo made two online statements about the use of IEDs, there was no evidence that he took any affirmative steps to obtain, construct, or use an IED. It was only after the CHS, who made in excess of $500,000 over a ten-year period working as an informant, repeatedly (1) rebuffed and disapproved of Mr. Domingo's idea to use firearms in an attack, (2) suggested the use an IED instead of a firearm to commit an attack, and (3) offered to find someone to make the IED, that Mr. Domingo agreed to use an IED in an attack at Bluff Park in Long Beach. As such, Mr. Domingo lacked the intent to use an IED in an attack in the United States prior to meeting the CHS.

16

1        Further, the UCE noted in a March 20, 2019, email produced in discovery that

2    Mr. Domingo did not "have the ability to produce" explosives.  *See* E-mail from UCE

3    to Law Enforcement dated March 20, 2019 at USAO_015449.  Rather, Mr. Domingo

4    explained to the CHS that he failed chemistry and did not know how to make an IED.

5    In response, the CHS offered to find someone who could either teach them how to build

6    an IED or build an IED for them.  After law enforcement opted for the latter, the CHS

7    and UCE provided Mr. Domingo instructions on what components to buy for the IED

8    and how the IED worked.  According to Patrick Race, the FBI Bomb Technician

9    assigned to the case, the operation was conducted in a way that "ensur[ed]. . . [Mr.

10   Domingo] did not acquire enough knowledge that would enable [him] to construct a

11   viable IED [on] his own."  *See* FBI-302 of Patrick Race Interview at USAO_014170.

12   Law enforcement intentionally chose an IED to control the scenario and ensure that Mr.

13   Domingo did not commit an attack on his own.  That is, because Mr. Domingo did not

14   have the *capacity* to make or use an IED without the CHS and UCE, law enforcement

15   remained in control of the operation.

16       Absent law enforcement's persuasion and direction, Mr. Domingo - like the

17   defendant in *Naranjo* - would not have had the intent, nor the capacity, to use a weapon

18   of mass destruction.  Because he lacked both the capacity and the intent to use an IED

19   prior to meeting law enforcement agents, Mr. Domingo was the subject of sentencing

20   entrapment.

21       **3.     Non-drug case Sentencing Entrapment - Ambition or Means**

22       While "intent" and "capacity" are the factors courts use when evaluating

23   traditional claims of sentencing entrapment, the Ninth Circuit analyzes a defendant's

24   "ambition" or "means" in the non-drug distribution, stash-house robbery context.  The

25   defense submits that Mr. Domingo was the subject of sentencing entrapment under this

26   approach as well.

27       In *United States v. Briggs*, 623 F.3d 724, 730 (9th Cir. 2010), the defendant sold

28   methamphetamine to an undercover ATF agent.  Suspecting that the defendant may be

involved in a string of home invasion robberies, the agent floated a stash-house robbery operation to the defendant.  According to the agent, the house would contain at least twenty kilograms of cocaine and ten pounds of methamphetamine.  The defendant immediately expressed his desire to be included in the robbery and told the agent that he would assist in recruiting others to help execute the robbery, noting that his "crew" did "this all the time." *Id*. at 727.  After successfully recruiting several people, the defendant and his crew met with the undercover agent at a Motel 6.  The agent told the defendants to get inside the agent's van if they wanted to move forward with the plan.  After the defendant and his crew entered the van, they were arrested by an ATF SWAT team.  Defendant was then charged with possession with intent to distribute at least 15 kilograms but less than 50 kilograms of cocaine and at least 5 kilograms but less than 15 kilograms of methamphetamine, as well as possession of a firearm during and in furtherance of the aforementioned drug trafficking offense. The defendant pled guilty and, at sentencing, argued sentencing entrapment.

