TRACY L. WILKISON
Acting United States Attorney
CHRISTOPHER D. GRIGG
Assistant United States Attorney
Chief, National Security Division
REEMA M. EL-AMAMY (Cal. Bar No. 237743)
DAVID T. RYAN (Cal Bar No. 295785)
Assistant United States Attorneys
Terrorism and Export Crimes Section
        1500 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone: (213) 894-0552/4491
        Facsimile: (213) 894-2979
        E-mail:     reema.el-amamy@usdoj.gov
                    david.ryan@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 19-313-SVW |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT MARK STEVEN DOMINGO |
| v. | |
| MARK STEVEN DOMINGO, | Sentencing Date: November 1, 2021 Sentencing Time: 11:00 a.m. |
| Defendant. | |

     Plaintiff United States of America, by and through its counsel
of record, the Acting United States Attorney for the Central District
of California and Assistant United States Attorneys Reema M. El-Amamy
and David T. Ryan, hereby files its sentencing position for defendant
Mark Steven Domingo.

     This sentencing position is based upon the attached memorandum
of points and authorities, the United States Probation and Pretrial
Services Office's Presentence Investigation Report and Recommendation

Letter, the files and records in this case, and such further argument or evidence as the Court may permit.

Dated: October 20, 2021             Respectfully submitted,

                                    TRACY L. WILKISON
                                    Acting United States Attorney

                                    CHRISTOPHER D. GRIGG
                                    Assistant United States Attorney
                                    Chief, National Security Division


                                          /s/
                                    _____
                                    REEMA M. EL-AMAMY
                                    DAVID T. RYAN
                                    Assistant United States Attorneys

                                    Attorneys for Plaintiff
                                    UNITED STATES OF AMERICA

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.    INTRODUCTION...................................................1

II.   STATEMENT OF FACTS.............................................3

III.  DEFENDANT'S SENTENCING GUIDELINES RANGE IS LIFE
      IMPRISONMENT...................................................8

IV.   THE UNITED STATES RECOMMENDS THE COURT IMPOSE THE
      GUIDELINES SENTENCE OF LIFE IMPRISONMENT......................11

      A.    A Life Sentence is Warranted to Protect the Public,
            Address the Nature and Circumstances of the Crimes,
            Ensure Deterrence, and Provide Just Punishment..........11

      B.    A Life Sentence Would Avoid Unwarranted Sentence
            Disparities.............................................16

