1  CUAUHTEMOC ORTEGA (Bar No. 257443)
   Federal Public Defender
2  DAVID I. WASSERMAN (Bar, No. 275987)
   (E-Mail: David_Wasserman@fd.org)
3  Deputy Federal Public Defenders
   321 East 2nd Street
4  Los Angeles, CA 90012
   Telephone: (213) 894-2854
5  Facsimile: (213) 894-0081

6  Attorneys for Defendant
   MARK DOMINGO
7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                  WESTERN DIVISION

11

12  UNITED STATES OF AMERICA,          Case No. 19-313-SVW

13                Plaintiff,           **MR. DOMINGO'S SUPPLEMENTAL
                                       BRIEF RE: SENTENCING
14        v.                           ENTRAPMENT AND THE
                                       TERRORISM ADJUSTMENT**
15  MARK DOMINGO,

16                Defendant.

17

18        Defendant Mark Domingo, by and through his attorney of record, David I.

19  Wasserman, hereby files his supplemental brief regarding sentencing entrapment and

20  the terrorism adjustment.

21                              Respectfully submitted,

22                              CUAUHTEMOC ORTEGA
                                Federal Public Defender
23

24  DATED: October 27, 2021     By  */s/ DAVID I. WASSERMAN*
                                    DAVID I. WASSERMAN
25                                  Deputy Federal Public Defender
                                    Attorney for MARK DOMINGO
26

27

28

                                      1

## I.  INTRODUCTION

In its sentencing position, the government argues that Mr. Domingo was not subject to sentencing entrapment and that the probation office effectively disregards the terrorism adjustment. The government's arguments should be rejected for several reasons.

First, the government applies the wrong sentencing entrapment standard by manufacturing an element that does not exist in the case law.  Second, the government cites two federal statutes to contend that Mr. Domingo would not have committed a *lesser* offense were he to have attempted to kill people with a firearm.  But a close reading of these statutes shows why the government is also wrong on that front.  Third, the government fails to acknowledge that Mr. Domingo could have been charged with California firearms offenses long before he talked about bombing a rally in Long Beach.  However, because law enforcement introduced a bomb into the investigation, Mr. Domingo is now facing life in prison.  Fourth and finally, the government misconstrues the probation office's argument about the terrorism adjustment.  For these reasons, the Court should reject the government's position, find that Mr. Domingo was the subject of sentencing entrapment, and depart or vary downward from the applicable guideline range.

## II.  THE SENTENCING ENTRAPMENT STANDARD

For the reasons stated in Mr. Domingo's position regarding sentencing, the Court should employ the sentencing entrapment standard announced in stash-house robbery cases.  *See* Dkt. 297 at 13-14, 17-20 (citing *United States v. Briggs*, 623 F.3d 724 (9th Cir. 2010) and *United States v. Yuman-Hernandez*, 712 F.3d 471 (9th Cir. 2013).)[1]  In opposition, the government states that because "the government did not have unfettered ability to inflate the crime by choosing the weapon *without defendant's knowledge*," the stash-house standard should not apply.  Dkt. 301 at 9, n. 2 (emphasis added).

---

[1] The defense maintains that Mr. Domingo would prevail under both the traditional sentencing entrapment standard, as well as the "stash-house" standard.

1    First, there is nothing in the stash-house cases that links a defendant's lack of

2    knowledge to the application of the "means" and "ambition" standard outlined in

3    *Briggs* and *Yuman-Hernandez* (or the application of the traditional sentencing

4    entrapment standard outlined in *United States v. Mejia*, 559 F.3d. 1113 (9th Cir. 2009).

5    To the contrary, the defendants in both *Briggs* and *Yuman-Hernandez* knew the precise

6    type and quantity of drugs that were supposedly located at the fake stash-house.  The

7    government's linkage of a defendant's knowledge to the inapplicability of the

8    sentencing entrapment standard is a red herring designed to distract the Court from an

9    issue the government cannot so easily avoid - its "virtually unfettered ability" to choose

10   the type of weapon to be used in an attack "and thereby obtain a greater sentence for

11   the defendant." *Briggs*, 623 F.3d at 729-30.[2]

12   The facts in this case are clear.  The CHS suggested the use of a bomb; Mr.

13   Domingo did not have a bomb; Mr. Domingo did not know how to make a bomb; the

14   CHS intimated that he knew someone who could make a bomb and brought the UCE

15   into the operation to pose as a bomb-maker; and law enforcement created the inert

16   bomb that's the subject of this case.  The government chose the weapon, made the

17   weapon, and gave the weapon at issue to Mr. Domingo.  As discussed in further detail

18   below, doing so permitted them to obtain a greater sentence for Mr. Domingo.

19   **A.    THE "LESSER" OFFENSES**

20   The government contends that Mr. Domingo was not subjected to sentencing

21   entrapment because had he attempted to murder people with firearms, he still would

22   have been subject to a statutory maximum sentence of life imprisonment.  In support of

23   its position, the government cites two Title 18 offenses - attempted murder based on

24   religion (18 U.S.C. § 249) and attempted murder of a federal employee (18 U.S.C. §

25   1114).  The government's assertions are wrong for three reasons.