The crux of his argument was not that "the stash house contained more drugs than he wanted[.]"  Rather, he argued "that the only reason the government set the amount of drugs at such a high level was to impact his sentence." *Id*. at 729.  The Court rejected the defendant's claim because his guilty plea "fully admitted to the drug quantities on which his sentence was based." *Id*. at 730.  However, the Court agreed that the traditional sentencing entrapment analysis of "intent" and "capacity" was improper:

> "In fictional stash house operations like the one at issue here, the government has virtually unfettered ability to inflate the amount of drugs supposedly in the house and thereby obtain a greater sentence for the defendant. *In fact, not only is the government free to set the amount of drugs in a fictional stash house at an arbitrarily high level, it can also minimize the obstacles that a defendant must overcome to obtain the drugs.* [] The ease with which the government can manipulate these factors makes us wary of such operations in general, and inclined to take a hard look to ensure that the proposed stash-house robbery was within the scope of Briggs' ambition and means."

18

*Id*. at 729-30 (internal citations omitted) (emphasis added); *see also Yuman-Hernandez*, 712 F.3d at 475  (citing *Briggs* and noting that defendant's need only show by a preponderance of the evidence a lack of means or ambition, not both).

Just like in a reverse-sting stash house robbery case, the government in a reverse-sting terrorism case has the "virtually unfettered ability" to choose the type of weapon to be used in an attack "and thereby obtain a greater sentence for the defendant.  In fact, not only is the government free to" choose the type of weapon to be used, "it can also minimize the obstacles that a defendant must overcome to obtain the" weapon.  *Briggs*, 623 F.3d at 729-30.  In rejecting the "capacity/intent" analysis, the Court in *Yuman-Hernandez* observed that in stash-house cases:

> "the capability to steal a particular quantity of drugs is an amorphous concept.  Theoretically, nearly any person is capable of theft.  And once a thief gains access to the drugs, he or she is just as capable of carrying off one kilogram as ten.  Thus, the quantity of drugs has little relation to capability; in general, the only meaningfully measurable capability is typically the capability to perform the robbery.  But the capability to commit the robbery has little relevance to determining a defendant's predisposition to deal in a given quantity of drugs.  In the context of theft, the chosen quantity of drugs is divorced from capability, allowing the government to effectively offer an inordinate amount for free.  In essence, the government can easily manipulate the capability element in cases of fictitious robbery."

*Yuman-Hernandez*, 712 F.3d at 474.  Similarly, "the capability to commit" a generalized, non-specific attack is an "amorphous concept."  Theoretically, nearly any person is capable of committing *some sort* of attack.  But "the capability to commit [a general attack] has little relevance to determining a defendant's predisposition to [use an IED in an attack]."  Because law enforcement can "easily manipulate the capability element in cases of [a] fictitious [attack] . . . it makes little sense to require that a defendant establish both a lack of intent and lack of capability in the context of a fictitious" IED plot.

19

In the case at bar, Mr. Domingo had neither the ambition nor the means to use the weapon charged in Count Two. During their first meeting on March 18, Mr. Domingo told the CHS that he had a modified AK-47 and several magazines that could be used in a firearms attack. On March 20, Mr. Domingo posted a photograph online of his AK-47 and a high-capacity magazine. On March 22, Mr. Domingo again explained to the CHS that he had several high-capacity magazines. Even after the two discussed the potential for using an IED, Mr. Domingo continued to argue the merits of using firearms. On April 19, Mr. Domingo showed up to the CHS's apartment with an AK-47. And on April 26, during the final stages of their planning, Mr. Domingo reiterated to the CHS that he originally wanted to go "raiding [with his firearms]," but that the CHS suggested using an IED instead. It is clear Mr. Domingo lacked the ambition to use an IED until he was engaged by the CHS.

Furthermore, Mr. Domingo did not know how to make an IED. *See* FBI-302 of Patrick Race Interview at USAO_014170; *see also* E-mail from UCE to Law Enforcement dated March 20, 2019 at USAO_015449 (noting that Mr. Domingo did not have the ability to produce explosives). He did not have the materials to make an IED and, instead, was instructed by the CHS and UCE as to what materials to buy and how to operate the IED. As in the stash-house cases, the government was not only free to choose the type of weapon to be used, "it. . . also minimize[d] the obstacles that a defendant must overcome to obtain the" weapon of choice. It is clear that prior to meeting the CHS, Mr. Domingo lacked the means to make and use an IED in an attack in the United States.