V.    CONCLUSION....................................................19

i

**TABLE OF AUTHORITIES**

**Cases**

United States v. Abu Ali,

  410 Fed. Appx. 673 (4th Cir. 2011) ...........................15, 19

United States v. Abu Ali,

  528 F.3d 210 (4th Cir. 2008) ................................14, 15

United States v. Aguilar-Huerta,

  576 F.3d 365 (7th Cir. 2009) ....................................18

United States v. Ali,

  799 F.3d 1008 (8th Cir. 2015) ...................................14

United States v. Jayyousi,

  657 F.3d 1085 (11th Cir. 2011) ..............................15, 19

United States v. Mejia,

  559 F.3d 1113 (9th Cir. 2009) ....................................9

United States v. Meskini,

  319 F.3d 88 (2d Cir. 2003) ..................................14, 16

United States v. Osmakac,

  868 F.3d 937 (11th Cir. 2017) ...................................18

United States v. Ressam,

  679 F.3d 1069 (9th Cir. 2012) ...............................13, 19

United States v. Suarez,

  893 F.3d 1330 (11th Cir. 2018) ..............................16, 17

United States v. Treadwell,

  593 F.3d 990 (9th Cir. 2010) ....................................19

United States v. Yuman-Hernandez,

  712 F.3d 471 (9th Cir. 2013) .....................................9

## <u>TABLE OF AUTHORITIES (CONTINUED)</u>

**Statutes**

18 U.S.C. § 249 ................................................... 10

18 U.S.C. § 2332a(a)(2) ............................................ 1

18 U.S.C. § 3553(a) ............................................... 11

18 U.S.C. § 3553(a)(6) ............................................ 16

18 U.S.C. §§ 1114 ................................................. 10

**Rules**

U.S.S.G. § 2A2.1 ................................................... 8

U.S.S.G. § 3A1.4 .............................................. 12, 13

1          **MEMORANDUM OF POINTS AND AUTHORITIES**

2    **I.   INTRODUCTION**

3          The evidence at trial – including defendant's own sworn

4    testimony – revealed that he was intent on killing innocent Americans

5    and would have done so had he not been stopped.  He intended to

6    commit mass murder to vent his own anger at the world, to avenge the

7    shooting of Muslims in Christchurch, New Zealand, and to sow civil

8    unrest that would weaken America's ability to fight ISIS and other

9    Jihadist groups.  He repeatedly expressed his desire to kill various

10   groups of Americans: police officers, Jews, Christians, military

11   personnel, and ultimately, attendees at a political rally in Long

12   Beach.  He admitted on the stand that he led and fully intended to

13   carry out a plot to detonate bombs at that rally to commit mass

14   murder.  Had he not been stopped, he planned to commit further

15   terrorist attacks to kill more innocent people and attempt to divide

16   and weaken the United States.

17         After hearing the evidence of defendant's horrific plot in this

18   case, the jury convicted defendant of Attempted Use of a Weapon of

19   Mass Destruction, in violation of 18 U.S.C. § 2332a(a)(2), and

20   Providing Material Support to Terrorists, in violation of 18 U.S.C.

21   § 2339A.  The United States Probation and Pretrial Services Office

22   ("Probation Office") filed a Presentence Investigation Report

23   ("PSR"), in which it calculated a total offense level of 43, a

24   criminal history category of VI, and a Sentencing Guidelines range of

25   life imprisonment.  (PSR at 3.)

26         The Probation Office's Guidelines calculations are correct and

27   the Court should adopt them.  Plots to carry out mass-casualty

28   terrorist attacks are among the most serious offenses facing the

nation.  Defendant's crimes here are no exception; if anything, they stand at the apex of seriousness because, as defendant explained, they were intended to foment civil war.  Accordingly, the Court should impose the strongest sentence permitted by law: life imprisonment.  The United States strongly disagrees with the Probation Office's recommendation of a lesser sentence, especially as the bases for its recommendation – that defendant's conduct was not substantially more serious than a mine run attempted murder and that defendant is unlikely to commit crimes in the future – lack merit and are contrary to well-established caselaw.

As the trial evidence, including defendant's own testimony, made abundantly clear, for years defendant had been driven by hate and had armed himself to commit acts of extreme violence.  The fact, which defendant admitted on cross-examination, that the only reason why his attack was unsuccessful was because the FBI arrested him should give the Court and the community no comfort that defendant will not pose a future danger.  His own behavior makes that clear: his crimes were horrific – he attempted to murder dozens of innocent people in order to "bring terror and fear to the infidel," and facilitate the spread of ISIS and other terrorist groups – and he has shown no remorse for his conduct nor any indication that he has disavowed the violent extremist ideology that motivated it.

Accordingly, the United States recommends the Court impose a within-Guidelines sentence of life imprisonment.  Such a sentence will protect the public from future crimes by defendant, reflect the seriousness of the offenses, afford just punishment, deter other would-be attackers, and avoid unwarranted sentence disparities with similarly situated defendants.

## II.   STATEMENT OF FACTS

The facts are well-known to the Court and well-documented in the pretrial and trial record in this case.  Defendant's offense conduct is also recounted in paragraphs 5-24 of the PSR.  For ease of reference, the basic facts of the case are summarized below.

As early as May 2017 – nearly two years before he ever met the FBI Confidential Human Source ("CHS") or Undercover Employee ("UCE") – defendant began posting ISIS propaganda online, expressing his desire to commit violent Jihad in the United States, and seeking collaborators to join him.  For example, between May 2017 and March 2019, defendant exchanged numerous private Facebook messages with an associate, J.B., regarding his support for ISIS, hatred of Jews, and desire to commit mass-casualty attacks.

Beginning in at least January 2019, defendant also participated in several invite-only online chatrooms along with several dozen supporters of violent Jihadi groups and expressed his support for ISIS and his desire to commit violent attacks.  On March 3, 2019, defendant wrote about conducting a mass attack similar to the October 1, 2017 shooting in Las Vegas, Nevada which killed 59 people, stating, "America needs another vegas event [. . .] something to kick off civil unrest [. . .] and its not about winning the civil war its about weakening America giving them a taste of the terror they gladly spread all over the world."  On March 7, 2019, defendant wrote in a chatroom that he was looking forward to the collapse of the United States, which would provide "a chance for a conquest . . . to spread the [Muslim religion]."  On March 14, 2019, after a shooting at two Mosques in Christchurch New Zealand, defendant wrote, "there were mosque shootings in new Zealand . . . there must[]be retribution."