26

27

28   _____

[2] Again, even in the traditional sentencing entrapment cases the defendants knew the quantity of drugs in which they were obtaining for purposes of distribution.

3

**1.      Prosecution Under 18 U.S.C. § 249 is Not Realistic.**

First, while it is true that an attempted murder under 18 U.S.C. § 249 has a statutory maximum penalty of life imprisonment, the elements of the offense (and prerequisites for prosecution) do not exist here.  Section 249 requires an attempted murder accompanied by one of the following circumstances:

(a) travel across state lines by the victim or defendant;

(b) travel by the victim or defendant using a channel, facility, or instrumentality of interstate commerce;

(c) the defendant's use of a channel, facility, or instrumentality of interstate commerce in connection with the attempted murder;

(c) the firearm or weapon employed in the attempted murder traveled in interstate commerce;

(d) the attempted murder interfered with interstate commerce that the victim as engaged in at the time of the attempt, or

(e) the attempted murder otherwise affected interstate commerce.

18 U.S.C. § 249(a)(2)(B).[3]  Simply put, there are too many elements beyond the

---

[3] Although both subsections (a)(1) and (a)(2) of Section 249 contain a prohibition on attempted murder based on a victim's actual or perceived religion, the additional jurisdictional elements apply only to subsection (a)(2) as that portion of the law was enacted pursuant to Congress' Commerce Clause authority while subsection (a)(1) was enacted pursuant to Congress' authority to eliminate the "badges and incidents of slavery" under the 13th Amendment.  *See United States v. Cannon*, 750 F.3d 492, 499 (5th Cir. 2014) (detailing the legislative history).

Whether subsection (a)(1) would apply to the hypothetical conduct outlined by the government (i.e., attacks on people based on perceived religion) turns on whether the perceived religion attacked was considered a "race" at the time of the 13th Amendment's enactment.  *See Id.* at 500, n. 5 (citing Congressional findings from the enactment of section 249, the Court noted that "in order to eliminate, to the extent possible, the badges, incidents, and relics of slavery, it is necessary to prohibit assaults on the basis of real or perceived religions or national origins, *at least to the extent such religions or national origins were regarded as races at the time of the adoption of the 13th, 14th, and 15th amendments to the Constitution of the United States*") (emphasis added).  Because determining whom Mr. Domingo would have attacked on a hypothetical day (e.g., Christian v. Jews v. other non-Muslims) and *why* he would have attacked them (e.g., because they were Americans, rather than based on religion specifically) is nearly impossible on this record, the defense will outline the additional elements in subsection (a)(2) - the portion enacted pursuant to the Commerce Clause authority.

4

attempted murder of someone based on their religion that have not been proven at this point in the litigation to sustain the government's argument that a section 249 prosecution would have been viable.

Further, even the government could show that one of the aforementioned additional elements did exist or that prosecution under section 249(a)(1) was appropriate, "No prosecution of any offense described in this subsection may be undertaken by the United States" unless the State does not have jurisdiction, the State requested the Federal Government assume jurisdiction, the verdict or sentence obtained pursuant to State charges left an unvindicated federal interest, or a prosecution by the United States was in the public interest and necessary to secure substantial justice. 18 U.S.C. § 249(b)(1). Again, these counterfactuals leave this Court with no information to determine whether a section 249 prosecution would be viable. The Court should reject the government's argument regarding section 249.

### 2.    18 U.S.C. § 1114 is a Lesser Offense.

Second, 18 U.S.C. § 1114 does not provide a viable comparison for the government either. A statutory maximum sentence of life imprisonment only exists under section 1114 if the offense is completed. But we have to compare apples to apples. If the government stopped Mr. Domingo from committing the instant offense (which involved a bomb), the Court must consider the defense's sentencing entrapment argument in the context of the government stopping Mr. Domingo from committing a violation of section 1114 (i.e., an attempt). And an attempted murder under Section 1114 has a statutory maximum penalty of *20 years imprisonment*, not life. *See* 18 U.S.C. § 1113. That is, Mr. Domingo *would not* have been subject to a life sentence had he been convicted of a violation of section 1114.[4] Hence, a section 1114 violation is a "lesser" offense when compared to the attempted use of a bomb.

---

[4] Additionally, an attempted murder under Sections 1113 and 1114 would yield a base offense level of 33 under guideline section 2A2.1, not 43 as described by the government. *Contra* Dkt. 301 at 10. This is because the conduct at issue would be an attempted first-degree murder, not a completed first-degree murder.

### 3.    California Firearms Violations are Lesser Offenses.

Third, the government misapprehends the defense's argument.  The defense's argument is that before Mr. Domingo even introduced the idea of attacking a rally, law enforcement was aware that Mr. Domingo was in possession of a firearm in violation of California law.  As a review of the timeline leading up to the April 19, 2019, meeting make clear, the government dragged this investigation out until it could prosecute Mr. Domingo for a bomb-related offense rather than a firearms offense.  In doing so, it increased the statutory maximum penalty.