Because Mr. Domingo lacked the means and ambition to make and use an IED prior to meeting with the CHS, he was the subject of sentencing entrapment. As a result, a downward departure or variance is appropriate.

20

4.     **Dr. Marc Sageman's report in this case supports the conclusion that Mr. Domingo was subject to sentencing entrapment**

Dr. Marc Sageman's expert report also supports the conclusion that Mr. Domingo was subject to sentencing entrapment.  Underwriting Dr. Sageman's conclusions are the concerns highlighted by *Briggs'* and *Yuman-Hernandez's* discussion of factors relevant to entrapment in the non-drug distribution context. "Although the commission of a crime depends on means, motive, and opportunity, most discussions about entrapment deal only with motive and assume that means and opportunity are non-problematic issues.  This may be true in a drug case, where means (the drug, money) and opportunities are common.  But in cases where either means or opportunities are extremely rare, not taking these issues into account is called low base rate neglect and necessarily distort the probability that a crime may be committed." Dkt. 152, Doc. at 9.[6]  Because "[t]errorism is extremely rare" it "therefore has an extremely low base rate."  *Id*.  Because the opportunity to join a terrorist conspiracy has such a low base rate, "[m]eans and opportunity in addition to motive must be addressed in any analysis of the probability of a terrorist related crime, especially when state agents are involved to facilitate the crime."  *Id*. at 10.

As Dr. Sageman noted in his report, "my opinion is that, absent the FBI, Mr. Domingo was incapable of using a bomb in an attack against people in the United States and that he was extremely unlikely to participate in a bomb plot in the United States."  *See* Dkt. 152, Doc. at 5.  In rendering his opinion, Dr. Sageman considered the fact that (1) "a potential bomber would have to undergo special bomb training or teach himself how to use a bomb," (2) Mr. Domingo did not know how to construct an IED

---

[6] "The study of low base rate neglect as a common cognitive rule of thumb and therefore a common cognitive error has earned a Nobel Prize in economics for Daniel Kahneman (his collaborator Amos Tversky died before Kahneman received the prize in 2002)."  *See* Daniel Kahneman, Paul Slovic, and Amos Tversky, eds., 1982, *Judgment under uncertainty: Heuristics and biases*, Cambridge: Cambridge University Press.

on his own, (3) there was no evidence Mr. Domingo spent any significant time searching on the Internet for how to build a bomb, (4) the CHS suggested the use of an IED, and (5) the CHS and UCE provided the bomb to Mr. Domingo in this case.  He concluded that "Mr. Domingo. . .  would not have [attempted to use a bomb] absent the FBI['s involvement]."  *Id*. at 6.  All of these factors underscore Mr. Domingo's lack of intent, capacity, means and ambition to use an IED absent the involvement and encouragement of law enforcement.  Based on the foregoing, it is clear Mr. Domingo was the subject of sentencing entrapment and a downward departure or variance is appropriate.

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

## IV.  THE PRESENTENCE REPORT AND GUIDELINE CALCULATION

Although the defense objects to the probation officer's calculation of the guidelines because it declines to apply an adjustment for acceptance of responsibility, the defense concurs with the probation office that the terrorism adjustment artificially, and illogically, inflates the guidelines range in this case.  The defense proposes the following guideline calculations and sentencing recommendation:

| Offense Level | Defense Calculation and Rec. | USPO Calculation and Rec. |
|---|---|---|
| BOL - 2A2.1 | 33 | 33 |
| Role in the Offense - 3A1.4 (Terrorism Adjustment) | +12 | +12 |
| Adjusted Offense Level | 43[7] | 43 |
| Acceptance of Responsibility | -2 | 0 |
| Total Offense Level | 41 | 43 |
| GL Range @ CHC VI[8] | 324-405 | Life |
| Variance (Policy Disagreement with 3A1.4) | -12[9] | -12[10] |
| Defense grounds for additional Departure and Variance<br>- 5H1.3 - Mental and Emotional Conditions<br>- Sentencing Entrapment | Depart or Vary Downward to 180 Months on Both Counts to run Concurrently | N/A |

---

[7] Pursuant to Application Note 2 at U.S.S.G. Chapter 5, Part A, an offense level of more than 43 is to be treated as an offense level of 43.