3

1    On March 15, 2019, an FBI Online Covert Employee ("OCE") saw and
2    captured defendant's posts about the shootings in New Zealand, and
3    initiated a direct conversation with defendant.  Defendant wrote to
4    the OCE that he was "enraged" and "these fuckers do need to bleed [.
5    . .] one way or another."  In discussing with the OCE how many people
6    defendant would like to kill, defendant wrote, "Was thinking more
7    like a group theres a bunch of jews around this one street not a lot
8    of parking so theyre forced to find parking and walk to the
9    synagogue."  Over the next month, as defendant planned his terrorist
10   attack, the OCE captured more messages from defendant in which he
11   shared ISIS propaganda videos and photographs, and wrote about his
12   desire to kill Americans, to take over America and impose Islamic
13   law, and to die a martyr.  Many of defendant's captured
14   communications were admitted as trial exhibits.

15   On March 16, 2019, after defendant posted in the online chatroom
16   about his desire to seek retribution for the shootings in
17   Christchurch, New Zealand, the CHS, who also had an account in the
18   chatroom, sent defendant a message to ask how he was feeling.
19   Defendant responded that he was "still mad [. . .] even more so [. .
20   .] since I watched the vid," referring to the video of the New
21   Zealand shooting.  Over the next month, defendant met with the CHS
22   several times and made plans to conduct a string of terror attacks.
23   On April 3, 2019, defendant met with the CHS and said that placing an
24   IED on a freeway "would do damage. [. . .]  An IED, like the ones in
25   Iraq [. . .] blows up on the freeway, hundreds and maybe thousands of
26   US citizens injured."  The CHS asked, "And then what?"  Defendant
27   replied, "Then the fun starts."  Defendant said, "a dead police that
28   will get, like, that will get like the police riled up.  But I need

1   you bro, just the one IED that's going to stir up the hornet's nest,

2   bro."  Defendant said his plan was to "go in fast" and "kill enemies

3   here and there, then we flee."  Defendant said if they caused "small

4   casualties here and there," that would "put the stress" on America

5   and lead to martial law.

6        On April 19, 2019, defendant met the CHS again.  Defendant

7   arrived wearing camouflage pants and holding a backpack containing an

8   AK-47 style rifle partially covered by what appeared to be a shirt.

9   When the CHS expressed surprise that he had brought the rifle,

10  defendant replied "if we're going to commence fighting, jihad, yeah,

11  . . . you gotta remain."  Defendant later said he brought the gun

12  because "I just wanted to show you that I'm serious."

13       During their meeting, the CHS asked if defendant wanted the CHS

14  to reach out to an associate who could make IEDs.  Defendant said

15  yes, and directed the CHS to have the associate write down

16  instructions so defendant could buy the ingredients "little by

17  little" from different home improvement stores "so it's not

18  suspicious."  Defendant then brought up an upcoming rally on April

19  28, 2019 in Long Beach organized by a "white nationalist" group.

20  Defendant said if they could get an IED in time, "we can detonate it

21  in a crowd.  Which would be perfect. . . . Even a small IED would do

22  damage in a crowd. . . .  The human body is very easy to break . . .

23  a big IED just in a backpack, in a crowd?  You're looking at least 20

24  people dead, maybe, maybe 30 people injured."  The CHS asked

25  defendant if he was serious, and defendant said, "I am serious, I

26  want to do the IED route."

27       On April 22, 2019, the CHS wrote to defendant that the associate

28  was willing to help them build an IED the next day if they bought the

5

materials that night.  Defendant agreed to buy Christmas lights and nails to use as shrapnel inside the IED.  Defendant then went to home improvement stores and bought several hundred three-and-a-half inch and longer nails.

On April 23, 2019, defendant met with the CHS and showed the CHS the nails he had purchased for the IED.  Defendant said he chose the specific nails because they were long enough to penetrate the human body and puncture internal organs.  The CHS told defendant that they "don't have to do this."  Defendant said that the event in Long Beach may be cancelled, and proposed attacking a different "White Nationalist" rally in Huntington Beach, California, on Saturday, April 27, 2019.  Defendant said the Huntington Beach rally would be on the beach, which may make it more difficult to kill as many people because it was a wide open space.  Defendant also said the Santa Monica Pier would provide a better space for an attack, particularly during the summer when it was crowded, because it was a more enclosed space and people would not be able to escape from a blast.  Defendant said that detonating an IED with a timer on the Santa Monica Pier would cause a lot of casualties.