**Timeline**:

- On March 18, 2021, Mr. Domingo told the CHS that he had a modified AK-47 and several magazines.
- On March 19, 2019, SA Michael Gee says that per ATF, Mr. Domingo's firearms are legal and that there is no avenue to approach based on ownership of the firearms alone.  *See* Exhibit C (Email from SA Gee).  SA Gee notes in his email to law enforcement that based on his discussions with other law enforcement officers, to justify a California Department of Justice firearms inspection, they would need evidence that Mr. Domingo's firearms are out of compliance.  He gives examples such as the firearm having a pistol grip or Mr. Domingo possessing high-capacity magazines.  *Id*.
- Importantly, on this same date - March 20, 2019, the UCE emails law enforcement and explains that Mr. Domingo did not yet have the ability to produce any explosives.  Exhibit D (UCE Email to Law Enforcement).
- On March 20, 2019, Mr. Domingo posts a photograph to Discord that displays his AK-47 and a high-capacity magazine.  He admits in the post that his weapon's configuration is illegal due to the modification to the stock.  *See* Exhibit E (LAPD Firearms Report by Detective James Edwards) (noting the firearm displayed on Discord and eventually recovered by law enforcement violated California Penal Code sections 30600(a) and 30605(a).
- On March 22, 2019, Mr. Domingo tells the CHS that he has 30-round magazines.
- On April 19, 2019, Mr. Domingo first raised the idea of attacking a rally in Long Beach and the CHS discusses obtaining information from a friend about making an IED.

Based on the aforementioned timeline, it is clear that LAPD and FBI had probable cause by March 20, 2019, to arrest Mr. Domingo for firearms violations.  This is nearly one month *before* Mr. Domingo came to the CHS's house and mentioned a

rally in Long Beach; nearly one month *before* Mr. Domingo asked for the CHS to get information about making an IED; and nearly one month *before* the bombing plot actually started to materialize. Possession of an assault weapon in violation of California Penal Code section 30605 is punishable by a term of imprisonment not exceeding one year, or by imprisonment for 16 months, two years, or three years.[5] The illegal manufacture of an assault weapon in violation of California Penal Code section 30600 is punishable by imprisonment for four, six, or eight years. That is, the maximum combined sentence for both offenses is eleven years - a far cry from the life sentence Mr. Domingo faces in the case at bar.

In light of the foregoing, it is clear that law enforcement put Mr. Domingo in the position to commit a "greater" offense rather than arresting him for the "lesser" offense he had already committed. Because law enforcement introduced a bomb into the investigation, Mr. Domingo now faces a statutory maximum sentence of life in prison. As such, Mr. Domingo was subject to sentencing entrapment and a downward variance or departure is appropriate.

## III. THE TERRORISM ADJUSTMENT

The government's criticism of the probation office's position vis-à-vis the terrorism adjustment echoes sentiments noted by courts that "terrorists, even those with no prior criminal behavior, are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." *United States v. Ressam*, 679 F.3d 1069, 1091 (9th Cir. 2012) (en banc). However, as the defense noted in its sentencing position, this conclusion is simply not supported by empirical evidence and should be rejected as such. In fact, the case cited by *Ressam* (and the government), *United States v. Meskini*, 319 F.3d 88, 92 (2nd Cir. 2003), instructs that notwithstanding the terrorism adjustment, "[a] judge determining that § 3A1.4(b) over-represents the seriousness of the defendant's past criminal conduct or the likelihood that

---

[5] Possession of an assault weapon is a "wobbler," meaning that it could be charged as a misdemeanor or as a felony, hence the differential sentencing options.

the defendant will commit other crimes always has the discretion under § 4A1.3 to depart downward in sentencing."

More critically, however, is that the government misapprehends the probation office's argument for *why* the terrorism adjustment should carry less weight than proposed by the advisory guidelines.  The probation office is not saying that terrorism-related attempted murders are *exactly the same* as non-terrorism related attempted murders.  Had this been the case, the probation office seemingly would have recommended the guideline sentence for attempted murder (i.e., 97-121 months) rather than a sentence that is nearly double the high-end of that prescribed by the guidelines at criminal history category I.  Rather, the probation office is saying that there is no rhyme or reason as to the dramatic increase that takes a defendant from what would be a 10-year guideline sentence for non-terrorism related attempted murder to a guideline sentence of life imprisonment for a terrorism-related offense.  The defense concurs with that sentiment, one that is rooted in an empirical basis and logical reasoning.

## IV.  CONCLUSION

Based on the foregoing, the Court should find that Mr. Domingo was subject to sentencing entrapment and reject the blind application of the terrorism adjustment.

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  October 27, 2021      By  */s/ DAVID I. WASSERMAN*
DAVID I. WASSERMAN
Deputy Federal Public Defender
Attorney for MARK DOMINGO