[8] Mr. Domingo is artificially placed in Criminal History Category VI due to application of the Terrorism Adjustment under U.S.S.G. § 3A1.4

[9] Because application of the Terrorism Adjustment artificially results in Mr. Domingo being placed in Criminal History Category VI, a downward variance based on a policy disagreement with guideline section 3A1.4 similarly results in placing Mr. Domingo in the operative Criminal History Category (i.e., CHC I).  Furthermore, the Court can place Mr. Domingo in Criminal History Category I by finding that his placement in Category VI overstates his criminal history pursuant to 4A1.3(b) (Inadequacy of Criminal History).

[10] Based on the probation office's recommendation of 240 months imprisonment, it appears the probation office has made a downward departure equivalent to one category to category V (resulting in a range of 210-262 months).

23

| Respective Recs. | 180 Months BOP (to run concurrently as to each count) | 240 Months BOP (to run concurrently as to each count) |
| --- | --- | --- |

## A. Acceptance of Responsibility - 3E1.1

There can be no doubt that the instant offense is serious.  As noted in the PSR, "Mr. Domingo accepts responsibility for his conduct and recognizes that he should be sentenced for the wrongfulness of his actions. Mr. Domingo, on the advice of counsel, went to trial to preserve the legal issue of whether he was encouraged to (or predisposed to) commit the offenses as they were charged (i.e., by attempting to use a weapon of mass destruction) as opposed to some other, lesser means."  PSR ¶ 28.  At trial, Mr. Domingo testified and did not deny the allegations made by the government on cross examination.  To the contrary, the government strenuously argued the veracity of Mr. Domingo's testimony in its rebuttal argument to the jury.  Because Mr. Domingo put the government to its burden in order to preserve the legal issues of entrapment and sentencing entrapment, the Court should apply a two-level downward adjustment for acceptance of responsibility.  *See* U.S.S.G. § 3E1.1 (The adjustment for acceptance of responsibility "is not intended to apply to a defendant who puts the government to its burden of proof at trial *by denying the essential factual elements of guilt. . . . Conviction by trial*, however, *does not automatically preclude a defendant from consideration for such a reduction.  In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial*) (emphasis added); *see also United States v. Ing*, 70 F.3d, 553, 556 (9th Cir. 1995) (An entrapment defense is not inconsistent with acceptance of responsibility); *United States v. Dickey*, 924 F.2d 836 (9th Cir. 1991) (imperfect entrapment argument at sentencing precluded by a guilty plea); *Cf. Briggs*, 623 F.3d at 730.

24

**B.     Reduction for Mental and Emotional Conditions - 5H1.3**

Guideline section 5H1.3 permits the Court to depart downward when mental and emotional conditions, "individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines."  As has been made clear *supra* and throughout the trial, Mr. Domingo suffers from significant mental and emotional health issues which contributed to his conduct in this case.  The Court should take this into account in assessing his culpability, as well as his susceptibility to encouragement by law enforcement (even if it does not rise to a complete defense) and should depart downward in recognition thereof.