Shortly thereafter, the UCE arrived, and defendant showed the UCE the nails he had bought for the bombs and told the UCE he would buy more parts if needed.  Defendant told the UCE and CHS that he would let them know in a few days whether they would proceed with the attack in Long Beach, and the UCE should wait to complete the bombs until receiving confirmation from defendant.  Defendant said that when he was ready to proceed, he would send the UCE a message with a photograph which would be the "go ahead" for the attack.

On April 25, 2019, after confirming that the Long Beach rally was not cancelled, defendant sent the UCE the "go ahead" message, and the UCE replied, "Okay I hear and obey."  The UCE said he would have the IEDs ready by the next morning.  The next evening, April 26, 2019, defendant met with the UCE and CHS, inspected what he believed were completed IEDs, practiced operating the remote detonators, and drove to the location for the upcoming rally to identify how they would enter the rally, where they would detonate the IEDs in order to kill the most people, and how they would escape.  Defendant said if they survived the attack, they could conduct further attacks against multiple locations.  Defendant then explained the purpose of the attacks, saying "it's designed to cause fear and terror through the capital yeah.  But this is also because, I mean you feel it, the tension in the air, left and right . . . there's a civil war brewing bro.  A divided America. . . .  It's not just for the movement but just for the world in general, bro."  Defendant continued, "All around the world America goes on sticking its fucking cock in everyone's fucking business.  Now, divided America! . . . I'm banking on a lot of the US fleets, the Navy, that are constantly patrolling to have a strike for us anywhere in the world, they will be forced to duck back here, and, you know, martial law, to bring back order.  Because it's common sense right?  Why patrol the world when your own house is on fire?"

Defendant then explained that provoking civil war in the United States and causing the US military to impose martial law would "give[] our brothers around the world, the Mujahideen, a little stress off their back. . . .  If we can cause enough civil tension

7

1  here and bring back the US troops, they all come back here and give
2  our brothers a little more time to fight."

3      After surveilling the location for the attack, defendant
4  returned with the UCE and CHS to their meeting location.  Defendant
5  then carried one of the IEDs outside to put into a vehicle, at which
6  point he was arrested by the FBI.  Later that night, in a recorded,
7  Mirandized interview, defendant told FBI agents that he chose to
8  commit the attack to "bring terror and fear to the infidel," to
9  "stand up" for the global Sunni Muslim community, and to deliver a
10 "big fuck you to this world."

11     At trial, defendant testified and repeatedly affirmed that he
12 intended to commit mass murder in March and April 2019.  He admitted
13 that the CHS stopped him from committing at least one murder in April
14 2019 by encouraging him to be patient.  Finally, he admitted that he
15 was excited when he learned that the CHS had access to an individual
16 who could construct a bomb, and that he was the one who chose to
17 attack the rally, chose to use the bombs, and chose to go through
18 with the plot to commit mass murder, right up until the moment of his
19 arrest.

20 **III. DEFENDANT'S SENTENCING GUIDELINES RANGE IS LIFE IMPRISONMENT**

21     The PSR correctly determined that defendant's Guidelines range
22 is life imprisonment, based on a total offense level of 43.  (PSR at
23 3.)  The applicable Guideline provision is U.S.S.G. § 2A2.1, because
24 the offense conduct constituted attempted murder.  (Id. ¶¶ 30-33.)
25 Section 2A2.1 establishes a base offense level of 33 where, as here,
26 the object of the offense would have satisfied the elements of first-
27 degree murder.  The Guidelines then provide for a 12-level
28 enhancement under Section 3A1.4 because the offense was a felony that

1  involved a federal crime of terrorism.  (Id. ¶ 36.)[1]  Defendant's

2  resulting Guidelines range would be 45, which is off the chart.

3  Accordingly, the total Guidelines offense level is automatically

4  reduced to 43, which establishes a Guidelines sentence of life

5  imprisonment.  (Id. ¶ 42.)

6       Defendant was not the subject of sentencing entrapment, so his

7  request for a downward departure or variance on that basis is without

8  merit.  "Sentencing entrapment occurs when a defendant is predisposed

9  to commit a lesser crime, but is entrapped by the government into

10 committing a crime subject to more severe punishment."  United States

11 v. Mejia, 559 F.3d 1113, 1118 (9th Cir. 2009).  The burden is on the

12 defendant to show, by a preponderance of the evidence, that he lacked

13 both the intent and the capacity to commit the crime subject to more

14 severe punishment.  Id.[2]  Here, the evidence at trial, and

15 defendant's own sworn testimony, proved that defendant was

16 

17      [1] The application of the Section 3A1.4 enhancement also
   increases defendant's criminal history category from I to VI, though
18 the Guidelines offense level of 43 would yield a Guidelines sentence
   of life imprisonment regardless of defendant's criminal history.
19 (PSR ¶ 49.)