**C.     The Court Should Reject the Terrorism Adjustment, Vary Downward in Offense Level, and Depart Downward in Criminal History Category.**

Although the probation office applies an enhancement under Section 3A1.4(a), it aptly notes that "it is difficult, in this case, to articulate the ways in which Domingo's actions are so many more [i.e., 12] levels serious than the actions of another person who would be found guilty of attempted murder, and then to justify a sentence of life imprisonment for Domingo."  Dkt. 293, Rec. Ltr. at 5.  As a result, the probation office not only departs from Criminal History Category VI to Category I (Mr. Domingo's actual Criminal History Category), but also recommends a variance.  *Id.*  The defense concurs and submits that the Court should depart downward in criminal history and vary downward from the applicable guideline range since the Terrorism Adjustment (1) is the product of Congressional dictate rather than of empirical data and national experience per the Commission's institutional role, (2) is overly broad and unreliable, (3) in effect creates a separate offense, and (4) distorts the guidelines' function by artificially increasing Mr. Domingo's criminal history category from category I to category VI.[11]

---

[11] Further, given the significant increase in the offense level produced by this

1.    **The Terrorism Adjustment is not based on valid statistics and principles.**

The Terrorism Enhancement was created by the United States Sentencing Commission at the request of Congress and was not based on empirical data and national experience.  *See* U.S.S.G. § 3A1.4, App. Note 4 ("By the terms of the directive to the Commission in section 730 of the Antiterrorism and Effective Death Penalty Act of 1996, the adjustment provided by this guideline applies only to federal crimes of terrorism.")  As such, the Court may disregard the adjustment if doing so is necessary to fashion a sentence no greater than necessary to achieve the objective of 18 U.S.C. § 3553(a).  *See Kimbrough v. United States*, 552 U.S. 85, 109-110 (2007).

Before 1994, the Sentencing Guidelines did not include the Terrorism Adjustment. After passage of the Violent Crime Control and Law Enforcement Act (1994), Congress directed the Sentencing Commission to "amend its sentencing guidelines to provide an appropriate enhancement for any felony . . . that involves or is intended to promote international terrorism." Pub. L. No. 103-322, § 120004, 108 Stat. 1796 (1994).  In 1996, this provision was expanded to apply to "federal crime[s] of terrorism," whether international or not.  Pub. L. No. 104–132, § 730, 110 Stat. 1303 (1996).  When the Commission adopted Section 3A1.4, the number of terrorism cases was so tiny that there was little empirical data to base the guideline on." James P. McLoughlin, *Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations*, Law & Inequality: A Journal of Theory and Practice, Vol 21, Issue 1 (2010) at p. 112.

---

enhancement, and the automatic increase to criminal history category VI, the defense submits that the findings used to support this dramatic enhancement must be found by clear and convincing evidence. *United States v. Jordan*, 256 F.3d 922, 926 (9th Cir. 2001) ("when a sentencing factor has an extremely disproportionate effect on the sentence relative to the offense of conviction, due process requires that the government prove the facts underlying the enhancement by clear and convincing evidence.").

1    Thus, the Terrorism Adjustment is not based on valid statistics and principals that came

2    from examining hundreds of cases.  It is simply not reliable and should be rejected.

3              **2.       The Terrorism Enhancement is overly broad and unreliable.**

4              Section 3A1.4(a) is so broad in scope it invariably applies to most prosecutions

5    for material support for terrorism.  Indeed, because the enhancement is so broad, it is at

6    odds with the statutes criminalizing the underlying conduct.  For example, 18 U.S.C. §

7    2339A (i.e., Count One in this case) prohibits providing material support, such as

8    money, training, expert advice, personnel, or assistance, to terrorists or intending that

9    an enumerated offense be carried out.  18 U.S.C. § 2339A.  Unlike the Terrorism

10   Adjustment, however, 18 U.S.C. § 2339A recognizes a distinction in conduct.  It

11   provides for a much harsher punishment, up to life imprisonment, if someone dies,

12   whereas if death does not occur, the maximum punishment is 15 years.  Moreover,

13   under section 18 U.S.C. § 2339C, if a defendant provides financial support with the

14   intent to fund an act of terrorism, the maximum sentence is twenty years.  18 U.S.C. §

15   2339C(d)(1).  If a defendant conceals such financial support, the maximum is reduced

16   to ten years.  18 U.S.C. § 2339C(d)(2).  Despite these varying levels of punishment for

17   the type of conduct, the minimum sentence under the Terrorism Enhancement is 17.5

18   years (210 months).  U.S.S.G. § 3A1.4(b) (setting a minimum offense level of 32 and

19   criminal history category VI).  And in this case, because the Terrorism Adjustment

20   adds 12-levels onto the Base Offense Level of 33, the guideline sentence is life

21   imprisonment.  The material support statutes show that Congress intended for sentences

22   to be proportional to the culpability, yet the Terrorism Adjudgment treats those who

23   provide any type of "material support" as harshly as those who actually commit violent

24   acts.