20      [2] Defendant's suggestion that the Court apply a different
   standard, which the Ninth Circuit has applied solely in the unique
21 context of "stash-house robbery" cases, is incorrect.  Unlike typical
   drug distribution cases, stash house robberies "allow the government
22 the virtually unfettered ability to inflate the amount of drugs
   supposedly in the house and thereby obtain a greater sentence for the
23 defendant."  United States v. Yuman-Hernandez, 712 F.3d 471, 474 (9th
   Cir. 2013).  Because law enforcement can "easily manipulate the
24 capability element" with respect to the quantity of drugs in a stash
   house robbery, "it makes little sense to require that a defendant
25 establish both a lack of intent and lack of capability" to steal a
   particular quantity of drugs in that context.  Id.  "Thus, in the
26 case of fictitious stash house robberies, the defendant need only
   show a lack of intent or lack of capability to deal in the quantity
27 of drugs charged."  Id. at 475.  Here, unlike a stash house robbery,
   the government did not have "unfettered ability" to "inflate" the
28 crime by choosing the weapon without the defendant's knowledge.  Id.
   at 474.  On the contrary, defendant and the CHS discussed what
   weapons to use, and defendant ultimately chose to use the bombs.

predisposed to commit a mass-casualty terrorist attack with whatever weapon would help him kill the most people and foment civil unrest in the United States.  He had received training in the military on IEDs, viewed and shared ISIS propaganda videos including the use of car bombs, grenades, and other explosives, and spoke online with other ISIS supporters about using IEDs in terrorist attacks.  And when defendant proposed to the CHS various targets for attacks, and heard that the CHS may know someone who could make IEDs, defendant immediately jumped at the prospect, responding "that's even better." From then on, defendant spoke with excitement on several occasions about how many people he could kill with an IED, and how much chaos he could cause.

The fact that defendant, who said he was "impatient for the slaughter," considered using his firearms (rather than waiting to obtain a bomb) to commit mass shootings of Jews, Christians, or military personnel, does not change the analysis.  Defendant admitted on the stand that he would have carried out a shooting had the CHS not convinced him to be patient.  Defendant appears to assume, incorrectly, that committing such a shooting would have somehow been a "lesser" crime than the bombing he ultimately attempted.  That is not true.  Had defendant committed such a shooting, he would have faced the same statutory maximum and Guidelines sentence of life imprisonment.  See, e.g., 18 U.S.C. § 249 (statutory maximum of life for murder due to the victim's religion); 18 U.S.C. §§ 1114 (statutory maximum of life for murder of federal officer or employee); U.S.S.G. § 2A1.1 (Guidelines offense level of 43 for first degree murder).  Thus, had the CHS been unable to stop defendant, defendant would have been subjected to a statutory maximum and

10

Guidelines sentence of life imprisonment regardless of what weapon he chose to use. Ultimately, defendant jumped at the opportunity to obtain and use IEDs instead of, or in addition to, his assault rifles. Accordingly, he has not met his burden to prove that he was subject to sentencing entrapment, and no downward departure should be applied.

**IV.  THE UNITED STATES RECOMMENDS THE COURT IMPOSE THE GUIDELINES SENTENCE OF LIFE IMPRISONMENT**

The United States recommends that the Court impose a within-Guidelines sentence of life imprisonment, and submits that such a sentence is warranted to protect the public from future crimes by defendant, and to address the nature and circumstances of the crimes, reflect their seriousness, ensure deterrence, provide just punishment, and avoid unwarranted sentencing disparities. See 18 U.S.C. § 3553(a).

> **A.  A Life Sentence is Warranted to Protect the Public, Address the Nature and Circumstances of the Crimes, Ensure Deterrence, and Provide Just Punishment**

The jury found that defendant attempted to commit mass murder. Indeed, he admitted it under oath. He also admitted on the stand that he would have committed at least one murder before the Long Beach rally had the CHS not convinced him to wait. And he admitted that he led and intended to carry out a plot to detonate bombs at a political rally to kill dozens of innocent people. If he was not stopped, he planned to carry out a string of terrorist attacks. He was motivated to kill innocent people to vent his own anger and hatred at the world, to avenge the killing of Muslims in New Zealand, and to stoke terror, chaos, and civil unrest that would weaken the United States and help ISIS and other Jihadist groups spread. In

11

1    light of these incredibly serious, aggravating facts, the government
2    agrees with the Probation Office that a "lengthy term of
3    incarceration" is necessary.  (Dkt. 293 at 6.)