25             This point is made even clearer when one looks at how the Terrorism Adjustment

26   applies to inchoate offenses.  Mr. Domingo is charged in Count Two with an inchoate

27   offense, the *attempted* use of a weapon of mass destruction.  In general, Section

28   2X1.1(b) instructs the court to reduce the applicable offense level for an attempt

offense by three levels.  However, the Terrorism Adjustment is at odds with U.S.S.G. § 2X1.1(b) because the Adjustment itself precludes the application of Section 2X1.1(b). Under the Terrorism Adjustment, defendants who conspire or attempt to commit a crime are treated exactly like those who complete the crime.

In this case, but for the Terrorism Adjustment, Mr. Domingo would arguably receive the 3-level reduction under 2X1.1(b). In support of its theory at trial, the government produced evidence showing that Mr. Domingo purchased shrapnel for the IED (at the CHS and UCE's direction), provided those items to the UCE, and drove to Long Beach's Bluff Park two days prior to the scheduled rally.  According to the government's trial theory, the purpose in selecting this particular rally was to incite violence amongst two rival factions, white supremacists and counter protestors, and start a civil war.  Mr. Domingo testified at trial that he would not have used the IED at the Long Beach rally had he known that the rally had been cancelled.  Although he was arrested before obtaining this knowledge, it was not the arrest that interrupted his plans. Instead, his plans would have been interrupted by the lack of a target.  Because the rally had not yet occurred and was not going to occur, Mr. Domingo had not "complete[d] all such acts" necessary for conviction of the substantive offense (i.e., *use* of a weapon of mass destruction) and, therefore, would be entitled to a 3-level reduction under 2X1.1(b).  But because subsection (b) cannot be applied to Count Two if the "offense[]. . . involved, or was intended to promote, a federal crime of terrorism as defined in 18 U.S.C. § 2332b(g)(5)," Mr. Domingo does not get the benefit of the guidelines' reduction for inchoate offenses.

As Judge O'Toole found in *United States v. Mehanna*, No. 09-cr-10017-GAO (D. Mass. 2011), Dkt. 432 at 19 (Judgment in a Criminal Case):

> "Both the 12-level adjustment to the offense level and the automatic assignment of a Criminal History Category VI which are applied in any case that can be fairly characterized as a terrorism case, regardless of the particular facts, not only make the recommendation unuseful as a guide in a particular case but is actually, in my view, contrary to and subversive of

the mission of the Guidelines which is to address with some particularity the unique facts of the given case. And gross adjustments such as the ones I've referenced do not do that."

Thus, because the Terrorism Adjustment "is too general to be convincingly reliable in a given case," it should be rejected. *Id*.

### 3. The Terrorism Adjustment should be rejected because it in effect creates a separate offense.

The Terrorism Adjustment can become more important than the offense of conviction because of its substantial penalties in increasing the offense level by 12 and adjusting the Criminal History Category to VI. The government can obtain a lengthy sentence by indicting a defendant for an easy to prove offense, obtain a conviction or plea, and then argue the terrorism enhancement applies under the much easier preponderance or clear and convincing evidence standard, skyrocketing the guideline range.

For example, let's assume that Mr. Domingo's Base Offense Level is 33 per Section 2A2.1(a)(1). Further, let's assume that Mr. Domingo is in criminal history category I. This results in a guideline range of 135-168 months. But, because of the Terrorism Adjustment, the offense level is 43[12] and, with a criminal history category of VI, the resultant guidelines' range is life imprisonment. Thus, the enhancement is more important than the offense of conviction. The guideline should be rejected on this basis as well.