4         The Probation Office recommended that the Court impose a 20-year
5    sentence, arguing that the application of the Terrorism Enhancement
6    under U.S.S.G. § 3A1.4 led to an overstatement of defendant's
7    criminal history category, and that defendant's conduct did not
8    warrant a 12-level increase from the Guidelines offense level for
9    attempted murder.  (Id. at 4-5.)

10        In essence, the Probation Office invites the Court to almost
11   entirely delete Section 3A1.4 from the Guidelines, or ignore it
12   altogether, something no appellate court has ever condoned.
13   Moreover, the government respectfully disagrees that such a sweeping
14   downward variance to 20 years is warranted.  The Probation Office's
15   recommended sentence reflects a complete reversal of the Terrorism
16   Enhancement's increase in criminal history (from category VI back to
17   category I), and then a further downward variance of at least seven
18   levels.

19        There is no basis to so greatly undermine the application of the
20   Terrorism Enhancement in this case.  The Terrorism Enhancement
21   accurately reflects the numerous aggravating facts that separate
22   defendant's crime from a mine run attempted murder, including:
23   (1) defendant attempted to commit mass murder; (2) he intended not
24   only to kill and injure his victims, but also to, in his words,
25   "bring terror and fear to the infidel," meaning to innocent people
26   throughout America; and (3) he intended to provoke chaos and civil
27   unrest in order to weaken the United States so that terrorist groups
28

1    like ISIS could spread.  The Terrorism Enhancement is intended to

2    account for precisely these aggravating factors.

3         Indeed, the Ninth Circuit and other courts have reversed as

4    substantively unreasonable sentences that seek to effectively negate

5    the Terrorism Enhancement in the fashion proposed by the Probation

6    Office.  In United States v. Ressam, 679 F.3d 1069, 1090 (9th Cir.

7    2012) (en banc), the Ninth Circuit reversed as substantively

8    unreasonable a 27-year sentence for a defendant who attempted to

9    detonate a bomb at LAX.  The Ninth Circuit held that the district

10   court abused its discretion when it "effectively negated" the

11   Terrorism Enhancement, which had yielded a Guidelines sentence of 65

12   years to life.  The court explained, "[t]hat Ressam's crimes were in

13   furtherance of a terrorist attack compounded the severity of the

14   crimes.  Had Ressam succeeded, 'LAX' may well have entered our

15   vocabulary as a term analogous to 'the Oklahoma City bombing' or

16   '9/11.'  His clear intent was to intimidate this nation and the

17   world, and he sought to influence world events and the conduct of the

18   United States government through that intimidation.  The Sentencing

19   Guidelines specifically provide for a substantial upward adjustment

20   for federal crimes of terrorism.  U.S.S.G. § 3A1.4.  The sentence

21   imposed by the district court effectively negated that adjustment."

22   Id.

23        The Ninth Circuit in Ressam also flatly rejected the position

24   advanced by the Probation Office in this case that the Terrorism

25   Enhancement leads to an overstatement of criminal history because

26   terrorists have a low risk of recidivism.  (Dkt. 293 at 4.)  On the

27   contrary, the Ninth Circuit held that "[t]errorists, even those with

28   no prior criminal behavior, are unique among criminals in the

likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." Id. at 1091. The Second Circuit reached the same conclusion, holding that the Terrorism Enhancement reflects Congress and the Sentencing Commission's "rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time." United States v. Meskini, 319 F.3d 88, 92 (2d Cir. 2003). See also United States v. Ali, 799 F.3d 1008, 1031 (8th Cir. 2015) (adopting the "Second Circuit's well-reasoned conclusion in Meskini"). The same reasoning applies in this case, where defendant attempted to commit a mass terrorist attack in furtherance of a violent extremist ideology, has never expressed remorse or given any indication that he has separated himself from that ideology, and remains a "particularly grave theft" to the public.