/ /

/ /

/ /

/ /

---

[12] The base offense level would be 33. With the additional 12-level Adjustment under 3A1.4(b), the total offense level is 45. Because the guidelines top out at 43, the offense level would be 43. *See* U.S.S.G., Chapter 5, Part A; App. Note 2 ("An offense level of more than 43 is to be treated as an offense level of 43.").

**4.    Because the Terrorism Adjustment artificially inflates a defendant's criminal history category and distorts the function of the Guidelines, a downward departure in criminal history is appropriate.**

"[T]he terrorism enhancement both increases a terror defendant's offense level, and increases his or her criminal history category to the highest possible number (VI). U.S.S.G. § 3A1.4(a). The argument for doing so is presumably that terrorism is an extremely serious crime.[]. . . But it is the *offense level* that reflects the seriousness of a charged offense. . . . A defendant's *criminal history category* reflects something different." *United States v. Alhaggagi*, 372 F. Supp. 3d 1005, 1013 (N.D. Cal. 2019), *vacated and remanded for resentencing*, 973 F.3d 693 (9th Cir. 2020) (concluding that the district court abused its discretion in applying the adjustment in offense level, but noting the well-reasoned decision on the court's unchallenged downward departure in criminal history category) (emphasis in original).  Because the Terrorism Adjustment applies to nearly every material support case, every defendant is placed in Criminal History Category VI, regardless of whether they have zero or 13 or more criminal history points.  U.S.S.G. § 3A1.4.  This result grossly distorts the function of the Criminal History Category, which is to judge the likelihood of recidivism and send a clear message to society that repeated criminal behavior will result in greater punishment.  U.S.S.G. § 4A, Introductory Commentary, p. 379.

Placing every defendant in Criminal History VI "import[s] a fiction into the calculus." *United States v. Mehanna*, No. 09-cr-10017-GAO (D. Mass. 2011), Dkt. 432 at 19 (Judgment in a Criminal Case) ("It's one thing to adjust the offense level upward to signify the seriousness of the offense. . . . It is entirely another to say that a defendant has a history of criminal activity that he does not, in fact, have.")  It "impute[s] to a defendant who has had no criminal history a fictional history of the highest level of seriousness." *Id*.  Even the Career Offender guideline, which often applies when a defendant with a significant criminal history has committed a serious felony, is based

30

on a defendant's prior convictions.  U.S.S.G. § 4B1.1.  Not so with the Terrorism Adjustment.  As Judge O'Toole writes, "[t]he adjustment to criminal history called for by Section 3A1.4(b) is. . . simply a way of 'cooking the books' to get to a score and a desired sentencing range . . . ." *Mehanna*, No. 09-cr-10017-GAO, Dkt. 432 at 20.

The Guidelines instruct that the Court may depart downward in criminal history category if "reliable information indicates that the defendant's criminal history category substantially overrepresents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes[.]"  U.S.S.G. § 4A1.3(b)(1). There is no Commission data to back up the claim that defendants convicted of terrorist offenses are unique in terms of recidivism, thus warranting the Criminal History category adjustment.  *See also Alhaggagi*, 372 F. Supp. 3d at 1012 ("The Sentencing Guidelines are a remarkable system, developed over the course of decades to achieve "effective, fair sentencing" that serves the goals of honesty, reasonable uniformity, and proportionality. . . . The terrorism enhancement takes a wrecking ball to this carefully constructed edifice.")  Rather, social science research shows the exact opposite.

According to an article published by the Combating Terrorism Center at West Point, of the 31 persons convicted for jihadi activity and subsequently released from prison, four people recidivated with only two of the four being categorized as jihadi plot recidivists.[13]  *See* Dr. Christopher Wright, *An Examination of Jihadi Recidivism Rates in the United States*, CTC Sentinel, Vol. 12, Issue 10 (Nov. 2019) at p. 28.  The author found that "[w]hile the recidivism rate for those linked to jihadi plots is not zero, it is far below that of common criminals."  *Id*. at 30.  *Perspectives on Terrorism*, a peer reviewed online journal affiliated with the Institute of Security and Global Affairs at Leiden University's the Hague Campus in the Netherlands, published a study that

---

[13] The study's dataset was comprised of "189 total individuals [] identified as being involved in jihadi plots against targets in the United States between January 1990 and the end of May 2019. Of these, 17 were convicted prior to 9/11. Only 31 individuals involved in these plots have been identified as being released from prison, three of those were involved in pre-9/11 plots."