The Fourth Circuit similarly reversed as substantively unreasonable a 30-year sentence for a defendant who participated in an al-Qaeda terrorist cell and plotted to carry out terrorist attacks and political assassinations in the United States. See United States v. Abu Ali, 528 F.3d 210, 258-260 (4th Cir. 2008). In that case, the Guidelines sentence after application of the Terrorism Enhancement was life imprisonment, but the district varied down to 30 years, reasoning that Abu Ali never actually "planted any bombs, shot any weapons, or injured any people," had no prior criminal history, and would likely not pose a danger to public safety if released at a more-advanced age. Id. at 259. The Fourth Circuit reversed, holding that the fact that Abu Ali did not successfully carry out an attack

14

did not warrant such a large downward variance, because, "[h]ad Abu Ali's plans come to fruition, they would, according to his own words, have led to massive civilian casualties," and "we cannot wait until there are victims of terrorist attacks to fully enforce the nation's criminal laws against terrorism." Id. at 264.

The Fourth Circuit further held that the Guidelines sentence of life imprisonment was warranted, as "[p]lotting terrorist attacks on the civilian population and conspiring to assassinate the President of the United States are offenses of the utmost gravity, and the Guidelines and for that matter any other measure of severity manifestly treat them as such." Id. at 264. On remand, the district court imposed a sentence of life imprisonment, which the Fourth Circuit affirmed. See United States v. Abu Ali, 410 Fed. Appx. 673 (4th Cir. 2011).

The Eleventh Circuit applied the same reasoning in United States v. Jayyousi, 657 F.3d 1085, 1116-17 (11th Cir. 2011), reversing as substantively unreasonable a 17-year-and-four-month sentence for a defendant who participated in a plot to commit a terrorist attack overseas. The Guidelines sentence after application of the Terrorism Enhancement was 30-years to life, but the district court sentenced the defendant to 17 years and four months, reasoning, among other things, that the defendant did not personally injure anyone, did not complete training with a terrorist group, and did not plot an attack against the United States. Id. at 1116. The Eleventh Circuit reversed, holding that the Terrorism Enhancement was properly applied, and the downward variance was substantively unreasonable because, among other things, it "unreasonably fails to protect the public from further crimes of the defendant," and "terrorists, even

15

1    those with no prior criminal behavior, are unique among criminals in

2    the likelihood of recidivism, the difficulty of rehabilitation, and

3    the need for incapacitation." Id. at 117 (quoting Meskini, 319 F.3d

4    at 92).

5        As in these cases, there is no basis here to "effectively

6    negate" the impact of the Terrorism Enhancement by wiping out the

7    criminal history adjustment and further varying down by seven levels

8    to reach a sentence of 20 years.  The Terrorism Enhancement

9    appropriately accounts for the seriousness of defendant's conduct,

10   the horrific nature of his plot, and the unique dangerousness posed

11   by individuals like defendant who not only attempt to commit mass

12   murder, but are trained to engage in warfare, express no remorse for

13   their conduct, and are dedicated to furthering a violent extremist

14   ideology.

15       **B.    A Life Sentence Would Avoid Unwarranted Sentence**
         **Disparities**

16

17       A within-Guidelines sentence of life imprisonment also would

18   avoid unwarranted sentence disparities.  See 18 U.S.C. § 3553(a)(6).

19   Indeed, such a sentence would be within the range (and the Probation

20   Office's recommendation of 20 years would be outside the range) of

21   sentences imposed in similar cases in which defendants were convicted

22   after trial of plots to commit terrorist attacks, including plots

23   involving undercover agents and informants.

24       The case of United States v. Suarez, 893 F.3d 1330 (11th Cir.

25   2018), contains remarkable similarities to this one.  There, the

26   district court imposed, and the Eleventh Circuit affirmed, a sentence

27   of life imprisonment for a defendant convicted after a jury trial of

28   attempted use of a weapon of mass destruction and providing material

                                    16

support to a foreign terrorist organization.  In that case, as here, the defendant had no criminal history, and came to the attention of the FBI after posting ISIS propaganda online.  As here, the defendant then met with an FBI informant, told the informant he wanted to commit an attack and had multiple guns, and asked the informant if the informant knew how to make bombs.  As here, the informant then introduced the defendant to an undercover agent posing as a bombmaker, who told the defendant what materials to buy to help build the bomb.  As here, the defendant bought boxes of nails and gave them to the undercover to insert into the bomb as shrapnel.  As here, the defendant told the informant and undercover that his plan was to detonate the bomb by remote detonator in a crowded beach area.  And as here, the undercover agent gave the defendant an inert bomb, and the defendant was arrested after taking possession of it.