31

found of the 247 persons convicted of terrorism-related offenses post-9/11 in the United States and later released, four recidivated.[14]  *See Omi Hodwitz, The Terrorism Recidivism Study (TRS): Examining Recidivism Rates for Post-9/11 Offenders*, Vol. 13, Issue 2, (April 2019) at p. 54.  Thus, the recidivism rate is only 1.6%.[15]  *Id.*  Moreover, "[n]othing in the history of U.S.S.G. section 3A1.4 would indicate that any reliable data was used to determine if a person convicted of a material support offense is more likely to be a recidivist."  McLoughlin, at p. 115.  Thus, there is no empirical basis to put all defendants in Criminal History Category VI.  *Cf. Alhaggagi*, 372 F. Supp. 3d at 1014 ("The terrorism enhancement is not backed by any empirical evidence.")

This Court has the authority to depart downward based on section 4A1.3(b)(1) notwithstanding the putative application of section 3A1.4.  *See United States v. Benkhala*, 501 F. Supp. 2d 748, 751 (E.D. VA. 2007) ("no text within § 4A1.3 restricts or prohibits its application after the application of the § 3A1.4 enhancement.  Several guidelines other than 3A1.4 prescribe specific criminal history categories [listing other guideline sections and noting that] § 4A1.3 prohibits a downward departure in the cases of armed career criminals under § 4B1.4 and repeat sex offenders under § 4B1.5, and limits downward departures to one category at most in the case of a career offender.  Unlike with the other guidelines that specify a criminal history category, § 3A1.4 is listed nowhere in the guideline or its application notes.  Without any prohibition or limitation, it is clear that the Commission did not intend to restrict a court's discretion with respect to criminal history downward departure under § 3A1.4."); *see also* Dkt.

---

[14] The study's author described its dataset as: "The TRS data are collected from a variety of sources, including offender datasets, state arrest records, Department of Justice (DOJ) records, and media sources. Researchers began by identifying potential offenders included in other datasets, including The Intercept's Trial and Terror dataset, the Global Terrorism Database, and Charles Kurzman's Muslim-American Violent Extremism data.  In addition, researchers used a number of internet-based search terms to identify other cases for inclusion.  Once a near-exhaustive pool of potential terrorism-related offenders was collected, researchers reviewed reputable media sources and state and federal arrest and court records to confirm the existence of each case and to identify potential co-defendants. No case or offender was included in the TRS unless validated by two or more credible sources."  *Id.* at 56.

[15] In terms of the sample, 12.9 years was the average sentence.  *Id*. at 58.

293, Rec. Ltr. at 4 (same).  As the probation office correctly concludes, "[Mr.] Domingo has no criminal history whatsoever.  As such, there is very reliable information that criminal history category VI substantially over-represents the seriousness of Domingo's criminal history. . . . There is little to support [Mr.] Domingo's designation in category VI.  A departure to criminal history category I, which is [his] actual criminal history category, was applied."  Dkt. 293, Rec. Ltr. at 4.

Based on the foregoing, this baseless advisory guideline should be rejected, Mr. Domingo's criminal history category should not be increased arbitrarily to VI, and his criminal history category should remain as his true category, category I.

## V.  CONCLUSION

Based on the foregoing, the defense requests that the Court sentence Mr. Domingo to 180 months in custody as to each count, to run concurrently, followed by twenty years of supervised release.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  October 18, 2021        By  /s/ DAVID I. WASSERMAN
                                    DAVID I. WASSERMAN
                                    Deputy Federal Public Defender
                                    Attorney for MARK DOMINGO

33