The Guidelines sentence in that case was life imprisonment.  The government recommended a sentence of life imprisonment, or, in the event the Court imposed a downward variance, a sentence of not less than 40 years.  The district court imposed a life sentence, and the Eleventh Circuit affirmed over the defendant's appeal.  The Eleventh Circuit held that the fact that the defendant did not ultimately injury anybody did not warrant a downward variance, because, as here, the defendant was "convicted of attempt offenses" and "to deviate a sentence downward on the basis of unrealized harm is to require an act of completion for an offense that clearly contemplates inchoate conduct."  Id. at 1337.  The Eleventh Circuit further recognized that "the district court concluded that the seriousness of the crime and Suarez's potential future threat to the public—given the likelihood of him maintaining his radical beliefs—outweighed his lower

17

1   intelligence and lack of criminal history." Id.

2       Even where district courts have imposed sentences less than life

3   imprisonment in similar cases, they have imposed sentences

4   substantially longer than the 20-year term recommended by the

5   Probation Office.  For example, in United States v. Osmakac, 868 F.3d

6   937 (11th Cir. 2017), the district court imposed, and the Eleventh

7   Circuit affirmed, a sentence of 40 years for a defendant convicted

8   after a jury trial of attempted use of a weapon of mass destruction

9   and possession of an unregistered firearm.  In that case, as here,

10  the defendant came to the attention of the FBI after an associate

11  reported his comments in support of terrorist groups.  As here, the

12  defendant told the informant about his intent to commit a terrorist

13  attack, and attempted to purchase guns to use in an attack.  As here,

14  the informant introduced the defendant to an undercover agent posing

15  as a bombmaker.  As here, the undercover agent gave the defendant an

16  inert bomb, and the defendant was arrested after taking possession of

17  it.  The Guidelines sentence was life imprisonment.  The defendant

18  raised a sentencing entrapment argument.  The court rejected that

19  argument and imposed a sentence of 40 years.

20      Similarly, in United States v. Aguilar-Huerta, 576 F.3d 365, 368

21  (7th Cir. 2009), the district court imposed and the Seventh Circuit

22  affirmed a sentence of 35 years for a defendant convicted after

23  pleading guilty to attempted use of a weapon of mass destruction.

24  There, the defendant discussed his plans to commit an attack with a

25  confidential informant, and the informant provided the defendant

26  inert grenades to use in a plot to kill shoppers at a mall.  The

27  Guidelines sentence was 30-years-to-life imprisonment.  The defendant

28  raised a sentencing entrapment argument.  The district court rejected

                                    18

1    that argument and imposed a 35-year sentence.

2         Finally, as discussed above, the Ninth, Fourth, and Eleventh

3    Circuits in Ressam, Jayyousi, and Abu Ali reversed as substantively

4    unreasonable sentences of 30, 27, and 17 years for defendants

5    convicted of conspiring or attempting to commit terrorist attacks.

6    On remand, the court in Abu Ali imposed a sentence of life

7    imprisonment, the court in Ressam imposed a sentence of 37 years, and

8    the court in Jayyousi imposed a sentence of 21 years.  See Abu Ali,

9    410 Fed. Appx. 673; United States v. Ressam, No. 99-CR-00666-JCC-1,

10   Dkt. 461 (W.D. Wash.); United States v. Jayyousi et al., No. 04-CR-

11   60001-MGC, Dkt. 1458 (S.D. Fl.).[3]

12        Furthermore, because the Guidelines range in this case is life

13   imprisonment, a within-Guidelines sentence of life imprisonment would

14   avoid unwarranted sentence disparities.  See United States v.

15   Treadwell, 593 F.3d 990, 1011 (9th Cir. 2010), overruled on other

16   grounds by United States v. Miller, 953 F.3d 1095 (9th Cir.

17   2020)("Because the Guidelines range was correctly calculated, the

18   district court was entitled to rely on the Guidelines range in

19   determining that there was no 'unwarranted disparity[.]'").

20   **V.    CONCLUSION**

21        For the foregoing reasons, the United States recommends that the

22   Court impose a sentence of life imprisonment.

23

24        [3] In reversing the initial sentences, the courts in Ressam,
     Jayyousi, and Abu Ali all held that the district courts had

25   improperly made comparisons to terrorism-related cases in which lower
     sentences were imposed, but which contained substantial differences,

26   such as that the government recommended less time pursuant to plea
     agreements, or the defendants played supporting roles in others'

27   plots, or the defendants had provided support to terrorist groups but
     did not directly participate in or attempt to commit attacks.  See

28   Ressam, 679 F.3d at 1095; Jayyousi, 657 F.3d at 1117-18; United
     States v. Abu Ali, 410 Fed. Appx. 673, 679 (4th Cir. 2011).

                                    19